UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| CENTER FOR INDEPENDENCE OF THE DISABLED, NEW YORK, a nonprofit organization, BROOKLYN CENTER FOR INDEPENDENCE OF THE DISABLED, a nonprofit organization, BRONX INDEPENDENT LIVING SERVICES, a nonprofit organization, HARLEM INDEPENDENT LIVING CENTER, a nonprofit organization, DISABLED IN ACTION OF METROPOLITAN NEW YORK, a nonprofit organization, NEW YORK STATEWIDE SENIOR ACTION COUNCIL, a nonprofit organization, SASHA BLAIR-GOLDENSOHN, an individual, CHRIS PANGILINAN, an individual, and DUSTIN JONES, an individual, on behalf of themselves and all others similarly situated,<br><br>                    Plaintiffs,<br>-against-<br><br>METROPOLITAN TRANSPORTATION AUTHORITY, a public benefit corporation, VERONIQUE HAKIM, in her official capacity as interim executive director of the Metropolitan Transportation Authority, NEW YORK CITY TRANSIT AUTHORITY, a public benefit corporation, DARRYL C. IRICK, in his official capacity as acting president of the New York City Transit Authority, and THE CITY OF NEW YORK,<br><br>                    Defendants. | Case No. 1:17-cv-2990<br><br>**COMPLAINT** |

## **INTRODUCTION**

1.      This class-action lawsuit seeks to remedy the systemic, discriminatory exclusion

of hundreds of thousands of New Yorkers with mobility disabilities from New York City's ("the

City") subway system because the Metropolitan Transportation Authority ("MTA"), New York

City Transit Authority ("NYC Transit"), and the City of New York ("the City") (collectively, "Defendants") fail to maintain the already limited number of elevators in the subway system.

2.      Riders with mobility disabilities routinely face frequent elevator outages.  These often occur without notice and last as long as several months.

3.      In many cases, Defendants provide no warning of the outages in the form of signage or audio announcements.

4.      When elevator outages occur, Defendants provide no alternate accommodations to ensure that people that require elevator access can get to their destinations.

5.      The level of elevator accessibility in the New York City subway system is already abysmal.  Of all major cities in the United States, New York City has by far the lowest percentage of accessible subway service line stations.  Only 112 (24%) of the 472 subway service line stations in New York City are wheelchair-accessible.  Out of these 112 stations, only 100 are currently operable and offer elevator service in both directions, and an additional 2 are entirely at street level and are accessible without elevators, rendering the subway system only 22% fully accessible.  At any given time, this number is even lower due to frequent and regular elevator outages.  Publicly available outage data demonstrates that:

- There are an average of at least twenty-five elevator outages per day in the New York City subway system.

- Median outage time is approximately four hours, though many outages last for months at a time.

- The subway system does not provide trained personnel assigned to assist people with disabilities when outages occur.

- Outages are frequently not accompanied by signage describing alternate accommodations and/or accessible routes.

- Defendants do not provide alternate accommodations, such as station-to-station transportation, when elevator outages occur.

- Even when functioning, subway elevators are often unclean, odiferous, and littered with trash, urine, or feces.

6. The subway is a critical component of living in, working in, and visiting New York City. It is the largest and the most utilized metro system in the Western world, with daily ridership reaching up to nearly 6,000,000 people and the yearly number of rides totaling almost 1.8 billion. Indeed, commuters in the New York City metropolitan area have the highest rates of public transportation usage out of any metropolitan area in the United States.

7. Access to public transportation is particularly critical for people with mobility disabilities because many of them do not own cars and cannot rely on ridesharing systems, which have limited accessibility options.

8. Defendants routinely deny this critical service to hundreds of thousands of New Yorkers with mobility disabilities. Public data from the MTA demonstrates that over 9,019 elevator outages occurred during the one-year period ending on June 30, 2015. Over 4,100 of those outages were unscheduled—a predictable result of Defendants' failure to maintain and implement adequate preventative maintenance procedures.

9. Sasha Blair-Goldensohn is a software engineer in Manhattan and a wheelchair user. He repeatedly encounters subway outages forcing him to alter plans and miss appointments. On multiple occasions, Mr. Blair-Goldensohn has been trapped on an inaccessible platform during an unplanned elevator outage and has had to engage in the dangerous and humiliating act of asking strangers to carry him and his wheelchair up or down stairs.

10. Chris Pangilinan is a Brooklyn resident who uses a wheelchair. He uses the subway to commute to work in Manhattan. From November 24, 2014 to March 15, 2017, Mr. Pangilinan personally logged over 200 unplanned outages that forced him to either cancel or alter subway trips.

11.     Dustin Jones, a wheelchair user residing in the Bronx, likewise repeatedly encounters subway outages that make it virtually impossible for him to move about the City freely and independently.  Mr. Jones has also had to engage in the humiliating act of asking strangers to assist him in getting up or down stairs when he has been stranded without assistance during elevator outages.

12.     The experiences of Mr. Pangilinan, Mr. Blair-Goldensohn, and Mr. Jones are typical of New Yorkers with mobility disabilities who seek to use the subway.

13.     Organizational Plaintiffs the Center for the Independence of the Disabled, New York ("CIDNY"), the Brooklyn Center for the Independence of the Disabled ("BCID"), Bronx Independent Living Services ("BILS"), the Harlem Independent Living Center ("HILC"), Disabled In Action of Metropolitan New York ("DIA"), and the New York StateWide Senior Action Council ("StateWide") (collectively, "Plaintiffs") have thousands of constituents with mobility disabilities who face similar barriers on a routine basis throughout New York City.

14.     Defendants' failure to maintain the limited number of elevators they provide in the New York City subway system violates federal and local disability rights laws, including Title II of the Americans with Disabilities Act ("ADA"), Section 504 of the Rehabilitation Act of 1973, and the New York City Human Rights Law ("NYCHRL").  These laws prevent public transit providers from denying people with disabilities the benefits, services, accommodations, and facilities they provide to the non-disabled public.  They also specifically require that public transit providers maintain, in operative condition, the features of transit facilities that are required to make such facilities readily accessible to and usable by individuals with disabilities. These features include elevators.

15.    As Congress recognized in 1990, "transportation is the linchpin which enables people with disabilities to be integrated and mainstreamed into society."  *See* H.R. Rep. No. 485 (II), at 37, (1990), reprinted in 1990 U.S.C.C.A.N. 303, 319 (observing that testimony of Executive Director of President's Committee on Employment of People with Disabilities echoed the same: "inaccessible transportation has been identified as the major barrier, second only to discriminatory attitudes"); *accord*, H.R. Rep. No. 485 (IV), at 25, (1990), reprinted in 1990 U.S.C.C.A.N. 512, 514 ("[Transportation] is a veritable lifeline to the economic and social benefits that our Nation offers its citizens . . . For this reason, the National Council on Disability has declared that 'accessible transportation is a critical component of a national policy that promotes self-reliance and self-sufficiency of people with disabilities.'").

16.    Defendants' failure to competently maintain the elevators in operative and sanitary condition, provide adequate notice of elevator outages, and provide alternate accommodations during outages, hurts all New Yorkers and visitors to New York, including the elderly, people with suitcases or strollers, and those transporting heavy items.

17.    Plaintiffs attempted to resolve these issues prior to filing a lawsuit, requesting that Defendants commit to prepare and implement a remedial plan that would address their failure to adequately maintain subway elevators for people with mobility disabilities.  Defendants, who have known of these problems for years, failed to make such a commitment.

18.    Plaintiffs bring this lawsuit on behalf of themselves and all residents and visitors to New York City with mobility disabilities who use or seek to use the subway system.

## JURISDICTION AND VENUE

19.    This is an action for declaratory and injunctive relief, brought pursuant to the ADA, 42 U.S.C. § 12131 *et seq*.; Section 504 of the Rehabilitation Act of 1973 ("Section 504"),

29 U.S.C. § 794 *et seq.*; and the New York City Human Rights Law ("NYCHRL"), N.Y.C. Admin. Code § 8-101 *et seq.*

20.    This Court has subject matter jurisdiction over this action under 28 U.S.C. §§ 1331 and 1343 for claims arising under the ADA and Section 504, and supplemental jurisdiction over the NYCHRL claims pursuant to 28 U.S.C. § 1367.  Moreover, this Court has jurisdiction to issue a declaratory judgment pursuant to 28 U.S.C. §§ 2201 and 2202.

21.    Venue is proper in this Court, pursuant to 28 U.S.C. § 1391(b), because Defendants are located within this District.  Moreover, a substantial part of the events or omissions giving rise to the claims alleged herein occurred in this District.

## PARTIES

### A.    Plaintiffs

22.    Plaintiff CIDNY is an independent living center that serves people with disabilities throughout New York City.  Founded in 1978, CIDNY is a non-profit organization.  The majority of CIDNY's board members and two-thirds of CIDNY's staff are people with disabilities.  CIDNY serves approximately 22,800 people with disabilities, family members and partners of people with disabilities in New York City annually.

23.    CIDNY's mission is to ensure full integration, independence, and equal opportunity for all people with disabilities by removing barriers to the social, economic, cultural, and civic life of the community.  CIDNY's expert counselors help people develop individualized roadmaps to better their lives.  CIDNY helps people obtain health coverage and access to health care, transition from institutions to the community, improve access to healthy and affordable foods, obtain access to transportation, solve problems related to their transportation, housing, health care, and educational opportunities.  The inability of people with disabilities to safely use

public transportation in New York City impacts almost all of CIDNY's programs and impairs its mission.

24.     Since its inception, CIDNY has worked to provide people with disabilities a safe and accessible way to move freely around New York City.  For example, as far back as 1979, CIDNY was surveying trends in requests for service to identify the need New Yorkers had in accessing New York City's public transit services. In 1980, CIDNY lead the coalition of people requesting that MTA trains and buses be made accessible to people who use wheelchairs. In 1999, CIDNY helped negotiate a settlement of a federal lawsuit guaranteeing improvements to the Access-a-Ride program, which provided transportation for more than 40,000 people with disabilities in New York City. In 2004, CIDNY completed a survey of subway platform safety for people with visual disabilities and used the data in a media campaign to draw attention to the lack of appropriate platform edge markings. In 2005, CIDNY was a partner in the coalition that successfully advocated for the introduction of accessible taxi cabs into the fleet of yellow taxis and later contributed to the successful federal civil rights case brought to require additional accessible taxis in New York City. In 2014, CIDNY surveyed sidewalks and used the data to file suit against the City for failing to ensure curb cuts are compliant with the Americans with Disabilities Act.

25.     CIDNY's work on subway accessibility is a continuation of its longstanding commitment to make it possible for people with disabilities to travel independently and safely in New York City.

26.     CIDNY's constituents, staff, and volunteers with mobility disabilities or other disabilities affecting a person's ability to use stairs are presently being harmed by Defendants' failure to install elevators or vertical access throughout the subway system.

27.    CIDNY has also expended time and resources responding to complaints from constituents, staff, and volunteers with mobility disabilities or other disabilities affecting a person's ability to use stairs who are barred, limited, and deterred from use of the subway system.

28.    Defendants' failure to ensure the accessibility of their subway system to people with mobility disabilities or other disabilities affecting a person's ability to use stairs is thus an issue of urgent and immediate concern for CIDNY.

29.    Plaintiff BCID is a consumer-based, nonprofit independent living center that provides services and advocacy toward independent living for people with disabilities throughout the City.  The majority of BCID's board members and staff are people with disabilities, including mobility-related disabilities.

30.    Each year, BCID serves approximately 1,400 to 1,700 people with disabilities. Moreover, BCID also has approximately fifty support-group members and peer counselors; many have mobility disabilities that require the use of wheelchairs, walkers, scooters, or other assistive devices.

31.    BCID's mission is to ensure full integration, independence, and equal opportunity for all people with disabilities.  BCID strives to accomplish this goal by removing barriers to its disabled constituents' full and equal participation in the social, economic, cultural, and civic life of the community.  Safeguarding access to the public transportation program run by Defendants is a vital component of this mission, particularly given the impracticability of owning a car in a city like New York.

32.    Since its inception in the year 1956, BCID has worked to ensure that each program, service, or activity provided in the City is accessible for people with disabilities.

Among other things, BCID has advocated to remedy the inaccessibility of the City's police stations, sidewalks, and emergency shelters as well as the failures of the City's paratransit system.

33.     BCID's members, constituents, staff, and volunteers with mobility disabilities are presently being harmed by Defendants' failure to maintain its elevators at the limited number of subway stations that are accessible to people with mobility disabilities.

34.     BCID has also expended time and resources responding to complaints from constituents, staff, and volunteers with mobility disabilities regarding elevator outages.

35.     The continued inaccessibility of the subway system resulting from Defendants' failure to properly maintain stations' elevators is thus an issue of urgent and immediate concern for BCID.

36.     Plaintiff BILS, founded in 1983, is an independent living center and a consumer-based, nonprofit organization, providing services and advocacy for independent living for individuals with disabilities.  BILS' mission is to ensure full integration, independence, and equal opportunity for all people with disabilities by removing barriers to the social, economic, cultural, and civic life of the community.  Both BILS' board and staff are made up of a majority of people with disabilities.

37.     BILS is dedicated to guaranteeing the civil rights of people with disabilities. BILS seeks to improve the quality of life of Bronx residents with disabilities through programs that empower them to gain greater control of their lives and achieve full and equal integration into society, including through access to public transportation.  BILS accomplishes this goal through its services; its advocacy for systemic changes to remove physical, attitudinal, and communicational barriers to people with disabilities, and through its education and awareness

programs. BILS has done systemic advocacy on issues involving public transportation on behalf of its constituents with mobility disabilities.

38.    BILS' constituents, staff, and volunteers with mobility disabilities are presently being harmed by Defendants' failure to maintain its elevators at the limited number of subway stations that are accessible to people with mobility disabilities.

39.    BILS has also expended time and resources responding to complaints from constituents, staff, and volunteers with mobility disabilities regarding elevator outages.

40.    The continued inaccessibility of the subway system resulting from Defendants' failure to properly maintain stations' elevators is thus an issue of urgent and immediate concern for BILS.

41.    Plaintiff HILC is a consumer-based, nonprofit independent living center founded in 1990 to serve people with disabilities in the Greater Harlem area in Manhattan. The mission of HILC is to assist communities of people with disabilities in achieving optimal independence through culturally and linguistically appropriate services by advocating, educating, empowering, and being a community change catalyst.

42.    To further its mission, HILC provides an array of independent living services to people with disabilities to increase their ability to function independently within their community by providing them with information and skills.

43.    HILC provides a peer-based approach to services where people with disabilities frequently assist other disabled people. The majority of HILC's board members and staff are people with disabilities, including mobility-related disabilities.

44.     HILC's constituents, staff, volunteers, and board members with mobility disabilities are presently being harmed by Defendants' failure to maintain its elevators at the limited number of subway stations that are accessible to people with mobility disabilities.

45.     HILC has also expended time and resources responding to complaints from constituents, staff, and volunteers with mobility disabilities regarding elevator outages.

46.     The continued inaccessibility of the subway system resulting from Defendants' failure to properly maintain stations' elevators is thus an issue of urgent and immediate concern for HILC.

47.     Plaintiff DIA, founded in 1970, is a nonprofit civil rights membership organization committed to ending discrimination against people with all disabilities.  DIA has approximately 150 members who live and work in New York City.  DIA consists primarily of and is directed by people with disabilities.

48.     To achieve its mission, DIA works to eliminate the barriers that prevent people with disabilities from enjoying full equality in American society.  DIA seeks to empower people with disabilities to become assertive and fully involved in self-advocacy.  DIA promotes the ability of people with disabilities to live independently by mandating equal access to education, employment, entitlements, health care, housing, personal assistance services, public accommodations, telecommunications, and transportation.  DIA uses education and awareness, legislative advocacy, and public demonstrations to achieve these goals.

49.     DIA's members with mobility disabilities are presently being harmed by Defendants' failure to maintain its elevators at the limited number of subway stations that are accessible to people with mobility disabilities.

50.     DIA has also expended time and resources responding to complaints from members with mobility disabilities regarding elevator outages.

51.     The continued inaccessibility of the subway system resulting from Defendants' failure to properly maintain stations' elevators is thus an issue of urgent and immediate concern for DIA.

52.     Plaintiff StateWide is a grassroots membership organization of individual senior citizens and senior citizen clubs throughout New York State.  Founded in 1972, StateWide's mission is to achieve through united action the dignity, well-being, and security of all senior citizens of New York State.  StateWide has seven chapters throughout the state, including a New York City chapter.

53.     StateWide works to achieve its mission through trainings, educational workshops, legislative advocacy, direct consumer assistance, and monitoring programs and services for the elderly of New York State to ensure their full representation and participation.

54.     The New York City chapter of StateWide works with local leaders to promote planning that ensures seniors have the opportunity to age in place.  A critical component of ensuring livable communities for seniors, especially for seniors with mobility disabilities, is reliable access to elevators in the New York City subway system.  Thus, StateWide members with mobility disabilities are presently being harmed by Defendants' failure to maintain its elevators at the limited number of subway stations that are accessible to people with mobility disabilities.

55.     StateWide has also expended time and resources responding to complaints from members with mobility disabilities regarding elevator outages.

56.    The continued inaccessibility of the subway system resulting from Defendants' failure to properly maintain stations' elevators is thus an issue of urgent and immediate concern for StateWide.

57.    Plaintiff Sasha Blair-Goldensohn is a qualified person with a disability.  He uses a wheelchair for mobility and regularly uses the New York City subway system for commutes to work and a wide variety of activities and events.  Mr. Blair-Goldensohn has experienced and continues to experience harm due to Defendants' failure to maintain the limited number of elevators in their subway system in functional and usable condition.

58.    Plaintiff Chris Pangilinan is a qualified person with a disability.  He uses a wheelchair for mobility and regularly uses the New York City subway system for commutes to work and a wide variety of activities and events.  Mr. Pangilinan has experienced and continues to experience harm due to Defendants' failure to maintain the limited number of elevators in their subway system in functional and usable condition.

59.    Plaintiff Dustin Jones is a qualified person with a disability.  He serves on the Boards of Plaintiffs CIDNY and DIA.  He uses a wheelchair for mobility and regularly uses the New York City subway system for commutes to work and a wide variety of activities and events.  Mr. Jones has experienced and continues to experience harm due to Defendants' failure to maintain the limited number of elevators in their subway system in functional and usable condition.

**B.    <u>Defendants</u>**

60.    Defendant MTA is a public benefit corporation chartered by the New York State Legislature in 1965 under the Metropolitan Transportation Authority Act, N.Y. Pub. Auth. Law § 1260 *et seq.*  Accordingly, MTA qualifies as a "public entity" within the meaning of Title II of the ADA, as that term is defined under 42 U.S.C. § 12131(l) and 28 C.F.R. § 35.104.   MTA also

qualifies as a "government body or agency with the meaning of the NYCHRL. N.Y.C. Admin. Code § 8-102 (1).

61.    Defendant MTA is a recipient of federal financial assistance to operate its transportation program and services within the meaning of Section 504 of the Rehabilitation Act.

62.    MTA is the largest transportation network in North America, serving a population of 15.3 million people in the 5,000 square mile area covering New York City, Long Island, southeastern New York State, and Connecticut.  As of February 24, 2016, the MTA had an operating budget of $15.1 billion.

63.    Defendant Veronique Hakim, sued in her official capacity, is the Interim Executive Director of the MTA.

64.    Defendant NYC Transit is a public benefit corporation that operates as MTA's subsidiary pursuant to N.Y. Pub. Auth. Law § 1200 *et seq*.  Accordingly, NYC Transit qualifies as a "public entity" within the meaning of Title II of the ADA, as that term is defined under 42 U.S.C. § 12131(l) and 28 C.F.R. § 35.104.  NYC Transit also qualifies as a "government body or agency with the meaning of the NYCHRL. N.Y.C. Admin. Code § 8-102 (1).

65.    NYC Transit administers twenty-five subway service lines with 472 service line stations within Manhattan, the Bronx, Brooklyn, and Queens, as well as the Staten Island Railway and the New York City buses.  As of February 24, 2016, NYC Transit had an operating budget of $10.9 billion.

66.    Defendant Darryl C. Irick, sued in his official capacity, is the Acting President of NYC Transit.

67.    Defendant NYC Transit is a recipient of federal financial assistance to operate its transportation program and services within the meaning of Section 504 of the Rehabilitation Act.

14

68.     Defendant City of New York, as defined by the laws of the City of New York, is a government entity.  As such, Defendant qualifies as a "public entity" within the meaning of Title II of the ADA, as that term is defined under 42 U.S.C. § 12131(1) and 28 C.F.R. § 35.104.

69.     Defendant City of New York is a recipient of federal financial assistance to operate its transportation program and services within the meaning of Section 504 of the Rehabilitation Act.

70.     Defendant City of New York owns the New York City subway system.

## FACTUAL ALLEGATIONS

71.     Defendants own and operate the largest and most traveled subway system in the United States.  New York City's subway system covers an 846-mile long network of tracks throughout all five New York City boroughs and operates twenty-four hours a day, 365 days a year.

72.     On any given day, the subway system's ridership totals nearly 6 million; in any given year, the ridership exceeds 1.7 billion.

73.     Despite its status as the largest and most traveled subway system in the country, it lags far behind every other major urban rail system in accessibility for people with mobility disabilities such as wheelchair users.

74.     Almost 80% of the 472 subway service line stations in New York City do not provide elevator access for riders with mobility disabilities.

75.     In contrast, Boston, another old, densely populated, city on the East Coast, has now achieved station accessibility to the point that only 26% of stations are inaccessible. Moreover, Chicago has planned for and committed to making all of its stations accessible within the next twenty years.

15

76.     Nonetheless, the exclusion of people with disabilities caused by the low number of accessible subway stations in New York City is made worse by Defendants' failure to maintain the few elevators it does operate in functional condition.  Defendants' own data shows that 4,117 unplanned elevator outages occurred between July 1, 2014 and June 30, 2015 alone.  On average, more than 12% of elevators were out of service on any given day in this time period.

77.     Defendants' data show that elevator outages at its subway stations are lengthy as well as frequent.  In a system with only 112 accessible service line stations, there are approximately 25 elevator outages per day.

78.     Defendants' data shows that on 58 occasions between July 1, 2014 and June 30, 2015, outages due to repairs to subway elevators lasted at least 72 hours.  On 21 occasions, outages due to repairs lasted at least 120 hours.  The station with the lengthiest outages for the year, 161st Street-Yankee Stadium Station, which serves two subway service line stations, experienced a total of 321 outages spanning a total of 2,664 hours during that year.

79.     Elevator outages were particularly frequent in the stations that have the highest levels of ridership and often provide critical juncture points for the system.  For example, seven of the top ten stations with the highest level of ridership had the following numbers of elevator outages in the one-year period ending on June 30, 2015:

> A.  Times Square – 42nd Street Station had a total of 196 outages, lasting 1,183 hours and 22 minutes.
>
> B.  Grand Central – 42nd Street Station had a total of 275 outages, lasting 1,157 hours and 12 minutes.
>
> C.  34th Street – Herald Square Station had a total of 241 outages, lasting 1,231 hours and 31 minutes.

D.  14th Street – Union Square Station had a total of 108 outages, lasting 605 hours and 26 minutes.

E.  34th Street – Penn Station on the 8th Avenue Line had a total of 161 outages, lasting 864 hours and 25 minutes.

F.  59th Street Station – Columbus Circle had a total of 264 outages, lasting 1,632 hours.

G.  Fulton Street Station had a total of 347 outages lasting 1,683 hours and 38 minutes.

80.    Further, some outage statistics expressed herein are drawn from publicly reported data and are likely underreported. For instance, requested outage information provided by MTA for a one year period failed to include any reported outages at 16 stations with elevators, which is unlikely.

81.    The hardships riders with mobility disabilities face due to these frequent, unplanned, and lengthy outages are created and exacerbated by Defendants' failure to maintain and implement system-wide policies to (1) inform the public of elevator outages in a timely manner, (2) provide well-publicized information to riders with disabilities regarding alternate, accessible routes, (3) ensure that staff are adequately trained and available to assist riders with mobility disabilities during outages, and (4) provide appropriate emergency procedures when riders with disabilities are stranded during outages.

82.    Riders who use wheelchairs, scooters, or walkers and who rely on elevator access, such as Mr. Blair-Goldensohn, Mr. Pangilinan, Mr. Jones, and the members and constituents of the organizational Plaintiffs, routinely encounter elevator outages without any notice at all.  As a result, in some cases, they are trapped on platforms and cannot safely exit stations.  In some

17

cases, riders who use wheelchairs have had to rely on strangers to physically lift them up or down stairs in order to exit the station.

83.    MTA staff have either been unavailable, unwilling to assist, or not properly trained in assisting riders who use wheelchairs during outages.

84.    Riders who use wheelchairs, scooters, or walkers often receive no information from the MTA and NYC Transit about alternate accessible routes to use during elevator breakdowns.  MTA and NYC Transit do not provide such riders alternate transportation options during elevator outages, such as transport to the nearest accessible station with a functioning elevator.

85.    Even when subway elevators are in working order, Defendants' failure to maintain and implement proper inspection and cleaning procedures at subway elevators has limited their usability for riders with mobility disabilities.  Named Plaintiffs and members and constituents of the organizational Plaintiffs consistently encounter subway elevators that are strewn with trash or human waste.  These riders are faced with the disturbing choice of having to roll into waste or miss appointments or other obligations due to the delays caused by having to go to another station with an elevator in the hope that the elevator at that station may be cleaner.

86.    Other large, urban transit providers, such as the Massachusetts Bay Transit Authority ("MBTA"), which covers the Boston area, have successfully implemented elevator inspection, maintenance, and contingency procedures to reduce the numbers of elevator outages; provide notice of outages and announcements and signage indicating alternate accessible routes during outages; provide alternate forms of transportation to people with disabilities during elevator outages; and have implemented training for staff on assisting people with disabilities

18

during outages as well as improved procedures to ensure routine inspection and cleaning of elevators.

87.     Defendants have had and continue to have ample resources to maintain and implement such procedures, yet have failed to do so.  In the time period since Defendants' first capital program in 1982, they have spent $100 billion on improvements to the subway system and have a current revised capital budget of $29 billion.

88.     The combination of (1) having 360 New York subway service line stations that exclude people with disabilities because they have no elevator and (2) Defendants' failure to maintain those few elevators that do exist, as well as (3) Defendants' failure to alert riders to outages or provide alternate transportation, makes the subway system, as a practical matter, unusable as transportation for people with mobility disabilities.

89.     The harm to people with disabilities caused by Defendants' failure to maintain the limited number of elevators in the subway system is worsened by the fact that none of the City's alternate modes of transportation, including buses and paratransit services, offer meaningful, reliable substitutes for riders with mobility disabilities.

90.     The City's bus system is significantly slower than the subway, runs less frequently, and is more geographically limited.  Bus service is also subject to delays involving traffic and weather, including hazardous street conditions caused by snow and rain impeding traffic and accessible routes to bus stops.

91.     The City's paratransit service for people with disabilities, Access-A-Ride, is unreliable, subject to long delays and missed pickups.  It also requires up to twenty-four hours advance notice, and fails to provide riders with disabilities the freedom of rapid, convenient subway travel that is such a vital part of living in, working in, and visiting New York City.

92.     Defendants' exclusionary policies create social isolation and barriers to employment, education, civic, social, and cultural life for hundreds of thousands of New Yorkers and visitors to the City with disabilities.

93.     Defendants' exclusionary policies do not merely harm people with disabilities; they hurt everyone and create grave harm to the seniors, tourists, parents, working people, and others who benefit from safe, functioning, and clean elevators in the subway system.

## EXPERIENCES OF THE NAMED PLAINTIFFS

### A.      Mr. Blair-Goldensohn

94.     Plaintiff Sasha Blair-Goldensohn is a wheelchair user who attempts to rely on the subway to commute to and from work, travel to other transit centers, attend sporting events, and accomplish a number of daily tasks.

95.     Mr. Blair-Goldensohn generally prefers the subway to all other modes of transportation.  However, repeated out-of-service elevators have forced him to reroute his travel plans, delay his arrival times, or give up on traveling altogether on a number of occasions.  He has experienced outages lasting for months at a time, including at stations located at South Ferry & Cortlandt Street. He is likewise accustomed to encountering urine, feces, and trash when using subway elevators.

96.     On repeated occasions, Mr. Blair-Goldensohn has been stranded without elevator access during outages and has had to ask strangers to carry him and his wheelchair up or down stairs so that he could exit subway stations.  On each such occasion, MTA staff was either unable or unwilling to assist Mr. Blair-Goldensohn to exit the station safely.

97.     Mr. Blair-Goldensohn has particularly struggled with broken down elevators when commuting to and from work.  His commute route involves traveling from his home on the Upper West Side to his employer's office in Chelsea.  Because the closest accessible station to

20

Mr. Blair-Goldensohn's home is the 72nd Street Station on the 2/3 line, Mr. Blair-Goldensohn ordinarily takes the 2/3 line to the 59th Street-Columbus Circle station, then transfers to the A/C line to travel to the 14th Street-8th Avenue station.  He must use four elevators in total in the course of his commute.

98.    Whenever the 72nd Street station elevator is out of service, Mr. Blair-Goldensohn must detour to the nearest accessible station at 66th Street-Lincoln Center, lengthening his commute by half a mile.

99.    Upon arriving at the 14th Street-8th Avenue station, if either the mezzanine-level or the street level elevator is out of service, Mr. Blair-Goldensohn must travel to the West 4th Street Station and take a cab or travel by chair to his office.  This detour costs him extra money and extends his subway commute by 0.6 miles.

100.    Mr. Blair-Goldensohn's commute back is often even more arduous because the elevator on the front end of the platform at the 59th Street-Columbus Circle station is regularly out of service and unusable.  Mr. Blair-Goldensohn is frequently forced to travel all the way to the other end of the station, take an elevator to the mezzanine, ride another elevator to the street, travel across an intersection, and take an elevator from the street to the mezzanine of the Uptown 1 train.  This alternative route lacks signage, further extending the overall detour.  Moreover, he often has to purchase an additional fare to re-enter the gated area unless he is able to convince the station agent to let him enter.

101.    Mr. Blair-Goldensohn's commute back is also frequently complicated by elevator outages at the 72nd Street Station.  If the elevator there is out of service, Mr. Blair-Goldensohn is forced to exit at the 96th Street Station and travel an additional ten blocks in order to arrive back home.

B.    **Mr. Pangilinan**

102.    Mr. Pangilinan is a wheelchair user who attempts to rely on the subway system for a variety of purposes, including attending social and cultural events, visiting friends, and participating in work-related activities.  Mr. Pangilinan most frequently uses the subway to commute between his home in Downtown Brooklyn and his lower Manhattan office.

103.    When Mr. Pangilinan moved to the City, he searched for an apartment within walking distance of at least two wheelchair-accessible stations to ensure that he could access the subway if an elevator at one station was out of service.

104.    However, Mr. Pangilinan has consistently faced elevator outages, making his commute, trips to social engagements, and what would otherwise be routine aspects of life in New York City exceedingly difficult.  From November 24, 2014 to March 15, 2017, Mr. Pangilinan recorded over 200 elevator outages that forced him to either alter or cancel trips.

105.    When commuting to his office, Mr. Pangilinan typically travels on the 4/5 line from Borough Hall to Bowling Green.  Because the elevator at Borough Hall is broken about once a week, while the one at Bowling Green is out of service around once every two weeks, he frequently experiences obstacles that render the subway inaccessible to him.

106.    Moreover, because of the inaccessibility of the southbound 4/5 line at the Borough Hall station, he must take a detour each time he commutes back home.  In particular, he must take the 4/5 line from Bowling Green to Fulton Street, then transfer to the A/C line at Fulton Street and travel to Jay Street-MetroTech to arrive back home.  Even this alternative route is frequently rendered inaccessible by elevator outages at Fulton Street.

107.    Mr. Pangilinan has likewise struggled to use the 4/5/6 line at the 125th Street Station.  He visits the area regularly in order to work on a project at City College, but has frequently found the travel difficult due to frequent and unannounced elevator outages.  Despite

the fact that the elevators at the 125th Street 4/5/6 station were recently out of service for several months for repairs, elevator outages at that station persist, prolonging the inaccessibility of that station.

108.    Other stations with frequent elevator outages that Mr. Pangilinan has struggled with include the 34th Street-Herald Square Station, the 42nd Street-Grand Central Station, and the 34th Street-Penn Station.  Outages like these significantly aggravate Mr. Pangilinan's general struggles with gaps in accessible subway service.

**C.    Mr. Jones**

109.    Mr. Jones has regularly attempted to rely on the subway system, especially the Union Square station, to attend CIDNY board meetings, medical appointments at Beth Israel, and various social activities.  He has consistently found stations' elevators to be in exceedingly poor condition and has had to struggle to move around the City as a result.

110.    As just one example, on January 25, 2017, Mr. Jones encountered two broken elevators while traveling from his home in the Bronx to CIDNY's offices near Union Square for a meeting.  Because Union Square Station is inaccessible for the 4/5/6 lines, Mr. Jones was unable to take the 5 train directly from his home to the meeting.  Instead, he had to take the 2 train to Times Square-42nd Street, then transfer to a train on the N/Q/R/W line to go downtown.

111.    When Mr. Jones reached Union Square station, he discovered that the elevator from the platform to the mezzanine was broken and not usable.  In an attempt to get assistance, he located a subway worker to ask when the elevator would be back in service, only to be told that he should go to the next station and then turn around.  When he informed the worker that the next station on the line was not wheelchair-accessible and was therefore impossible for him to use, the worker responded with "what do you want me to do?" and turned his back, offering no assistance and leaving Mr. Jones feeling humiliated.

23

112.    Mr. Jones' only alternative in this situation was to take the downtown Q train to the next accessible station – which was not until Brooklyn – and then turn around and go back to 42nd Street, from where he could return to 14th Street by bus.  Because this alternative was extremely time-consuming, Mr. Jones could not utilize it without missing his meeting.  He was consequently forced to flag down a bystander to carry his wheelchair to the upstairs mezzanine elevator leading out into the street while he hopped up the stairs on his foot, feeling embarrassed.

113.    Further heightening his humiliation, he struggled to find a bystander who would help him until he finally stopped directly in front of someone and said: "Excuse me, sir, I'm not asking for money. I need your help."  Once he was at the top, other passengers again had to help him so that he could get back into his wheelchair.

114.    Mr. Jones' struggles did not end there.  Instead, he discovered upon reaching the elevator that it had broken down.  He reported the problem to the ticket agent and noted that it was the second broken elevator he had encountered in three minutes.  In response, the agent exasperatedly asked what he expected her to "do about it."  Mr. Jones found that her indifference and lack of interest in offering any kind of assistance further aggravated the sense of frustration and despair he was already feeling about the entire situation.

115.    To avoid being stranded in the mezzanine, Mr. Jones again had to ask strangers to carry his wheelchair up the stairs while he hopped on one foot.  All the while, not one of the nearby station employees showed any interest in the situation.

116.    This unpleasant experience mirrored an earlier incident that also took place at the 14th Street-Union Square station on or around January 4, 2017.  That day, Mr. Jones was traveling uptown to meet a friend at 14th Street and Second Avenue.  Once he realized the

mezzanine-to-street elevator was not working, he had to ask a bystander to help him get upstairs by carrying his wheelchair as he hopped on one foot.

117.    Mr. Jones has struggled at other subway stations as well.  For instance, between September 2016 and January 2017, Mr. Jones experienced four elevator outages at the 125th Street on the A/B/C/D line as he was traveling to Harlem to visit friends.

118.    One of these instances took place on January 21, 2017 when he went to the station to meet a friend with whom he planned to attend the Women's March.  He took the 4/5/6 line to arrive at the 125th Street station, then crossed town and met his friend above ground to jointly head to the Women's March using the A/B/C/D line.

119.    However, when he pressed the button to call the elevator, he discovered that it was not working properly.  He waited for twenty minutes until it arrived, and maintenance took it out of service once it transported his friend and him down to the mezzanine.  The maintenance team noted that this was the second time the 125th Street A/B/C/D elevator had broken down that week.

120.    Some additional elevator outage-related incidents include an October 2016 incident, during which Mr. Jones got trapped at the Grand Central station and required police assistance to get out onto the street, and a November 2016 incident, during which Mr. Jones could not get out of the Wall Street 4/5 station and had to instead travel back to Fulton Street, then walk several blocks back to attend his meeting at City Hall.

121.    Mr. Jones also is worried that, in case of an emergency, he might get trapped in a subway station.  He regularly avoids a number of stations because he is accustomed to their elevators being out and cannot rely on MTA to accurately post timely warnings.  Since few

stations have elevators to begin with, this poses significant additional burdens on Mr. Jones'

ability to rely on the subway system to get around the City in which he lives.

## CLASS ACTION ALLEGATIONS

122.     Pursuant to Rule 23(b)(2) of the Federal Rules of Civil Procedure, Plaintiffs bring

this action for injunctive and declaratory relief, on their own behalf and on behalf of all people

similarly situated.

123.     The class that Plaintiffs seek to represent consists of all people with mobility

disabilities who use, or seek to use, the City's subway system.  The claims asserted herein are

solely for injunctive and declaratory relief for the class; damage claims are not included in this

Complaint.

124.     The people in the class are so numerous that joinder of all such people is

impracticable.  The disposition of their claims in a class action is a benefit to the parties and to

the Court.  Indeed, data from the United States Census American Community Survey conducted

in 2014 indicates that more than 500,000 non-institutionalized New York City residents have a

mobility-related disability.  Hundreds of thousands of people with disabilities, moreover, visit

the City each year.

125.     Proposed class members share a well-defined community of interest with respect

to both questions of law and fact involved because they are all being denied, or will be denied,

access to the City's subway system due to frequent and continuous elevator outages.

126.     A common question of law and fact involves Plaintiffs' allegations that

Defendants have violated Title II of the ADA and Section 504 of the Rehabilitation Act by

failing to provide equal access to the City's subway system for people with mobility disabilities

through their failure to maintain the elevators in operative and sanitary condition, provide

adequate notice of elevator outages, and provide alternate accommodations during outages.

Common questions also include whether the disability-related provisions of the New York City Human Rights Law require elevator maintenance at subway stations, as well as what remedial scheme should be implemented to rectify the regular barriers to access.  Such common questions clearly predominate over any questions affecting individual class members.

127.    Plaintiffs are adequate class representatives because they, or the people they serve, are directly impacted by Defendants' failure to provide equal access to the City's subway system through proper elevator maintenance.  Moreover, Plaintiffs' claims are typical of the claims of the class as a whole because Plaintiffs and other class members are similarly affected by the Defendants' failure to provide equal access to the City's subway system for people with mobility disabilities through their failure to maintain the elevators in  operative and sanitary condition, provide adequate notice of elevator outages, and provide alternate accommodations during outages.

128.    Plaintiffs' interests are not antagonistic, or in conflict with, the interests of the class as a whole.  The attorneys representing the class are highly trained, duly qualified, and very experienced in representing plaintiffs in civil rights class actions for injunctive relief.

129.    By failing to ensure the accessibility of the subway system for people with mobility disabilities through proper maintenance and policies related to the stations' elevators, consistent with federal disability access laws, Defendants have acted and/or failed to act on grounds generally applicable to the class as a whole.  Accordingly, an award of appropriate final declaratory and injunctive relief with respect to the class as a whole is warranted in this case.

130.    References to Plaintiffs shall include each Plaintiff and each member of the class, unless otherwise indicated.

**FIRST CAUSE OF ACTION**
Violation of Title II of the Americans with Disabilities Act
42 U.S.C. § 12131, *et seq.*

131.    Plaintiffs re-allege and incorporate herein all previously alleged paragraphs in this Complaint.

132.    Title II of the ADA seeks to eradicate disability-based discrimination perpetrated by public entities.  In pertinent part, it provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."  42 U.S.C. § 12132.

133.    Public entities must provide their programs, services, and activities in such a way that each program, service, or activity, "when viewed in its entirety, is readily accessible to and useable by individuals with disabilities."  28 C.F.R. § 35.150; *see also* 28 C.F.R. §§ 35.149, 35.151.  This obligation is commonly referred to as the program access requirement.

134.    The obligation to provide program access expressly includes public transportation programs, services, and activities.  Under 42 U.S.C. § 12148, it is unlawful "for a public entity to fail to operate a designated public transportation program or activity" conducted in existing facilities so that, "when viewed in its entirety, the program or activity is readily accessible to and usable by individuals with disabilities."  42 U.S.C. § 12148; *see also* 49 C.F.R. § 37.61.

135.    Regulations promulgated pursuant to this provision clarify that the "readily accessible" standard encompasses maintaining accessible features at each existing facility in operable condition so that they can be readily used by people with disabilities.  This obligation entails promptly repairing accessibility features that are damaged and out of order, as well as taking reasonable steps to accommodate individuals with disabilities who would otherwise use

that feature, while such repairs are being made.  *See* 49 C.F.R. §§ 37.161(a)-(b) (providing that

"[p]ublic and private entities providing transportation services shall maintain in operative

condition those features of facilities . . .  that are required to make the . . . facilities readily

accessible to and usable by individuals with disabilities" and that "these features include, but are

not limited to elevators, signage, and systems to facilitate communication").  *Id.*

136.    At all times relevant to this action, Defendants have provided public

transportation services, programs, and activities, including owning and/or operating a fixed route

system of designated public transportation covered under 42 U.S.C. § 12148 and 49 C.F.R. §

37.61.  Accordingly, Defendants qualify as public entities within the meaning of Title II, *see* 42

U.S.C. § 12141(3), and are subject to each of the mandates articulated under 42 U.S.C. § 12132,

42 U.S.C. § 12148, and 49 C.F.R. § 37.61.

137.    Further, each of the organizational Plaintiffs has constituents and staff who are

qualified individuals with disabilities within the meaning of Title II of the ADA.  *See* 42 U.S.C.

§ 12131(2).

138.    Likewise, each of the individual Plaintiffs is a "qualified individual with a

disability" under the meaning of Title II of the ADA.  *See* 42 U.S.C. § 12131(2).

139.    Defendants have breached their duties towards the Plaintiffs as articulated under

each and every one of the provisions cited above.  In particular, Defendants have failed to ensure

that the services they provide at New York City subway stations are readily accessible and

usable by people with mobility disabilities by failing to maintain the elevators in the New York

City subway system in functional and useable condition and by failing to provide adequate notice

or alternate accommodations for people with mobility disabilities when outages occur.

140.    Defendants have also failed to maintain in operative condition those features of facilities, including elevators, that are required to make New York City subway stations readily accessible to and usable by individuals with disabilities in violation of 49 C.F.R. § 37.161.

141.    Defendants have further failed to address Plaintiffs' request to "make reasonable modifications in policies, practices, or procedures, when the modifications are necessary to avoid discrimination on the basis of disability, or provide program access to their services," as mandated by 49 C.F.R. § 37.5(i)(3) and 49 C.F.R. § 37.169.  *See* 49 C.F.R. § 37.5(i)(3); 49 C.F.R. § 37.169.  This failure has involved refusal to make reasonable modifications to Defendants' policies and practices regarding the maintenance of elevators and the provision of adequate alternate accommodations during elevator outages as necessary to avoid discrimination on the basis of disability or provide program access to their transportation services.

142.    As a direct and proximate result of Defendants' aforementioned acts and omissions, Plaintiffs have suffered, and continue to suffer, injuries for which they have no adequate remedy at law.  This ongoing discriminatory conduct warrants both declaratory and injunctive relief, as well as reasonable attorneys' fees, expert expenses, and costs incurred in bringing this action.  *See* 42 U.S.C. § 12133.

143.    WHEREFORE, Plaintiffs request relief as set forth below.

**SECOND CAUSE OF ACTION**
Violation of Section 504 of the Rehabilitation Act
29 U.S.C. § 794

144.    Plaintiffs re-allege and incorporate herein all previously alleged paragraphs in this Complaint.

145.    Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794, provides that "no otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability,

be excluded from the participation in, be denied the benefits of, or be subjected to discrimination

under any program or activity receiving federal financial assistance." 29 U.S.C. § 794.

146.    Implementing regulations further reinforce this mandate by requiring public

entities to institute policies and practices regarding the maintenance of crucial accessible

features.  *See* 49 C.F.R. §§ 27.7(b)(4)(i). 49 C.F.R. §§ 27.7(b)(4)(i)

147.    As recipients of federal funds that are used to operate its programs and services,

Defendants are obliged to comply with this mandate.  Further, each organizational and individual

Plaintiff has a disability that entitles them to the protections of 29 U.S.C. § 794 and its

implementing regulations.

148.    However, Defendants have continuously violated these protections by failing to

ensure that the subway stations are readily accessible to people with disabilities.  Those

violations have included continuous and systemic failures to ensure that stations' elevators are

maintained in operative, sanitary, and usable condition or provide adequate notice or alternate

accommodations during outages.

149.    Because of those omissions, people with mobility disabilities have been, and

continue to be, deprived of "an opportunity to participate in or benefit from" Defendants'

services on an equal basis with "people who are not disabled," in violation of 49 C.F.R. §

27.7(b)(1)(ii).  Indeed, given that the benefits or services available as the result of these

omissions are "not as effective in affording equal opportunity to obtain the same result or to gain

the same benefit" as the benefits and services available to people who are not disabled,

Defendants' conduct amounts to a provision of "different or separate aids, benefits, or services"

to the class of people with mobility disabilities.  *See* 49 C.F.R. §§ 27.7(b)(1)(iii)-(iv), (vii).

Accordingly, Defendants' conduct clearly limits disabled people's enjoyment of the "rights,

privileges, advantages, and opportunities enjoyed by others" who use New York City's subway system. *Id.*

150.    The resulting unequal access to the programs, services, and activities provided by Defendants constitutes disability-based discrimination in violation of 29 U.S.C. § 794, and 49 C.F.R. §§ 27.7(b)(4)(i).

151.    Defendants' conduct additionally violates implementing regulations that require recipients of federal funding to "make reasonable accommodations in policies, practices, or procedures when such accommodations are necessary to avoid discrimination on the basis of disability." 49 C.F.R. § 27.7(e).

152.    Defendants have violated this requirement in several ways, including by failing to modify their policies and practices regarding elevator maintenance. Their lack of compliance amounts to a violation of 49 C.F.R. § 27.7(e).

153.    Finally, Defendants' violations of 42 U.S.C. §§ 12146, 12147(b)(1), and § 12148, as described above, also constitute violations of 29 U.S.C. § 794.

154.    As a direct and proximate result of each of these acts and omissions, Plaintiffs have suffered, and continue to suffer, injuries for which they have no adequate remedy at law. Defendants' ongoing discriminatory conduct warrants both declaratory and injunctive relief, as well as reasonable attorneys' fees and costs incurred in bringing this action. *See* 29 U.S.C. § 794(a).

WHEREFORE, Plaintiffs request relief as set forth below.

### THIRD CAUSE OF ACTION
Violation of the New York City Human Rights Law
(N.Y.C. Admin. Code § 8-101 et seq.)

155.    Plaintiffs re-allege and incorporate herein all previously alleged paragraphs in this Complaint.

156.    The New York City Human Rights Law provides that "[i]t shall be an unlawful discriminatory practice for any person, being the owner, lessee, proprietor, manager, superintendent, agent or employee of any place or provider of public accommodation because of the actual or perceived . . . disability . . . status of any person directly or indirectly, to refuse, withhold from or deny to such person any of the accommodations, advantages, facilities or privileges thereof . . . ." N.Y.C. Admin. Code § 8-107(4)(a). Persons include all "natural persons, proprietorship, partnerships, associations, group associations, organizations, governmental bodies or agencies, corporations [and] legal representatives . . ." N.Y.C. Admin. Code § 8-102(1).

157.    Further, the term "place or provider of public accommodation" encompasses "providers, whether licensed or unlicensed, of goods, services, facilities, accommodations, advantages or privileges of any kind, and places whether licensed or unlicensed, where goods, services, facilities, accommodations, advantages or privileges of any kind are extended, offered, sold or otherwise made available." N.Y.C. Admin. Code § 8-102(9).

158.    Public transportation services clearly constitute a service, accommodation, advantage, or privilege that is offered to the general public within the meaning of N.Y.C. Admin. Code § 8-102(9). Defendants MTA and New York City Transit act as "managers" of this system in their role as a public benefits corporation created by the City. Further, the City is the owner of

the subway system.  Accordingly, Defendants are plainly "persons" within N.Y.C. Admin. Code § 8-102(1).

159.    Because frequent and continuous elevator outages, poor maintenance and inspection of elevators, and lack of notice or alternative accommodations during outages render the subway system inaccessible to people with mobility disabilities, Defendants, in their role as the system's managers, violate § 8-107(4)(a) by denying to people with mobility disabilities access to a service, accommodation, privilege, or advantage that is otherwise available to the general public.

160.    In addition, Defendants violate N.Y.C. Admin. Code § 8-107(15).  This provision mandates that covered entities must "make reasonable accommodation to enable a person with a disability to . . . enjoy the right or rights in question, provided that the disability is known or should have been known by the covered entity."  N.Y.C. Admin. Code § 8-107(15).  Because this provision applies to all entities that must comply with N.Y.C. Admin Code § 8-107, Defendants are bound by it.

161.    The functionality of elevators at each and every station is vital to enable people with mobility disabilities to access the system on equal terms with the general public.  Moreover, Defendants are aware, or should be aware, that people with mobility disabilities constitute a portion of the population wishing to use the City's subway system.  Defendants' failure to ensure elevators' functionality is thus a violation of the § 8-107(15) reasonable accommodation mandate.

162.    Defendants' conduct also violates N.Y.C. Admin. Code § 8-107 (17), which states that "an unlawful discriminatory practice . . . is established . . . [when plaintiff] demonstrates that a  policy or practice of a covered entity or a group of policies or practices of a covered entity

34

results in a disparate impact to the detriment of any group protected by the provisions of this chapter."

163.    Defendants' violation of this section is evident from their systemic failure to ensure elevators' functionality and thereby meaningful access to the subway program in its entirety for people with mobility disabilities.  By failing to operate this program so that it is readily accessible and usable by people with mobility disabilities when viewed in its entirety, Defendants have demonstrated a policy or practice that has a disproportionately negative impact on people with mobility disabilities, a group that is protected under the provisions of the NYCHRL.

164.    These violations are particularly grave in light of the "uniquely remedial" purpose behind the NYCHRL.  The construction provision of this law expressly provides that each section must be "construed liberally for the accomplishment of the uniquely broad and remedial purposes thereof, regardless of whether federal or New York State civil and human rights laws, including those laws with provisions comparably-worded to provisions of this title, have been so construed."  N.Y.C. Admin. Code § 8-130.  Accordingly, Defendants' conduct is subject to a much stricter standard than under state or federal law, and its liability under these provisions must be determined separately and independently from its liability under the disability provisions of either state or federal civil rights law.

165.    As a direct and proximate result of Defendants' violations of the NYCHRL, Plaintiffs have been injured as set forth herein.

166.    Defendants' conduct constitutes an ongoing and continuous violation of the NYCHRL.  Unless Defendants are enjoined from further violations, Plaintiffs will continue to suffer injuries for which there is no adequate remedy at law.  In particular, Plaintiffs will suffer

35

irreparable harm in that they will continue to be discriminated against and denied the accommodations, advantages, facilities, or privileges of the subway program as a whole, as well as reasonable accommodations that would provide them the opportunity to benefit from it. Plaintiffs are accordingly entitled to injunctive relief and reasonable attorneys' fees and costs.

Wherefore, Plaintiffs pray for relief as set forth below.

## FOURTH CAUSE OF ACTION
Declaratory Relief

167.    Plaintiffs re-allege and incorporate herein all previously alleged paragraphs in this Complaint.

168.    Plaintiffs contend that Defendants have failed and are failing to comply with applicable laws prohibiting discrimination against people with mobility disabilities in violation of Title II of the ADA, 42 U.S.C. § 12131 *et seq*.; Section 504 of the Rehabilitation Act, 29 U.S.C. § 794; and the NYCHRL, N.Y.C. Admin. Code § 8-101 *et seq*.

169.    Defendants disagree with Plaintiffs' contention.

170.    A judicial declaration is necessary and appropriate at this time in order that each of the parties may know their respective rights and duties and act accordingly.

Wherefore, Plaintiffs pray for relief as set forth below.

## PRAYER FOR RELIEF

Wherefore, Plaintiffs, on their own behalf and on behalf of the class, pray for the following relief against Defendants:

171.    That this matter be certified as a class action with the class defined as set forth above, that Plaintiffs be appointed class representatives, and their attorneys be appointed class counsel;

172.    For an order and judgment enjoining Defendants from violating the Title II of the

ADA, 42 U.S.C. § 12131 *et seq.*; Section 504 of the Rehabilitation Act, 29 U.S.C. § 794,  and the

NYCHRL, N.Y.C. Admin. Code § 8-101 *et seq.*;

173.    For an order and judgment declaring that Defendants' acts and omissions as

challenged herein are unlawful;

174.    For an order requiring Defendants to institute system-wide policies and practices

necessary to ensure the subway system elevators regularly operate in a useable and sanitary

condition, and provide adequate notice and alternative accommodations when outages occur, all

as necessary to ensure that the subway system as a whole is readily accessible to people with

mobility disabilities;

175.    For an award of Plaintiffs' reasonable attorneys' fees and costs; and

176.    For such other relief that the Court may deem just and proper.


Dated:  April 25, 2017                      Respectfully submitted,
        New York, New York

                                            _____

                                            Michelle Caiola (MC2110)
                                            Rebecca Rodgers (RR1349)
                                            DISABILITY RIGHTS ADVOCATES
                                            675 Third Avenue, Suite 2216
                                            New York, NY 10017
                                            Tel:  (212) 644-8644
                                            Fax:  (212) 644-8636
                                            mcaiola@dralegal.org
                                            rrodgers@dralegal.org

                                            Jelena Kolic (JK1985)
                                            DISABILITY RIGHTS ADVOCATES
                                            10 South LaSalle Street, 18th Floor
                                            Chicago, IL 60613
                                            Tel:  (312) 559-4660

Fax:  (212) 644-8636
jkolic@dralegal.org

Sidney Wolinsky (CA Bar No. 33716) *
Stuart Seaborn (CA Bar No. 198590) *
DISABILITY RIGHTS ADVOCATES
2001 Center Street, 4th Floor
Berkeley, CA 94704
Tel: (510) 665-8644
Fax: (510) 665-8511

Daniel Brown
SHEPPARD MULLIN RICHTER & HAMPTON LLP
30 Rockefeller Plaza
New York, NY 10112
Tel: (212) 653-8700
Fax: (212) 653-8701

*Attorneys for Plaintiffs*

* motions for *pro hac vice* admission to be filed