UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

CENTER FOR INDEPENDENCE OF THE
DISABLED, NEW YORK, a nonprofit
organization, BROOKLYN CENTER FOR
INDEPENDENCE OF THE DISABLED, a
nonprofit organization, BRONX
INDEPENDENT LIVING SERVICES, a
nonprofit organization, HARLEM
INDEPENDENT LIVING CENTER, a
nonprofit organization, DISABLED IN
ACTION OF METROPOLITAN NEW
YORK, a nonprofit organization, NEW
YORK STATEWIDE SENIOR ACTION
COUNCIL, a nonprofit organization,
SASHA BLAIR-GOLDENSOHN, an
individual, CHRIS PANGILINAN, an
individual, and DUSTIN JONES, an
individual, on behalf of themselves and all
others similarly situated,

17 Civ. 2990 (GBD)

**TRANSIT DEFENDANTS'
MEMORANDUM OF LAW IN
SUPPORT OF THEIR MOTION
FOR SUMMARY JUDGMENT**

Plaintiffs,

-against-

METROPOLITAN TRANSPORTATION
AUTHORITY, a public benefit corporation,
VERONIQUE HAKIM, in her official
capacity as interim executive director of the
Metropolitan Transportation Authority, NEW
YORK CITY TRANSIT AUTHORITY, a
public benefit corporation, DARRYL C.
IRICK, in his official capacity as acting
president of the New York City Transit
Authority, and THE CITY OF NEW YORK,

Defendants.

**Table of Contents**

Table of Contents ............................................................................................................... i

Table of Authorities .......................................................................................................... ii

I.    PRELIMINARY STATEMENT .................................................................................... 1

II.    FACTUAL BACKGROUND ........................................................................................ 2

      A.  New York City's Transportation System ........................................................ 2

      B.  NYCT's Elevator and Escalator Maintenance Department ........................... 3

           *i.*   *The Equipment* ................................................................................ 3

           *ii.*  *E&E's Maintenance and Repair Protocol* ..................................... 4

           *iii.*  *Recent Changes in E&E* .................................................................. 4

      C.  Elevator Performance ....................................................................................... 5

      D.  How NYCT Handles Elevator Outages ........................................................... 7

           *i.*   *Unanticipated Outages* ................................................................... 7

           *i.*   *Outage Notifications to Customers* ................................................ 8

           *i.*   *Anticipated Outages* ....................................................................... 9

      E.  Options for Customers When There Are Elevator Outages ........................... 10

      F.  NYCT's Dedication to the Station Environment ............................................ 11

III.  SUMMARY JUDGMENT STANDARD ....................................................................... 11

IV.  ARGUMENT ................................................................................................................ 12

      A.  Statutory and Regulatory Framework ............................................................. 12

      B.  NYCT Is In Compliance With the ADA and its Regulations ......................... 15

      C.  The Program or Activity Provided by New York City Transit is Compliant with the ADA *as a Whole* ..................................................................... 18

      D.  "Operative Condition" and Alternative Means of Travel ............................... 19

      E.  NYCT Appropriately Cleans Its Elevators ..................................................... 22

      F.  The New York City Human Rights Law Does Not Apply to NYCT .............. 23

      G.  Defendants Are In Compliance With the NYCHRL ...................................... 24

V.    CONCLUSION ............................................................................................................ 25

## **Table of Authorities**

**Cases**

*Anderson v. Liberty Lobby, Inc.*,
  477 U.S. 242 (1986) ................................................................................................ 11

*Brooklyn Ctr. for Indep. of the Disabled v. Bloomberg*,
  980 F. Supp. 2d 588 (S.D.N.Y. 2013) ..................................................................... 15

*CBS Outdoor, Inc. v. City of New York*,
  50 Misc. 3d 283 (Sup. Ct. N.Y. Cnty. 2015) .......................................................... 24

*Daubert v. Lindsay Unified Sch. Dist.*,
  760 F.3d 982 (9th Cir. 2014) ................................................................................... 19

*DiCarlo v. Walgreens Boot All., Inc.*,
  No. 15-CV-2919(JPO), 2016 WL 482982 (S.D.N.Y. Feb. 5, 2016) ....................... 15

*Disabled in Action v. Bd. of Elections.*
  752 F.3d 189 (2d Cir. 2014) .................................................................................... 12

*Foley v. City of Lafayette*,
  359 F.3d 925 (7th Cir. 2004) ................................................................................... 20

*Gonzalez v. Wright*,
  665 F. Supp. 2d 334 (S.D.N.Y. 2009) ..................................................................... 11

*Greer v. Richardson Indep. Sch. Dist.*,
  472 F. App'x 287 (5th Cir. 2012) ............................................................................ 19

*Henrietta D. v. Bloomberg*,
  331 F.3d 261 (2d Cir. 2003) .................................................................................... 12

*Kirola v. City & Cnty. of San Francisco*,
  860 F.3d 1164 (9th Cir. 2017) ........................................................................... 18, 19

*Lowell v. Lyft, Inc.*,
  352 F. Supp. 3d 248 (S.D.N.Y. 2018) ................................................................ 24, 25

*Martin v. Metropolitan Atlanta Rapid Transit Authority*,
  225 F. Supp. 2d 1362 (N.D. Ga. 2002) ................................................................... 21

*Martinelli v. Bridgeport Roman Catholic Diocesan Corp.*,
  196 F.3d 409, 428 .................................................................................................... 11

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
  475 U.S. 574 (1986) ................................................................................................ 11

*Parker v. Universidad de P.R.*,
    225 F.3d 1 (1st Cir. 2000) ............................................................. 19

*People v. Metro-North Commuter R.R. Co.*,
    132 Misc. 2d 1072 (Crim. Ct. Bronx Cnty. 1986) ............................... 24

*Stewart v. New York City Transit Auth., No. 03 Civ. 10329*
    (RWS), 2007 WL 656993 (S.D.N.Y Feb, 27. 2007) ............................ 16

*Williams v. Chicago Transit Auth., No. 16 C 9072*,
    2017 WL 4467456 (N.D. Ill. Sept. 30 2017) ...................................... 21

*Williams v. N.Y.C. Hous. Auth.*,
    872 N.Y.S.2d (1st Dep't 2009) ........................................................ 15

## **Statutes**

29 U.S.C. § 794 ................................................................................ 12

42 U.S.C. § 12132 ............................................................................. 12

42 U.S.C. § 12134 ............................................................................. 13

42 U.S.C. § 12141 ............................................................................. 13

42 U.S.C. § 12148 ........................................................................ 12, 18

42 U.S.C. § 12149 ............................................................................. 12

N.Y.C. Admin. Code § 8-107 ............................................................. 15

N.Y. Public Authorities Law § 1202(1) ............................................... 19

N.Y. Public Authorities Law § 1204(15) ............................................. 23

N.Y. Public Authorities Law § 1261 ................................................... 23

N.Y. Public Authorities Law § 1266 ................................................... 23

## **Rules**

Federal Rule of Evidence 702 .............................................................. 1

## **Regulations**

28 C.F.R. § 35 ........................................................................ *passim.*

49 C.F.R. § 27.7 ............................................................................. 14

49 C.F.R. § 37 ....................................................................... *passim.*

## I.      PRELIMINARY STATEMENT

Plaintiffs, five non-profit disability rights organizations and four individuals, brought this class action suit claiming that elevators in the New York City subway system are too often out of service (or "unavailable") and that this violates their rights under the Americans with Disabilities Act ("ADA"), the Rehabilitation Act of 1973 ("Rehab Act") and the New York City Human Rights Law ("NYCHRL").  Defendants are the Metropolitan Transportation Authority ("MTA") and the New York City Transit Authority ("NYCT'), the operator of the subway system. Plaintiffs also name Veronique Hakim, former interim director of the MTA, and Darryl C. Irick, former acting president of NYCT, both in their official capacities.[1]

In any case, the indisputable evidence shows that NYCT's subway elevators on the ADA "path of travel" are in service 96.5% of the time, and 97% of the time during the 6 a.m. to 10 p.m. timeframe.  While there are occasional elevator outages, NYCT's subway elevators are operable almost all of the time.  Moreover, the ADA and its implementing regulations explicitly acknowledge that elevators will be out of service from time to time.  Accordingly, the law focuses on the need for prompt repair and alternative means of travel in the event that access is impeded due to an elevator breakdown.  NYCT has a robust elevator maintenance department that makes prompt repairs and has procedures for maintaining and repairing the elevators in the system. Additionally, to mitigate the impact of elevator outages, NYCT notifies passengers (in advance, where possible) of elevator outages by email and text message, signs posted in stations, and other methods.  Moreover, within NYCT's extensive transportation network, there are ample alternative means of travel in the event of an elevator outage, including alternative subway routes and a bus system, which is designed to cover – and exceed – the scope of the subway system.

---

[1] Plaintiffs also sued the City of New York, which was dismissed without prejudice.  (Docket No. 53)

Plaintiffs are unable to meet their burden of proof in this case.  While they offer up a dubious metric relating to the availability of NYCT's elevators through their own "expert"[2], they completely fail to establish that there is an elevator availability percentage that is required by the ADA, its implementing regulations, or any other law; nor have they provided any evidence of an industry standard for elevator availability in a public mass transit system.  They have not produced expert testimony that elucidates the required level of elevator availability that the MTA fails to meet.  They simply toss out a statistic that is not tethered to any legal standard.

Plaintiffs also claim that the elevators are sometimes allowed to become dirty or smelly to a point at which they violate the ADA.  NYCT has in place an extensive elevator cleaning program.  Again, Plaintiffs provide no metric by which their claim can be measured under the ADA or Rehab Act; nor have they provided any evidence of an industry standard for elevator cleanliness that they say NYCT has failed to meet.

Finally, Plaintiffs' New York City Human Rights Law claim fails for the same reasons described above, and regardless, the NYCHRL does not apply to NYCT.

## II.     FACTUAL BACKGROUND

### A.  New York City's Transportation System

Originally opened in 1904, the New York City subway system is extensive.  It operates 24 hours per day, 7 days per week.  It is one of the busiest rapid transit networks in the world, handling over 7.7 million rides on an average weekday on its buses and subways, and over 2.3 billion rides each year.  The subway network covers 665 miles of track, served by 472 stations.  98 of those stations are ADA accessible, and another 15 provide accessible transfer

---

[2] Defendants simultaneously move to preclude this expert, David Rishel. *See Defendants' Motion Pursuant to Rule 702 of the Federal Rules of Evidence.*

points. NYCT's bus fleet is entirely accessible, and the bus network goes everywhere the subway goes and more. (56.1 ¶¶ 1-4.)

## B.  NYCT's Elevator and Escalator Maintenance Department

NYCT's elevators are maintained (with some exceptions) by the Elevator and Escalator Maintenance Department ("E&E").   E&E is divided into Operations Support and Field Operations.  (56.1 ¶ 5.)  The Field Operations unit's 218 elevator and escalator Maintainers, 40 Helpers, and 36 Apprentices are responsible for maintenance and repair of elevators and ancillary equipment across the subway system. (56.1 ¶ 7.)  The E&E Division is staffed 24 hours per day, seven days per week, 365 days a year. (56.1 ¶ 8.)

### i.   The Equipment

E&E is responsible for 235 "ADA Elevators," meaning that they are on an accessible route of travel and can be used by individuals who use a wheelchair. (56.1 ¶ 9.)   The Subway system is also served by 53 elevators which were not built by NYCT and are neither owned nor maintained by NYCT, 37 of which are on the ADA path of travel. (56.1 ¶¶ 10, 11.)   Third-party entities are required to maintain these elevators for customer use under contractual agreements with either NYCT or the MTA.  (56.1 ¶ 11.)   All NYCT-maintained ADA Elevators are equipped with a remote monitoring system called Lift-Net that provides data to a control center (the Control Desk) regarding the operational status of the elevator, as well as diagnostic messages such as, for example, a problem with doors.  (56.1 ¶ 30.)

E&E uses a database known as the Elevator and Escalator Reporting and Maintenance System or "EERMS" to collect information about the elevators. Information enters EERMS through both LiftNet and by employees at the Control Desk, who receive information from station personnel and customers about the elevators maintained by NYCT as well as those that

3

are privately owned. EERMS records, among other things, the time of notification of the need for service, the source of the notification, the cause of an elevator outage, the response time following notification, and the date and time of return to service.  (56.1 ¶¶ 13-15.)

### ii.      E&E's Maintenance and Repair Protocol

As with any piece of complex machinery, elevators must be maintained periodically. NYCT has a preventative maintenance protocol for all of its elevators, which is outlined in the E&E Maintenance and Inspection Procedures and Checklists (hereinafter the "E&E Manual"). The E&E Manual provides step by step instructions of how preventative maintenance should be completed, and states that preventive maintenance of revenue elevators is carried out in three different cycles of four weeks, six weeks and eight weeks, depending on the condition, usage and performance history of the equipment.  (56.1 ¶¶ 16-17.)

### iii.      Recent Changes in E&E

In October 2018, NYCT instituted new elevator maintenance protocols.  Each elevator is scheduled for preventative maintenance at least twelve times per year, requiring that each be removed from service for approximately five hours each time.  Therefore, even without a single elevator breakdown, they could never be available more than 99.2% of the time.  (56.1 ¶ 19.)

NYCT has also made other changes to improve E&E processes in the past few years: E&E Supervisors are conducting site checks in the field with greater frequency, to ensure maintenance and repair work is done timely, and correctly.  (56.1 ¶ 20.)  E&E has instituted an apprenticeship program and an "E&E Specialist" title to retain more qualified maintenance employees.  (56.1 ¶ 21.)  NYCT has also worked with the elevator maintainer's labor union and negotiated wage increases to make the position more appealing and competitive with similar private sector jobs. (56.1 ¶ 22.)   E&E has issued new tool bags to Maintainers to ensure that at

4

all times they have all equipment necessary to complete repairs in a timely manner rather than needing to leave the station to get the necessary tools before making the repair. (56.1 ¶ 23.) The department has also placed cleaning supplies in elevator machine rooms at each station, to enable elevators to be returned to service more quickly. (56.1 ¶ 24.) NYCT has also enhanced training provided to elevator Maintainers. (56.1 ¶ 25.)

E&E is also piloting a device that monitors the movement of elevators at 59th Street – Columbus Circle. If the elevator does not move for a pre-set period, an email notification will be sent to the Control Desk. This technology also tracks elevator usage data, which can be used to inform decision-making preventative maintenance and component replacement. A further roll-out has been approved to monitor both NYCT and third-party owned elevators. (56.1 ¶ 26.)

NYCT is also augmenting its ability to service the elevators by entering into contracts with outside elevator maintenance contractors. Contractors are currently engaged in maintaining and repairing elevators at subway stations in Washington Heights, and in the new Second Avenue Subway stations. NYCT has also awarded a contract to an outside firm to perform targeted repairs on elevators throughout the system. By contracting out specific elevators and specific targeted repairs, NYCT's internal E&E workforce has more time and resources to spend performing maintenance and responding to unexpected outages. (56.1 ¶ 27-29.)

**C. <u>Elevator Performance</u>**

NYCT's expert statistician, Alan Salzberg, analyzed the data kept in the EERMS database. His findings as to elevator availability are summarized as follows:

For the period January 1, 2014, through June 30, 2018, the median weekday availability for all ADA Elevators was 98.7%. This availability figure is higher than the median figure on a 24/7 basis (98.0%) because planned preventive maintenance and inspections almost always occur

late at night or on weekends.  The mean figures for weekdays and on a 24/7 basis for this period are 97% and 96.5% respectively.  (56.1 ¶¶ 30-32.)

Dr. Salzberg also calculated the availability of each accessible subway stop. A subway stop refers to a stop on a particular platform within a station in a particular direction.  A stop may be for one particular line or more than one line or for express or local service only. Thus, a station may consist of multiple stops.  In the aggregate, median 24-hour stop availability between January 2014 and June 2018 was 96.4%. When considering only the weekday hours of 6:00 a.m. to 10:00 p.m., median stop availability rises to 97.5%.  (56.1 ¶¶ 33-34.)

Finally, when looking at whether a person who requires an elevator can use a station, Dr. Salzberg calculated station availability. He found that median 24-hour station availability for the 2014 through June 30, 2018 period was 98.5% and when considering only the weekday hours of 6:00 a.m. to 10:00 p.m., station availability increases to 99.2%. (56.1 ¶¶ 35-36.)

Dr. Salzberg calculated the frequency with which a hypothetical disabled subway commuter would encounter an interrupted trip, using the (incorrect) assumptions in Plaintiffs' expert Dr. Andrew Schwarz's report. Dr. Salzberg found that because there are often alternative itineraries available when a station stop is unavailable due to an outage – a fact Dr. Schwarz overlooked – the probability of having an intended trip interrupted on a round trip basis due to an elevator outage in the Schwarz commutation scenario would be once every seven to eight weeks. (56.1 ¶¶ 37-38.)   Using Plaintiffs' expert's data, Dr. Salzberg calculated that the typical delay encountered as a result of a commuter's having to resort to an alternative itinerary would be about 10 minutes. (56.1 ¶ 39.)

6

**D.** **How NYCT Handles Elevator Outages**

NYCT strives to provide elevator outage information as close to real-time as possible, across as many different communication platforms as possible. Before beginning a trip, customers may check elevator status on the MTA website and in the "MYmta" smartphone app. (56.1 ¶ 40.) Customers may also sign up to receive customizable alerts by e-mail or text message when an elevator at the customer's chosen station or stations goes out of service or is returned to service. (56.1 ¶ 41.) All of these sources of elevator outage information are drawn from the EERMS database maintained by E&E, which is updated in real time, 24 hours per day, as reports of outages and repairs arrive at the E&E control desk. (56.1 ¶ 42.)

  ***i.***    ***Unanticipated Outages***

There are two primary methods through which E&E learns of an unanticipated elevator outage: Sometimes, a customer or NYCT station personnel will report an elevator out of service. In other instances, the LiftNet remote monitoring system reports a "trouble" alert, which means the elevator has gone out of service. (56.1 ¶¶ 43-45.)

Regardless of the source of the information, the Control Desk is notified of a suspected elevator outage. Upon notification, someone working at the Control Desk will attempt to remotely access the elevator and mimic an elevator call (pressing the button) from one of the floors. If the elevator is not running, or if the Control Desk cannot determine whether the elevator is moving, an approved elevator outage is opened in EERMS, which automatically notifies the supervisor in charge of the zone responsible for the station at which the outage occurred. The supervisor will then dispatch a crew of Maintainers to the station to investigate the outage, and return the elevator to service as quickly as possible. (56.1 ¶¶ 46-48.)

Sometimes, Maintainers find the elevator is actually in service when they get to the station.  This can happen for many reasons.  For example, trash may have temporarily gotten stuck in the elevator door track, preventing the doors from closing.  When the trash becomes dislodged, the elevator begins working normally again.  Sometimes, customers hold the elevator doors open for too long, which might cause LiftNet to report a door-close alert.  (56.1 ¶ 49.)

If the elevator is out of service when the Maintainers arrive, they will try to make the necessary repairs and return the elevator to service.  If a repair cannot be made immediately, the reason for the elevator outage and an anticipated repair time is reported back to the Control Desk and Maintainers put up signage at both landings of the inoperable elevator advising customers of the temporary outage and the estimated return to service time.  As soon as possible thereafter, Maintainers make the necessary repairs and return it to service. (56.1 ¶¶ 50-51.)

For the period from January 1, 2014 through June 30, 2018, Dr. Salzberg determined that median response time for an elevator repair crew was just under an hour, and typically about three hours pass between the time an unplanned outage is reported and when the elevator is returned to operation.  Those three hours *include* the response time, *i.e.*, the time it takes for the Maintainer or crew to arrive at the elevator for repairs.  About 95% of repairs are completed in less than 24 hours. (56.1 ¶ 51.)

> i.    *Outage Notifications to Customers*

When the existence of an outage has been confirmed to the Control Desk, information is automatically and instantaneously fed to the MTA's website from the EERMS database, to inform customers that the elevator is out of service. Until a maintainer arrives on scene and diagnoses the problem, or determines the elevator is running, the website shows the elevator as being "Under Investigation."  The website also provides an estimated time when the elevator will

be returned to service. If an elevator cannot be returned to service during the initial visit, the website status will be changed to "Repair." The estimated return time may also be updated. When the elevator is returned to service, the website is updated to reflect that. (56.1 ¶¶ 53-55.)

The MTA elevator website also shows elevators that are or will be out of service for planned work, such as preventative maintenance, scheduled repairs, and capital replacement. When these activities are planned, the MTA website also reports upcoming scheduled outages and provides an anticipated return to service date and time. (56.1 ¶¶ 56-57.)

Elevator status information is also available through the MTA's cell phone application, MYmta. Through either the MTA website or MYmta, customers can register to receive notifications of elevator outages through email or text message. (56.1 ¶¶ 58-59.)

### i. Anticipated Outages

When it is known and anticipated that an elevator will need to be taken out of service, this information is available on the MTA website and MYmta app. (56.1 ¶ 60.) NYCT also makes efforts to avoid outages that might interfere with customers' use of an elevator to the greatest extent possible. When an elevator outage is proposed, the Office of ADA Compliance meets to discuss the impact of the proposed outage on subway customers, and to evaluate what communications channels should be deployed to notify subway customers of the planned outage and what, if any, actions should be taken to mitigate the effects of the outage. (56.1 ¶¶ 61-62.)

At least two weeks in advance, posters about the outage are placed in prominent locations in the affected station, as well as in other stations along the same subway line. The posters give alternative accessible routings to bypass the outage. These alternatives may include the use of other nearby accessible stations or the use of nearby buses. The poster also states how to contact NYCT for help with travel directions. Depending on the nature and length of the planned

outage, announcements may also be made over the public address system in affected subway stations, or on board trains on affected subway lines. (56.1 ¶¶ 63-64.)

### E.  Options for Customers When There Are Elevator Outages

Customers can use the TripPlanner+ tool on the MTA website or MYmta app to check elevator status before beginning a trip, to find an accessible route to their destination. TripPlanner+ incorporates current real-time elevator outage information into its routing function so that customers are not directed to stations where an elevator is inoperable.  A customer can also call 511, the MTA's customer assistance line, before beginning a trip to check on elevator status and request help in planning an accessible itinerary.  (56.1 ¶¶ 65-66.)

If a customer encounters an elevator outage during a trip, the customer has several options.  If the customer has a cell phone, they can use the MTA website, MYmta app, or call 511 to get re-routing information.  Customers can also use the Help Point intercoms located on every platform to reach the same customer service representatives who staff the 511 call center, in order to receive re-routing information.  (56.1 ¶ 67.)

NYCT is also installing permanent signage at each elevator which identifies alternative accessible routes that are available in the event of an outage, as well as how to contact NYCT for assistance. (56.1 ¶ 68.)  Customers can also seek out station personnel for assistance and directions to reach their destination in the event of an outage.  Station personnel have been trained on how to courteously interact with all customers, how to help them re-route their trip to the next accessible station, and on the specific NYCT policy regarding wheelchair users who require assistance to exit a station. (56.1 ¶¶ 69-70.)   The alternative travel directions often include using NYCT's bus network, which is fully accessible, to reach the customer's destination.  (56.1 ¶ 71.)

### F.  NYCT's Dedication to the Station Environment

Operating protocols call for each NYCT-operated elevator to be visited by a station supervisor at least once during each 8-hour tour, and for the station supervisors to visit each privately-operated elevator twice per tour.  (56.1 ¶¶ 72-73.)  If a report is received that an elevator has been fouled or is otherwise unclean, a station cleaner will be dispatched to that elevator as soon as possible, regardless of when the elevator was next scheduled to be cleaned. Station cleaners are also trained to immediately notify supervision if they encounter an elevator that is out of service.  (56.1 ¶¶ 74-75.)

### III.   SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate where there is no genuine issue of material fact and the undisputed facts warrant judgment for the moving party as a matter of law.  F.R.C.P. 56(c). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Finally, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986).   "To withstand a summary judgment motion, sufficient evidence must exist upon which a reasonable jury could return a verdict for the nonmovant." *Gonzalez v. Wright*, 665 F. Supp. 2d 334, 346 (S.D.N.Y. 2009) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).   Moreover, the burden is on the Plaintiffs to prove that NYCT has violated their rights under the ADA.  *See Martinelli v. Bridgeport Roman Catholic Diocesan Corp.*, 196 F.3d 409, 428 ("In general, the law places the burden of proof on the party that asserts a contention and seeks to benefit from it.").

11

## IV.   ARGUMENT

### A.   Statutory and Regulatory Framework

#### 1.   The Americans with Disabilities Act and Its Enacting Regulations

Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132.  In order to sue under this statute, a plaintiff must show that a public entity has failed to provide "meaningful access" to its benefits, programs, or services.  *Disabled in Action v. Bd. of Elections.* 752 F.3d 189, 198-99 (2d Cir. 2014).

Part A of Title II applies to public entities generally, while Part B applies to entities providing public transportation specifically.  With respect to existing transportation facilities, Part B provides that "it shall be considered discrimination . . . for a public entity to fail to operate a designated public transportation program or activity conducted in such facilities so that, when viewed in the entirety, the program or activity is readily accessible to and usable by individuals with disabilities."  42 U.S.C. § 12148(a)(1).

Plaintiffs have also brought claims under the Rehab Act, which provides in relevant part: "No otherwise qualified individual with a disability. . . shall, solely by reason of his or her disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance."  29 U.S.C. § 794(a).  Rehab Act claims are treated as coextensive with ADA claims, and we will treat them as such in this brief.  *See, Henrietta D. v. Bloomberg*, 331 F.3d 261, 272 (2d Cir. 2003).

#### 2.   The ADA Regulations: DOT vs. DOJ

Both the Department of Justice ("DOJ") and the Department of Transportation ("DOT") have promulgated regulations pursuant to the ADA: the DOJ has authority to regulate Part A of

Title II, pertaining to public entities generally, and the DOT has authority to regulate Part B, pertaining to public transportation.  *See* 42 U.S.C. §§ 12134 (Part A, regulated by the Attorney General); 12149 (Part B, regulated by the Secretary of Transportation).

The DOT implementing regulations, set forth at 49 C.F.R. Part 37, apply specifically to transportation services for individuals with disabilities.  The DOJ's implementing regulations, at 28 C.F.R. Part 35, apply more generally to public entities, and have an explicit carve-out for public transportation:  "To the extent that public transportation services, programs, and activities of public entities are covered by subtitle B of title II of the ADA (42 U.S.C. 12141), they are not subject to the requirements of this part."  28 C.F.R. § 35.102; *see also* 42 U.S.C. § 12134(a) (specifically prohibiting the DOJ from regulating "any matter within the scope of the authority of the Secretary of Transportation").  The DOT regulations recognize that there may be some overlap between the two sets of regulations, and instruct that the DOT regulations take priority. *See*, 49 C.F.R. § 37.21(c).  ("Entities to which this part applies also may be subject to ADA regulations of the Department of Justice . . . The provisions of this part shall be interpreted in a manner that will make them consistent with applicable Department of Justice regulations.  In any case of apparent inconsistency, the provisions of this part shall prevail.")

### 3.   *The ADA Regulations: General Obligation of Accessibility*

Both sets of regulations impose a general obligation on public entities to ensure accessibility for persons with disabilities.  The DOJ regulation provides: "A public entity shall operate each service, program. or activity so that the service, program, or activity, when viewed in its entirety, is readily accessible to and usable by individuals with disabilities."  28 C.F.R. § 35.150(a).  The analogous DOT regulation similarly provides: "A public entity shall operate a designated public transportation program or activity conducted in an existing facility so that,

13

when viewed in its entirety, the program or activity is readily accessible to and usable by individuals with disabilities." 49 C.F.R. § 37.61(a).

   4.   *The ADA Regulations: Obligation to Maintain and Repair*

Both sets of regulations address the obligation to maintain and repair "accessible features," such as elevators and bus lifts, while contemplating that a certain number of outages are to be expected as a matter of course.  The DOJ regulations provide:  "A public entity shall maintain in operable working condition those features of facilities and equipment that are required to be readily accessible to and usable by persons with disabilities by the Act or this part," and further, that "[t]his section does not prohibit isolated or temporary interruptions in service or access due to maintenance or repairs."  28 C.F.R. § 35.133(a)-(b).

The DOT regulations go further: in addition to requiring that accessibility features be maintained in "operative condition," there is a requirement that they be "repaired promptly if they are damaged or out of order," and that in the event of an outage, "the entity shall take reasonable steps to accommodate individuals with disabilities who would otherwise use the feature."  49 C.F.R. § 37.161(a)-(b).  Appendix D to Part 37 illustrates this "accommodation" requirement: "For example, when a rail system discovers that an elevator is out of order, blocking access to one of its stations, it could accommodate users of the station by announcing the problem at other stations to alert passengers and offer accessible shuttle bus service around the temporarily inaccessible station."  49 C.F.R. § Pt. 37.161, App. D.

   5.   *The Rehabilitation Act and its Enacting Regulations*

Plaintiffs also cite the DOT regulations promulgated pursuant to the Rehab Act, which provide: "No qualified person with a disability shall, solely by reason of his disability, be excluded from participation in, be denied the benefits of, or otherwise be subjected to

14

discrimination under any program or activity that receives Federal financial assistance administered by the Department of Transportation." 49 C.F.R. § 27.7(a).

      *6.  The New York City Human Rights Law*

      The New York City Human Rights Law ("NYCHRL"), which as explained below does not even apply to NYCT, prohibits an owner of a public accommodation to "refuse, withhold from or deny to such person the full and equal enjoyment, on equal terms and conditions, of any of the accommodations, advantages, services, facilities or privileges of the place or provider of public accommodation." N.Y.C. Admin. Code § 8-107(4)(a)(1)(a).  The NYCHRL requires that the court conduct "an independent liberal construction analysis in all circumstances, even where state and federal civil rights laws have comparable language." *Williams v. N.Y.C. Hous. Auth.*, 872 N.Y.S.2d, 27, 31 (1st Dep't 2009).  Where, however, there is no difference between the analysis required by the NYCHRL and the analysis required by the federal anti-discrimination laws, the result under the federal and city laws may be the same.  *See, e.g.*, *Brooklyn Ctr. for Indep. of the Disabled v. Bloomberg*, 980 F. Supp. 2d 588, 642 (S.D.N.Y. 2013); *DiCarlo v. Walgreens Boot All., Inc.*, No. 15-CV-2919 (JPO), 2016 WL 482982, at \*2 (S.D.N.Y. Feb. 5, 2016).

    **B.  <u>NYCT Is In Compliance With the ADA and its Regulations</u>**

      *1.  NYCT's Elevator Availability is Sufficient to Comply with the ADA*

      While the ADA does not dictate a particular percentage of the time that an accessibility feature must be in service, compliance levels lower than that experienced by riders in connection with NYCT elevators have been deemed adequate under DOT regulations.  In *Stewart v. New York City Transit Auth.*, No. 03 Civ. 10329 (RWS), 2007 WL 656993 (S.D.N.Y Feb, 27. 2007), the court was satisfied when NYCT made audible stop announcements for visually-impaired bus riders 70% of the time (improved from 52-55%), especially in light of a commitment by NYCT

to perform compliance monitoring to bring the rate up to 90%, as well as a commitment to implement automated technology to make stop announcements.

NYCT is in compliance with the ADA and its implementing regulations concerning elevator availability and maintenance.  As mentioned above, neither the statute nor regulations prescribe a particular level of availability.   NYCT's 96.5% availability (with over 97% availability for the morning and evening rush hour periods) is sufficient to meet the requirement that accessible features be maintained in "operable working condition" (28 C.F.R. § 35.133(a)), or "operative condition" (49 C.F.R. § 37.161(a)).[3]  While these numbers do not reach the 100% availability figure demanded by the Plaintiffs, the regulations do not require perfection – and with the preventative maintenance required to keep the elevators operating, which Plaintiffs agree is necessary, NYCT could never reach more than about 99% availability.

## 2. NYCT's Mitigation Efforts When Elevators Go Out of Service Meet the Requirements of the ADA

The DOT regulations require that "[w]hen an accessibility feature is out of order, the entity shall take reasonable steps to accommodate individuals with disabilities who would otherwise use the feature."  49 C.F.R. § 37.161(b).  Examples of accommodations provided in the DOT's Appendix D include "announcing the problem at other stations to alert passengers" and "accessible shuttle bus service around the temporarily inaccessible station."  49 C.F.R. § Pt. 37, App. D.  NYCT provides these accommodations in a number of ways.  NYCT announces elevator outages on its website and app, Help Points and on signage at stations (and, depending on the outage, at other stations as well). It also provides information to allow customers to identify alternative subway routes if an unexpected outage occurs, through the above methods as

---

[3] Nor do Plaintiffs provide any basis on which the Court could conclude that the 94.9% elevator availability observed by their expert, David Rishel, is insufficient to comply with NYCT's obligation under the ADA to provide meaningful access to NYCT's transportation services.

well as through permanent signage on each elevator and from station personnel and the 511 call center.   NYCT takes proactive steps to mitigate the effect of necessary maintenance and inspections on riders, performing 97% of preventative maintenance and inspections between the hours of 10 p.m. and 6 a.m., when ridership is much lower.

Significantly, due to the extensive and interconnected nature of the subway system, an elevator outage does not necessarily mean that a customer who requires elevators cannot complete a trip in the event of an elevator outage.   There is often more than one route available to get the customer from one point to another.   For example, many stations have multiple platforms serving different lines. This enables a customer dependent on an elevator to one platform to access an alternative platform serving a different line which may go to the desired destination station or a nearby station.   Customers may also ride past a station with an out-of-service elevator to the next ADA station and loop back to the unaffected platform at the desired destination station.   While this imposes an inconvenience, Dr. Salzberg found that, on average, having to take an alternative itinerary would add 10 minutes to a trip.   Additionally, the entire NYCT bus fleet is accessible and can be utilized when elevators are out of service.   (56.1 ¶¶ 4, 76-78.)

Interruptions in service due to non-working elevators occur because elevators are complex machines and the NYCT environment is particularly harsh, given its 24-hour schedule, extreme temperature fluctuations, and heavy usage.   The actual outage data, which shows that the elevators are available 96.5% of the time on average (97% on weekdays) with a median availability of 98% (and 98.7% during weekdays), provides the important context in which to understand the Plaintiffs' anecdotal evidence.   But when an elevator is out, NYCT has a

maintenance program that results in prompt repairs, so that most elevators will back in service within a few hours, and the vast majority by the next day.

### 3.   NYCT Promptly Repairs Elevators When They Go Out of Service

The DOT regulation requires that "[a]ccessibility features shall be repaired promptly if they are damaged or out of order."  49 C.F.R. § 37.161(b).  There is no definition of "promptly" in the regulation, but NYCT's repairs certainly qualify as prompt.  On average, elevator Maintainers arrive at the elevator within approximately 1.5-2 hours after the outage is first opened.  The median response time is approximately one hour.  The median repair time for an unexpected outage is about three hours after the initial report is logged.

### C.  The Program or Activity Provided by New York City Transit is Compliant with the ADA *as a Whole*

The ADA and its implementing regulations require that a "program or activity" be "viewed in the entirety" when analyzing whether it is "readily accessible to and usable by individuals with disabilities."  42 U.S.C. § 12148(a)(1); see also 28 C.F.R. § 35.150(a)

The Ninth Circuit recently explained that the DOJ's regulatory language "when viewed in its entirety" encompasses more than any one given facility, in a suit over the accessibility of municipal libraries, parks, pools, and public rights-of-way.   In *Kirola v. City & Cnty. of San Francisco*, 860 F.3d 1164 (9th Cir. 2017) the plaintiff class challenged the adequacy of curb ramps on public sidewalks, and the physical accessibility of the city's 28 public libraries, nine public swimming pools, and 220 public parks. The Ninth Circuit explained that program access under the DOJ regulations was more sweeping than any one particular facility:

> Under 28 C.F.R. § 35.150, the City is obligated to operate each existing facility so as to ensure 'program access.'  Program access does not require that each existing facility be disability accessible.  Rather, it requires that each 'program' offered by the City, when viewed in its entirety, be 'readily accessible to and usable by individuals with disabilities.'

18

*Id*. at 1173-74 (citations omitted).  Applying this broad view of accessible programming, the court ruled that missing or damaged curb ramps on a sidewalk did not constitute programmatic inaccessibility because the city also provided public transportation and paratransit services along the same right-of-way.  Id. at 1183.  It applied the same logic to complaints about inaccessible parks, *i.e*, that one particular park is not accessible does not mean that the entire park system is inaccessible when viewed as a whole, because "program access does not operate at such a narrow level of review," and other parks in the system were accessible.  Id. at 1184.

Other courts have employed similar logic in broadly defining what constitutes program accessibility "in its entirety."  See, e.g., *Daubert v. Lindsay Unified Sch. Dist*., 760 F.3d 982 (9th Cir. 2014) (accessible seating area at school stadium provided sufficient program accessibility despite bleachers being inaccessible); *Greer v. Richardson Indep. Sch. Dist*., 472 F. App'x 287 (5th Cir. 2012) (same); *Parker v. Universidad de P.R.*, 225 F.3d 1, 6-7 (1st Cir. 2000) (ADA requires only one route to an event venue to be accessible, rather than every possible route).

The proper system against which the subway elevator service must be judged is the entire system, inclusive of subways, buses, and paratransit, not merely the subway system. In fact, the statutory purpose of NYCT is " . . . the operation of transit facilities in accordance with the provisions of [the Public Authorities Law] . . . ." N.Y. Pub. Auth. L. § 1202(1).  Transit facilities include both the subways and buses. *Id.*  Looking at the NYCT transportation system as a whole, the outage of elevators at the rate shown by the data is not enough to prove that the system is in violation of the ADA.

### D.  **"Operative Condition" and Alternative Means of Travel**

Courts have taken a holistic view when assessing what it means to keep accessibility features in "operative condition," looking at whether an outage is "isolated," as dictated by the

DOJ and DOT regulations, or whether the problem is more wide-spread.  And in reaching a determination as to whether the elevators are systemically in operative condition, courts may also weigh the alternatives to travel that may be necessitated by an out of service elevator.

For example, in *Foley v. City of Lafayette*, a passenger who used a wheelchair was unable to leave a train station after disembarking from a train due to an elevator outage caused by very cold weather.  The Plaintiff alleged violations of the ADA, Rehab Act, and DOT regulations stemming from the failure to maintain the station's elevators in operative condition or promptly repair them.  359 F.3d 925 (7th Cir. 2004).  The Seventh Circuit interpreted the DOT regulations to allow the operating agency considerable leeway in applying them:

> [T]he only way to apply 49 C.F.R. § 37.161 is to consider the unique circumstances inherent in any particular transportation service site. In other words, there are no universal definitions in the regulations for what is required to "maintain in operative condition" the accessibility features, to repair "promptly" such features, or to take "reasonable steps" to accommodate when the features are not accessible. The extent of inaccessibility covered by the terms "isolated or temporary" in 49 C.F.R. § 37.161 is likewise unclear and only determinable by considering the unique circumstances of the case.

*Id.* at 929.  The court dismissed the claim, because all appropriate measures had been taken by the public operator of the train station. The court was satisfied that "[n]othing in the record indicates frequent denial of access to disabled persons or a policy that neglects elevator maintenance."  *Id.* at 929.

NYCT's subways run 24 hours per day. There is no "downtime" during which repairs and maintenance can be performed, although every effort is made to conduct planned maintenance overnight.  Unlike other systems, NYCT's elevator availability is measured on a 24 hour basis. Any attempt by Plaintiffs' to compare NYCT's data to other systems is inapposite.

In most cases, where a subway stop is rendered inaccessible due to an elevator outage, a disabled customer may be able to proceed to the next ADA accessible station and loop back to

his or her destination.  There are also some areas in New York City where, if one station is inaccessible, there is another accessible station in the vicinity. NYCT also takes "reasonable steps" in the form of parallel accessible bus service. Some stations have elevator redundancy (i.e., more than one elevator to get to a platform or mezzanine).  NYCT's subway system is extraordinarily extensive, so that an elevator failure does not necessarily prevent the disabled customer from using the system to get to his or her destination.  Some stations have multiple lines with different platforms separately served by different elevators.

This widespread availability of alternative routes to accommodate customers warrants the dismissal of Plaintiffs suit. *See Williams v. Chicago Transit Auth.*, No. 16 C 9072, 2017 WL 4467456 (N.D. Ill. Sept. 30 2017).  In *Williams,* the court considered the case of a wheelchair user who encountered an out of service elevator at one train station, and was forced to travel to the next station and loop back so that he could use the functioning elevator on the other side of the platform.  The court ruled that the plaintiff had failed to state a claim because an isolated outage, which was easily circumvented by riding to the next stop and looping back, did not constitute a violation of the ADA.  *Id.* at *3.   This is a feature characteristic of NYCT's subway system.  Although a passenger might be inconvenienced by the delay in having to modify his or her route by proceeding to another station and looping back, with that scenario available, the Plaintiffs cannot show that the occasional occurrence of isolated elevator outages renders the entire system not in "operative condition." Indeed, the *Williams* court specifically characterized the extra ride time as "a reasonable response to an isolated elevator outage."  *Id.*

The plaintiffs in *Martin v. Metropolitan Atlanta Rapid Transit Authority*, 225 F. Supp. 2d 1362 (N.D. Ga. 2002), like the plaintiffs in this case, alleged widespread elevator outages in the MARTA train system.   The court, applying the DOT's regulation at 49 C.F.R. § 37.161

regarding maintenance of accessible features, found that MARTA's elevator service complied with the ADA.  MARTA provided evidence that repairs were typically made within two hours of a service call, and that overall elevator availability was 99%.  *Id.* at 1370.  The court ruled that although "a pattern of unreliable elevator service constitutes a violation of the ADA," the evidence presented was "insufficient to demonstrate a systemic problem . . . . It is simply a fact of life that elevators will break down on occasion." *Id.* at 1380. The court also found that MARTA's maintenance policies were adequate, and that there had not been "a wholesale or systemic failure to follow its own policies and procedures." *Id.*  NYCT's system measures up well against MARTA's.  NYCT has an entire division devoted to elevators and escalators, and an extensive preventive maintenance and repair program.  NYCT's median repair time for an unexpected outage is about three hours – and on average, elevator Maintainers arrive at the elevator within 1.5 to 2 hours after the outage is first opened in EERMS.  Further, unlike MARTA, NYCT provides a robust set of tools for travelers to access outage information in real-time by internet, smartphone app, notifications, telephone, Help Points, and in person, allowing travelers to reroute their trip, sometimes even before they encounter the outage in person.

**E.  NYCT Appropriately Cleans Its Elevators**

While Plaintiffs allege that "[e]ven when subway elevators are in working order, Defendants' failure to maintain and implement proper inspection and cleaning procedures at subway elevators has limited their usability for riders with mobility disabilities" (Compl. at ¶ 85), the evidence is the opposite.  NYCT has an inspection and cleaning schedule for its elevators, which includes multiple visits per day by NYCT station cleaners.  If an elevator is reported to need additional cleaning, a cleaner is sent to that elevator as soon as possible, regardless of when the elevator is next scheduled to be cleaned.  There is no evidence that NYCT

neglects the elevators, which are open to the public 24 hours a day, seven days a week.  It is unfortunate that elevators sometimes become soiled by users, but NYCT has procedures in place that result in the elevators being cleaned regularly and as soon as possible after NYCT discovers they are in need of cleaning.

Defendants are entitled to summary judgment on Plaintiffs' federal claims for the simple reason that Plaintiffs have no evidence to establish that Transit Defendants are not in compliance with the ADA or Rehab Act.

### F.  The New York City Human Rights Law Does Not Apply to NYCT

Plaintiffs' NYCHRL claim fails because Public Authorities Law § 1266(8) preempts the application of the NYCHRL here.  Under the Public Authorities Law, the NYCT has plenary control over the subway system, including the power to "exercise all requisite and necessary authority to manage, control and direct the maintenance and operation of transit facilities."  Pub. Auth. § 1204(15).  Section 1266(8) expressly (i) bars any municipality, including New York City, from asserting "jurisdiction" over any facilities of the MTA or NYCT, and (ii) preempts any local law "conflicting" with the Public Authorities Law, unless those laws relate to facilities that are devoted to "purposes other than transportation or transit purposes."  *See also* Pub. Auth. §§ 1261(1), 1263 (defining "authority" as the MTA).

The subway stations at issue in this case are facilities devoted to "transportation or transit purposes".  Moreover, Plaintiffs seek to use the NYCHRL to regulate the manner in which NYCT maintains and operates the elevators at its transit facilities, which undoubtedly interferes with its statutory mandate to "manage, control and direct the maintenance and operation of [its] facilities."  Where, as here, plaintiffs have attempted to apply local laws in such a way as to interfere with Defendants' core transportation functions, courts have interpreted §

1266(8) to bar suit.  Accordingly, Plaintiffs' NYCHRL claim is preempted.  *See, e.g.*, *Penny Port*, N.Y.L.J., Sept. 27, 1999 at 30 (City smoking regulations could not be applied within Grand Central restaurant)*; CBS Outdoor, Inc. v. City of New York*, 50 Misc. 3d 283, 290-95 (Sup. Ct. N.Y. Cnty. 2015) (City zoning laws did not apply to revenue-producing billboards on MTA property because doing so would interfere with one of MTA's statutory purposes: generating revenue for transit); *People v. Metro-North Commuter R.R. Co.*, 132 Misc. 2d 1072, 1073 (Crim. Ct. Bronx Cnty. 1986) (City code provisions regulating fuel truck operations on City streets conflicted with MTA subsidiary's statutory power to control and direct the operation of transportation facilities and equipment).

### G.  Defendants Are In Compliance With the NYCHRL

Even assuming the NYCHRL applies to Defendants, the NYCHRL claim must be dismissed.  Plaintiffs' claims under the NYCHRL are the same as their claims under the federal anti-discrimination laws: that Defendants are discriminating against the class by failing to make reasonable accommodations (i.e. working elevators) at subway stations, thereby preventing the Plaintiffs from using the subway.  Their NYCHRL claim, however, fails for the same reasons their federal antidiscrimination claims: The elevators in the subway system work nearly all of the time, and when they are out of service for planned maintenance or repair, alternate accommodations are available to passengers.

In a recent case, Judge Román held that plaintiffs failed to state a NYCHRL claim when they alleged that the ride-sharing service Lyft offered insufficient wheelchair accessible vehicles in New York City, creating long wait times for individuals requiring such vehicles.  *Lowell v. Lyft, Inc.*, 352 F. Supp. 3d 248, 262-263 (S.D.N.Y. 2018).  The court dismissed the claim, finding that plaintiffs had not plausibly alleged a NYCHRL violation because

"[t]here is no case law to indicate that extended wait times for a public accommodation is a NYCHRL violation.  While it is a NYCHRL violation to entirely exclude a person with a disability from accessing a public accommodation . . . that is not the situation before the Court.  Defendant offers, albeit in a small number, [wheelchair accessible vehicles] in New York City."

*Id.* at 263 (citation omitted).

Applying Judge Román's analysis to this case, there is no NYCHRL violation.  While a customer with a mobility disability may need to wait for an elevator to come back to service, or travel to a nearby station to take a different elevator, or use a bus instead of a subway to get to the customer's destination, customers with mobility disabilities are not precluded from using NYCT's public accommodation (i.e. transportation services in the NYC metropolitan region).  Moreover, in the vast majority of instances, a customer encountering an elevator outage – even an unexpected outage – would be able to reroute their trip.  While this is certainly an inconvenience, which NYCT tries to minimize, this is not a violation of the NYCHRL.

## V.    CONCLUSION

For the reasons stated above, Defendants respectfully request that this Court dismiss the claims against them in their entirety, and that the Court grant such other and further relief as it deems just and proper.

Dated:  New York, New York
August 9, 2019

By: _____

Ira J. Lipton (IL-4835)
Helene R. Hechtkopf (HH-7402)
Steven M. Silverberg (SS-5064)
Miriam J. Manber (MM-0263)

HOGUET NEWMAN
REGAL & KENNEY, LLP
60 East 42nd Street, 48th Floor
New York, NY 10165
Phone: 212-689-8808

*Attorneys for Transit Defendants*

25