UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------- x

CENTER FOR INDEPENDENCE OF THE DISABLED,
NEW YORK, *a nonprofit organization*; BROOKLYN
CENTER FOR INDEPENDENCE OF THE DISABLED,
*a nonprofit organization*; BRONX INDEPENDENT
LIVING SERVICES, *a nonprofit organization*;
HARLEM INDEPENDENT LIVING CENTER, *a
nonprofit organization*; DISABLED IN ACTION OF
METROPOLITAN NEW YORK, *a nonprofit
organization*; NEW YORK STATEWIDE SENIOR
ACTION COUNCIL, *a nonprofit organization*; SASHA
BLAIR-GOLDENSOHN, *an individual*; CHRIS
PANGILINAN, *an individual*; DUSTIN JONES, *an
individual, on behalf of themselves and all others
similarly situated*,

        Plaintiffs,

-against-

METROPOLITAN TRANSPORTATION
AUTHORITY, *a public benefit corporation*;
VERONIQUE HAKIM, *in her official capacity as
interim executive director of the Metropolitan
Transportation Authority*; NEW YORK CITY TRANSIT
AUTHORITY, *a public benefit corporation*; DARRYL
C. IRICK, *in his official capacity as acting president of
the New York City Transit Authority*,

        Defendants.

------------------------------------- x

MEMORANDUM DECISION
AND ORDER

17 Civ. 2990 (GBD)

GEORGE B. DANIELS, United States District Judge:

  Plaintiffs, comprised of a group of both individuals and non-profit groups, bring a class-action lawsuit against the Metropolitan Transportation Authority (the "MTA"), Veronique Hakim, in her official capacity as interim executive director of the MTA, New York City Transit Authority (the "NYCTA"), and Darryl C. Irick, in his official capacity as acting President of the NYCTA (collectively, "Defendants") for violations of the Americans with Disabilities Act ("ADA"),

42 U.S.C. § 12131, *et seq.*, the Rehabilitation Act ("RA"), 29 U.S.C. § 794, and the New York City Human Rights Law ("NYCHRL"), N.Y.C. Admin. Code § 8-101 *et seq.*, seeking injunctive and declaratory relief and attorneys' fees. Specifically, Plaintiffs claim that Defendants have engaged in "systemic, discriminatory exclusion" of individuals with disabilities because Defendants "fail to maintain the already limited number of elevators in the subway system." (Compl., ECF No. 1, at ¶ 1.)

Pending before this Court are the parties' cross-motions for summary judgment, (*see* Notice of Mot. for Partial Summ. J., ECF No. 142; Transit Defs' Notice of Mot. for Summ. J., ECF No. 157), as well as the parties' cross-motions in limine to exclude their opponents' experts, (*see* Notice of Mot. to Exclude Expert Test. of Dennis W. Olson, ECF No. 151; Defs.' Notice of Mot. to Preclude Pls.' Experts, ECF No. 153). Plaintiffs' motion for partial summary judgment is DENIED. Defendants' motion for summary judgment is GRANTED. Additionally, both parties' motions in limine, (ECF Nos. 151, 153), are denied.

## I. FACTUAL BACKGROUND

Plaintiffs represent a class of "all persons who use or seek to use the [NYC Subway], and have a disability that requires them to use an elevator to access the subway system." (Stipulation and Order Certifying Class, ECF No. 63, at 3.) Plaintiffs claim that although the NYC Subway is "the largest and most traveled subway system in the country," it is inaccessible to people with mobility disabilities due to "frequent and continuous elevator outages, poor maintenance and inspection of elevators, and lack of notice or alternative accommodations during outages." (Compl. at ¶¶ 73, 159.) Additionally, Plaintiffs claim that of the limited number of elevators, Defendants fail to appropriately maintain the elevators so that they operate in a "functional condition." (*Id.* at ¶ 76.) Specifically, Plaintiffs emphasize the number of elevator outages per

2

day, how long those outages last, and the general condition and cleanliness of the elevators when they are in working order. (*Id.* at ¶¶ 76–79, 85.) Plaintiffs assert that the members of the class have faced extreme hardships due to the condition and status of the elevators, and that in order to remedy this situation, Defendants should implement system-wide policies to better inform the public of elevator outages and publicize information about alternative routes for those with mobility issues. They also contend that Defendants need to ensure that staff is properly trained to serve riders who require assistance with mobility, and provide emergency procedures for individuals with mobility issues that are stranded during any outages. (*Id.* at ¶ 81.) Moreover, Plaintiffs claim that New York City's alternative service specifically targeted at individuals with mobility issues, Access-A-Ride, is "unreliable, subject to long delays and missed pickups," and requires 24 hours' advance notice, which makes it impractical for individuals who need to travel through "rapid, convenient" means. (*Id.* at ¶ 91.)

To support their respective positions, the parties each rely upon various expert reports, with their focus on their own individual leading expert's analysis—that is, the survey and report by David R. Rishel on behalf of Plaintiffs, (*see* Decl. of Ira J. Lipton in Supp. of Transit Defs.' Mot. to Preclude Pls.' Experts ("Lipton Decl."), Ex. 3 ("Corrected Rishel Report"), ECF No. 154-3),[1]

---

[1] David R. Rishel, the Principal of Delta Services Group, Inc., consulted with Dr. Ross Koppel (who in turn consulted with Mr. Joel Telles) and Mr. David Mirch "to conduct an objective evaluation of the [NYC Subway]'s elevators during the spring of 2018," which was "intended to measure the rate of elevator outages and to assess their maintained condition." (Corrected Rishel Report at 6.) Rishel and his team conducted two separate assessments: (1) an "unannounced survey of elevators," which took account of their operability and general condition, and (2) an inspection of a "select group" of the elevators to appraise their condition and then to check the available maintenance records in order to assess the adequacy of their maintenance. (*See id.* at 7.) Rishel concluded that of the elevators he and his team encountered, they were out of service 5.1% of the time, and that 20.8% of those outages were not reported by the MTA, that passengers were "likely to encounter elevators with deficiencies 51.2% of the time," a statistic which he called "unusually high," and that none of the elevators were "well maintained," as they had "significant deficiencies with major operating components." (*Id.* at 45.)

3

and the analysis and report by Dr. Alan J. Salzberg on behalf of Defendants, (*see id.*, Ex. 4 ("Salzberg Report"), ECF No. 154-4).[2] Both parties also provided expert reports and rebuttals to further support their claims.[3]

## II. LEGAL STANDARDS

### A. Motions in Limine.

The admissibility of expert testimony is governed by Rule 702 of the Federal Rules of Evidence, which requires the district court to "ensur[e] that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *2 N.K. by Bruestle-Kumra v. Abbott Labs.*, 731 F. App'x 24, 26 (2d Cir. 2018) (quoting *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 597 (1993)). In assessing whether expert testimony is reliable, "the district court should consider the indicia of reliability identified in Rule 702, namely, (1) that the testimony is grounded on

---

[2] Dr. Alan J. Salzberg reviewed elevator "outage" information, which he received from Defendant NYCTA, and provided his own expert report based on that data. (See Salzberg Report.) After reviewing this data, he calculated the availability of the elevators through equations based on different metrics, *e.g.*, the time that the elevator was in active service, the availability of each accessible stop and station, etc. (*See id.* at 3–6, 15–16.) With regard to the availability of stations and elevators, Salzberg found that the median availability of NYC Subway elevators is 98.0%, which increases to 98.7% during "daytime weekday hours," which he defines as between the hours of 6:00 a.m. and 10:00 p.m. (*Id.* at 6, 11.) With respect to accessible subway stops, the median availability is 96.4%, which increases to 97.5% during daytime weekday hours. (*Id.* at 15–16.) The median availability of accessible stations was 98.5%, which increases to 99.2% during daytime weekday hours. (*Id.* at 16–17.) Additionally, Salzberg found that the median number of hours for which an elevator outage lasts is just over three hours, and the median response time is less than one hour, with approximately 95% of repairs completed in less than 24 hours. (*Id.* at 18.) Finally, other than those elevators that are removed from service to "major rehabilitations," Salzberg found that 20% of the time elevators are out of service, it is pursuant to pre-planned closures, targeted at "preventive maintenance or planned inspections," and the large majority of these outages—indeed, 97%—are completed between 10:00 p.m. and 6:00 a.m. or on the weekends, *i.e.*, not during "daytime weekday hours." (*Id.* at 3.)

[3] For example, Plaintiffs provided reports and/or rebuttals by Mr. Rishel and Dr. Koppel, (*See, e.g.*, Lipton Decl., Ex. 6 ("Rishel and Koppel Rebuttal"), ECF No. 154-6), Mr. Andrew D. Schwarz, (*see id.*, Ex. 10 ("Schwarz Report"), ECF No. 154-10, at ¶ 2), Dr. Stephen Fielding, (*see id.*, Ex. 8 ("Fielding Report"), ECF No. 154-8), and Mr. Richard Stern, (*see id.*, Ex. 9 ("Stern Report"), ECF No. 154-9, at 3–4, 6–7). Defendants provided reports and/or rebuttals by Dr. Salzberg, (*see id.*, Ex. 5, 7, ECF Nos. 154-5, 154-7), and Mr. Dennis W. Olson, (*see* Decl. of Michelle Caiola in Supp. of Pls.' Mot. for Partial Summ. J. and Pls.' Mot. to Exclude Expert Test. Of Dennis W. Olson, Ex. 49 ("Olson Report"), ECF No. 163-54).

4

sufficient facts or data, (2) that the testimony 'is the product of reliable principles and methods,' and (3) that 'the witness has applied the principles and methods reliably to the facts of the case.'" *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 265 (2d Cir. 2002) (quoting Fed. R. Evid. 702). However, courts may also consider other factors, as "the inquiry into the reliability of expert testimony under Rule 702 is a 'flexible one,'" *United States v. Williams*, 506 F.3d 151, 160 (2d Cir. 2007) (quoting *Daubert*, 509 U.S. at 594), that "must be tied to the facts of a particular case." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 150 (1999).

### B. Motions for Summary Judgment.

Summary judgment is appropriate when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a). "An issue of fact is 'genuine' if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Gayle v. Gonyea*, 313 F.3d 677, 682 (2d Cir. 2002) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). A fact is material when "it 'might affect the outcome of the suit under the governing law.'" *Gayle*, 313 F.3d at 682 (quoting *Anderson*, 477 U.S. at 248).

The party seeking summary judgment has the burden of demonstrating that no genuine issue of material fact exists. *See Marvel Characters, Inc. v. Simon*, 310 F.3d 280, 286 (2d Cir. 2002). In turn, to defeat a motion for summary judgment, the opposing party must raise a genuine issue of material fact. To do so, it "must do more than simply show that there is some metaphysical doubt as to the material facts," *Caldarola v. Calabrese*, 298 F.3d 156, 160 (2d Cir. 2002) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)), and it "may not rely on conclusory allegations or unsubstantiated speculation." *Fujitsu Ltd. v. Fed. Express Corp.*, 247 F.3d 423, 428 (2d Cir. 2001) (quoting *Scotto v. Almenas*, 143 F.3d 105, 114 (2d Cir. 1998)). Rather, the opposing party must produce admissible evidence that supports its pleadings. *See First*

5

*Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 289–90 (1968). In this regard, "[t]he 'mere existence of a scintilla of evidence' supporting the non-movant's case is also insufficient to defeat summary judgment." *Niagara Mohawk Power Corp. v. Jones Chem., Inc.*, 315 F.3d 171, 175 (2d Cir. 2003) (quoting *Anderson*, 477 U.S. at 252).

In determining whether a genuine issue of material fact exists, the court must construe the evidence in the light most favorable to the opposing party and draw all inferences in that party's favor. *See Niagara*, 315 F.3d at 175. However, "a court must not weigh the evidence, or assess the credibility of witnesses, or resolve issues of fact." *Victory v. Pataki*, 814 F.3d 47, 59 (2d Cir. 2016) (internal citations omitted). Summary judgment is therefore "improper if there is any evidence in the record that could reasonably support a jury's verdict for the non-moving party." *Marvel*, 310 F.3d at 286.

The standard for cross-motions for summary judgment is the same: a court will "evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration." *Byrne v. Rutledge*, 623 F.3d 46, 53 (2d Cir. 2010) (quoting *Hotel Emps. & Rest. Emps. Union v. City of N.Y. Dep't of Parks & Recreation*, 311 F.3d 534, 543 (2d Cir. 2002)).

### III. PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT IS DENIED AND DEFENDANTS' MOTION FOR SUMMARY JUDGMENT IS GRANTED[4]

At the core of their arguments, there are no genuine issues of material fact raised between the parties. Indeed, even considering the parties' differing expert analysis and findings, and because those determinations make no meaningful difference to the outcome of this dispute, they

---

[4] Because this Court finds that the evidence offered by each of that parties' experts would not affect this Court's analysis or determinations as to the parties' cross-motions for summary judgment, this Court denies both parties' motions in limine to exclude their testimony.

are not "material." The issue before this Court, therefore, as raised in both parties' motions, is whether Plaintiffs can rely upon the undisputed facts in the record to support a claim that Defendants violated the ADA, RA, or NYCHRL.

### A. Claims Under the ADA and RA.

Title II of the ADA requires that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. Section 504 of the RA requires that "[n]o otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance . . . ." 29 U.S.C. § 794(a). Because the standards under both statutes are generally the same and the subtle distinctions between the statutes are not implicated in this case, "[courts] treat claims under the two statutes identically." *Henrietta D. v. Bloomberg*, 331 F.3d 261, 272 (2d Cir. 2003).

Congress passed the ADA to provide "a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities." 42 U.S.C. § 12101(b)(1). In order to establish a violation under the ADA, Plaintiffs must demonstrate that (1) they are "qualified individuals" with a disability; (2) Defendants are subject to the ADA; and (3) Plaintiffs were denied the opportunity to participate in or benefit from defendants' services, programs, or activities, or were otherwise discriminated against by Defendants, by reason of Plaintiffs' disabilities. *Henrietta D.*, 331 F.3d at 272; *See Doe v. Pfrommer*, 148 F.3d 73, 82 (2d Cir.1998).

The parties do not dispute that Plaintiffs qualify for protection under the ADA or that Defendants' activities are subject to Title II under the ADA. Therefore, this Court need consider only whether Defendants have discriminated against Plaintiffs in violation of subtitle A of Title II.

7

The Second Circuit in *Henrietta D. v. Bloomberg* explained that in examining whether a party has sufficiently alleged a claim of discrimination under the ADA, "the relevant inquiry is not whether the benefits available to persons with disabilities and to others are actually equal, but whether individuals with disabilities have 'meaningful access' to the benefit that the grantee offers." 331 F.3d at 273 (citing *Alexander v. Choate*, 469 U.S. 287, 301 (1985)). Despite relying upon *Henrietta D.* throughout their moving papers, Plaintiffs argue, in what appears to completely disregard the Second Circuit's findings in that case, that "[p]artial or impeded access is not sufficiently meaningful access." (Pls.' Mem. of Law in Opp'n to Defs.' Mot. for Summ. J ("Pls.' Mem. in Opp'n"), ECF No. 174, at 15; *see also* Pls.' Mem. of Law in Supp. of Pls.' Mot. for Partial Summ. J. ("Pls.' Mem. in Supp."), ECF No. 143, at 22.) Plaintiffs assert this as a bright-line rule, yet, *Henrietta D.* stands for the principle that a Court's analysis should not focus on a comparison of what is offered to a protected and non-protected individual, *i.e.*, whether the protected individual receives only "partial" access as compared to others, but solely on whether the individual with a disability is provided with "meaningful access." *See Henrietta D.*, 331 F.3d at 273.

Moreover, the ADA does not require any specific or definitive procedures, a point which Defendants repeat throughout their moving papers both in support of their argument and in opposition to Plaintiffs' argument. (*See* Transit Defs.' Mem. of Law in Supp. of Their Mot. for Summ. J. ("Defs.' Mem. in Supp."), ECF No. 162, at 15–16; Mem. in Opp'n to Pls.' Mot. for Summ. J. ("Defs.' Mem. in Opp'n"), ECF No. 171, at 7–8.) Defendants further note that there is "no standard for a system-wide elevator availability in the . . . implementing regulations from the U.S. Department of Transportation," and in fact, "those regulations expressly contemplate that the elevators will go out of service." (Defs.' Mem. in Opp'n at 8; *see also* Defs.' Mem. in Supp. at 15–16.) Plaintiffs lose sight of this fact, focusing their claims on whether NYCTA's elevators are

8

adequately maintained or replaced to the extent that *they would like*, instead of whether Plaintiffs are receiving "meaningful access" to the NYC Subway.

Indeed, Plaintiffs rely upon individual class members' personal anecdotes of situations where they had issues with NYC Subway elevators, (*see* Pls.' Mem. in Supp. at 15–16; *see also* Pls. Mem. in Opp'n at 13; Tr. of Oral Arg. dated Oct. 24, 2019 ("Oral Argument Tr."), ECF No. 191, at 4:6–5:2, 22:9–11; Compl. at ¶¶ 94–121), their expert's survey of unavailable elevators and elevators with deficiencies, (*see* Corrected Rishel Report at 45), and the assertion that "80 percent of [Defendants'] planned preventative maintenance doesn't happen," (Oral Argument Tr. 10:4–6). Plaintiffs, however, do not, and cannot, describe what more is required of Defendants in order to comply with the ADA, other than to say that things should be better. (*See, e.g.*, Oral Argument Tr. at 11:13–12:20 (explaining that it is "difficult to know in some cases" where Defendants will have "crossed the line").)

Plaintiffs, therefore, do not proffer evidence that there is a "systemic failure" by Defendants to provide individuals with mobility issues with "meaningful access" to the NYC Subway. *See, e.g., Disabled in Action v. Board of Elections in City of New York*, 752 F.3d 189, 198 (2d Cir. 2014) (holding that the proper analysis in considering an ADA claim is whether there was a "systemic failure to provide meaningful access to individuals with disabilities"). In fact, Plaintiffs wholly reject the notion that this Court should rely upon *any* statistics, arguing that statistics are misplaced because "the law does not set forth some overall fixed percentage of elevator availability sufficient to demonstrate compliance." (Pls.' Mem. in Opp'n at 18.) Plaintiffs instead ask this Court to rely upon only their statements that the elevators could be better and the individual class members' personal experiences.

9

Plaintiffs also heavily relying upon a case from the Northern District of California. (*Id.* at 18–19 (citing *Cupolo v. Bay Area Rapid Transit*, 5 F. Supp. 2d 1078 (N.D. Cal. 1997).) Plaintiffs' reliance on this case is misplaced because the facts in *Cupolo* were extremely different from those that Plaintiffs assert here. Although in *Cupolo*, the Court found that despite a seemingly high system-wide elevator availability, the defendants had not provided plaintiffs with "meaningful access" to their transit system. The plaintiffs in that case provided evidence of severe concerns about elevators, such as the risk of their "catastrophic failure," and the fact that there were 76 entrapments in the elevators over a period of only 14 months. Indeed, that Court's finding that those facts presented a situation where individuals were denied "meaningful access" is not analogous, because Plaintiffs do not assert that the same level of severity is present here. The issues to which Plaintiffs point include anecdotal evidence of delays, class members' reliance on others to travel within the stations, and experiencing some delays because they are "not . . . able to call for help while stuck inside elevators thanks to accessible features' inoperability." (*See* Pls.' Mem. in Supp. at 22; *see also* Oral Argument Tr. at 4:6–5:2.) Indeed, Plaintiffs do not provide similar statistics of entrapments or other incidents similarly severe. This Court does not, in any way, mean to diminish these genuine concerns. Indeed, they are extremely troublesome. Defendants can and should do a better job of addressing these issues expeditiously. However, finding that Plaintiffs' concerns may be valid does not necessarily equate to a violation of the ADA.

Plaintiffs also attempt to demonstrate a lack of "meaningful access" by comparing NYCTA's efforts in repairing Accessibility elevators, *i.e.*, elevators that cover an entire path of travel through a station, against its efforts in repairing Non-Accessibility elevators, *i.e.*, elevators which are part of paths of travel that still require passengers to take at least one flight of stairs."

10

(*See* Pls.' Mem. in Opp'n at 1 n. 1; Pls.' Mem. in Supp. at 10–12; *see also* Pls.' Mem. in Supp. at 10–12 (describing the different efforts Defendants have taken in repairing each type of elevator).) Defendants, in response, describe their decisions to focus upgrading or funding certain aspects of the NYC Subway as an "entirely appropriate managerial determination." In fact, they argue that improving Non-Accessibility elevators allows NYC Subway employees to spend more time focusing on the Accessibility elevators. (*See* Defs.' Mem. in Opp'n. at 10.) Plaintiffs do not deny this, nor do they appear to consider whether there might be a legitimate reason for any differences in how Defendants address problems with the respective elevators. Indeed, they instead appear to argue that *any* difference between the two automatically indicates that Defendants do not comply with the ADA. The evidence cannot support that theory.

Plaintiffs also argue that this Court can find that Plaintiffs were denied "meaningful access" by considering the cleanliness of the elevators. Plaintiffs point to specific instances, for example, where human feces were found in one of the NYC Subway elevators. (*See* Pls.' Mem. in Supp. at 10; Oral Argument Tr. at 37:3–6.) Clearly, there is some level of filth that could cause an elevator to be "unusable," thereby denying Plaintiffs "meaningful access." Plaintiffs, however, do not provide any metric by which this Court could find that Defendants have not met the ADA, or that the issues with cleanliness to which they point are not "isolated and temporary," as Defendants argue. (Defs.' Mem. in Opp'n at 12–13.) It is not feasible, and therefore cannot possibly be required by the ADA, that the elevators operating in the NYC Subway—a 24 hour accommodation—are clean 100% of the time. Defendants assert that their program ensures that elevators are cleaned at least three times per day, as well as whenever an immediate need is identified, so that even if an elevator *is* dirty, it is addressed within a few hours. (*See* Defs.' Mem. in Supp. at 22—23; Defs.' Mem. in Opp'n at 12–13.) Plaintiffs do not deny this, but instead argue

11

simply that Defendants should be doing *more*. (*See, e.g.*, Oral Argument Tr. at 37:5–6.) To be sure, the majority of individuals in the City who have used a NYC Subway have likely found that it is not as clean as they would hope—this Court is not disillusioned to believe that these elevators are spotless or that the class members have not had run-ins with elevators that they find to be unacceptable. This, however, is not the standard for finding a violation under the ADA.

Plaintiffs and Defendants both raise the issue of whether Defendants provide alternative "reasonable accommodations." (*See* Pls.' Mem. in Supp. at 23; Defs.' Mem. in Supp. at 14.) Plaintiffs argue that Defendants completely fail to provide reasonable alternatives by "not even taking simple measures," (Pls.' Mem. in Supp. at 23), Defendants, on the other hand, assert that the options offered to passengers of, for example, re-routing to their destination or using the City's bus system are sufficient, relying on their argument that this Court must consider the system as a whole, including MTA's bus line. (Defs.' Mem. in Supp. at 14, 16–17.) It is not clear that these are actually "reasonable accommodations" in most caases. Instructing a passenger that if they are unable to use the NYC Subway elevators, they should use an entirely different mode of transportation does not seem to be an "accommodation" in the classic sense. Because Plaintiffs have failed, however, to demonstrate that there is an issue with the NYC Subway that reaches the level of a violation of the ADA or RA, this Court need not reach a determination as to whether these "accommodations" are reasonable.[5]

---

[5] Additionally, of the assistance that Defendants offer protected individuals, such as re-routing options and outage notifications, Plaintiffs state these efforts are insufficient, and also unreasonable because the MTA's current requirements place burdens on the class members that are "not [placed on] non-disabled passengers." (See Pls.' Mem. in Opp'n. at 20 (stating that disabled passengers are expected to check their smartphones to determine whether there is an elevator outage).) But, as previously explained, the standard is not whether these two groups are treated exactly the same; the standard is whether the efforts made by Defendants are reasonable.

12

## B. Claims Under the NYCHRL.

Plaintiffs also bring a claim under the NYCHRL. The NYCHRL provides,

> It shall be an unlawful discriminatory practice for any person who is the owner, franchisor, franchisee, lessor, lessee, proprietor, manager, superintendent, agent or employee of any place or provider of public accommodation ... Directly or indirectly to make any declaration, publish, circulate, issue, display, post or mail any written or printed communication, notice or advertisement, to the effect that ... Full and equal enjoyment, on equal terms and conditions, of any of the accommodations, advantages, facilities and privileges of any such place or provider of public accommodation shall be refused, withheld from or denied to any person on account of ... disability ....

N.Y. City Admin Code §§ 8-107(4).

As both parties agree, (*see* Pls.' Mem. in Supp. at 23–25; Reply Mem. in Further Supp. of Transit Defs.' Mot. for Summ. J., ECF No. 187, at 9–10), a Court "must analyze NYCHRL claims separately and independently from any federal and state law claims." *Mihalik v. Credit Agricole Cheuvreux N. Am., Inc.*, 715 F.3d 102, 109 (2d Cir. 2013). Moreover, the protections afforded under the NYCHRL are to be interpreted broadly and in favor of Plaintiffs. *Id.*

As analyzed in a similar case, however, this statute protects against an entity "entirely exclud[ing] a person with a disability from accessing a public accommodation." *Lowell v. Lyft, Inc.*, 352 F. Supp. 3d 248, 263 (S.D.N.Y. 2018). In *Lowell*, the Court found that Plaintiff had not plausibly alleged a NYCHRL violation when she did not claim that she or the individuals she represented were denied full access to the public accommodation, but instead were subject to long wait times due to their disabilities. *Id.* Indeed, as the *Lowell* Court stated, "There is no case law to indicate that extended wait times for a public accommodation is a NYCHRL violation." *Id.* The reasoning in *Lowell* is sound that Plaintiffs may not bring a claim under the NYCHRL against Defendants simply on the basis of extended wait times, when they have not been denied full access to the NYC Subway.

13

## IV. CONCLUSION

Plaintiffs' motion for partial summary judgment, (ECF No. 142), is DENIED. Defendants' motion for summary judgment, (ECF No. 157), is GRANTED. The Clerk of Court is directed to close these motions accordingly. Additionally, the Clerk of Court is directed co close Plaintiffs' motion in limine, (ECF No. 151), and Defendants' motion in limine, (ECF No. 153), as well.

Dated: New York, New York  
March 30, 2020

SO ORDERED.

GEORGE B. DANIELS  
United States District Judge