NITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

CENTER FOR INDEPENDENCE OF THE DISABLED, NEW YORK, a nonprofit organization, BROOKLYN CENTER FOR INDEPENDENCE OF THE DISABLED, a nonprofit organization, BRONX INDEPENDENT LIVING SERVICES, a nonprofit organization, HARLEM INDEPENDENT LIVING CENTER, a nonprofit organization, DISABLED IN ACTION OF METROPOLITAN NEW YORK, a nonprofit organization, NEW YORK STATEWIDE SENIOR ACTION COUNCIL, a nonprofit organization, SASHA BLAIR-GOLDENSOHN, an individual, CHRIS PANGILINAN, an individual, and DUSTIN JONES, an individual, on behalf of themselves and all others similarly situated,

Plaintiffs,

-against-

METROPOLITAN TRANSPORTATION AUTHORITY, a public benefit corporation, VERONIQUE HAKIM, in her official capacity as interim executive director of the Metropolitan Transportation Authority, NEW YORK CITY TRANSIT AUTHORITY, a public benefit corporation, DARRYL C. IRICK, in his official capacity as acting president of the New York City Transit Authority, and THE CITY OF NEW YORK,

Defendants.

17 Civ. 2990 (GBD)

**DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS


TABLE OF AUTHORITIES .......... iiii

PRELIMINARY STATEMENT .......... 1

BACKGROUND AND PROCEDURAL HISTORY .......... 2

STATEMENT OF FACTS .......... 5

A. New York City's Transportation System and Elevator Inventory .......... 5

B. NYCT's Elevators & Escalators Division .......... 6

C. Outage Information Available to Riders .......... 6

D. Alternatives in the Event of an Elevator Outage .......... 7

E. Class Members' Use of NYCT's Transit System and Rerouting Tools .......... 9

ARGUMENT .......... 11

I. LEGAL STANDARDS .......... 11

A. Summary Judgment Standards and Burden of Proof .......... 11

B. "Meaningful Access" Under the ADA .......... 11

1. The ADA's Implementing Regulations .......... 12

2. The ADA Regulations: DOT vs. DOJ .......... 13

3. The ADA Regulations: General Obligation of Accessibility .......... 14

4. The ADA Regulations: Obligation to Maintain and Repair .......... 14

5. The Rehabilitation Act and its Enacting Regulations .......... 15

C. The New York City Human Rights Law .......... 15

II. REASONABLE ACCOMMODATIONS ARE AVAILABLE IN THE EVENT OF AN ELEVATOR OUTAGE .......... 15

III. PLAINTIFFS CANNOT PROVE ABSENCE OF REASONABLE ACCOMMODATION WITH ANECDOTAL EVIDENCE .......... 20

CONCLUSION .......... 25

## TABLE OF AUTHORITIES

Page(s)

Cases

*Alexander v. Choate*,
469 U.S. 287 (1985) .......... 12

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986) .......... 11

*B.C. v. Mount Vernon School District*,
837 F.3d 152 (2d Cir. 2016) .......... 20

*Brooklyn Ctr. for Indep. of the Disabled v. Bloomberg*,
980 F. Supp. 2d 588 (S.D.N.Y. 2013) .......... 15, 18, 23

*Brooklyn Ctr. for Indep. of the Disabled v. Metropolitan Transp. Auth.*,
11 F.4th 55 (2d Cir. 2021) .......... *Passim*

*Ctr. for Indep. of Disabled, New York v. Metro. Transp. Auth.*,
2020 WL 1503454 (S.D.N.Y. Mar. 30, 2020) .......... 3

*Chen-Oster v. Goldman, Sachs & Co.*,
2022 WL 814074 (S.D.N.Y. Mar. 17, 2022) .......... 21

*Coral Const. Co. v. King Cnty.*,
941 F.2d 910 (9th Cir. 1991) .......... 20

*DiCarlo v. Walgreens Boot All., Inc.*,
2016 WL 482982 (S.D.N.Y. Feb. 5, 2016) .......... 15

*Disabled in Action v. Bd. of Elections*,
752 F.3d 189 (2d Cir. 2014) .......... 12

*E.E.O.C. v. Bloomberg L.P.*,
778 F. Supp. 2d 458 (S.D.N.Y. 2011) .......... 21

*Ellison v. United States Postal Serv.*,
603 F. Supp. 3d 658 (S.D. Ind. 2022) .......... 19

*Eng'g Contractors Ass'n of S. Fla. Inc. v. Metro. Dade Cnty.*,
122 F.3d 895 (11th Cir. 1997) .......... 21

*Gittens-Bridges v. City of New York*,
2022 WL 954462 (S.D.N.Y. Mar. 30, 2022) ... 21

*Gonzalez v. Wright*,
665 F. Supp. 2d 334 (S.D.N.Y. 2009) ... 11

*Kreisler v. Second Ave. Diner Corp.*,
2012 WL 3961304 (S.D.N.Y. Sept. 11, 2012) ... 23

*Loeffler v. Staten Is. Univ. Hosp.*,
582 F.3d 268 (2d Cir. 2009) ... 24

*Lonberg v. City of Riverside*,
2011 WL 13289607 (C.D. Cal. Mar. 28, 2011) ... 16

*Lowell v. Lyft, Inc.*,
352 F. Supp 3d 248 (S.D.N.Y. 2018) ... 24

*Mandala v. NTT Data, Inc.*,
975 F.3d 202 (2d Cir. 2020) ... 20

*Martinelli v. Bridgeport Roman Catholic Diocesan Corp.*,
196 F.3d 409 (2d Cir. 1999) ... 11

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
475 U.S. 574 (1986) ... 11

*Neal v. Metro Reg'l Transit Auth.*,
2019 WL 3753605 (N.D. Ohio Aug. 8, 2019) ... 20

*Wessmann v. Gittens*,
160 F.3d 790 (1st Cir. 1998) ... 21

*West v. Five Guys Enterprises, LLC*,
2016 WL 482981 (S.D.N.Y. Feb. 5, 2016) ... 22

*Williams v. Chicago Transit Auth.*,
2017 WL 4467456 (N.D. Ill. Sept. 30, 2017) ... 18

*Woods v. Centro of Oneida, Inc.*,
2022 WL 14374734 (N.D.N.Y. Sept. 19, 2022) ... 19

Statutes

29 U.S.C. § 794(a) ... 13
42 U.S.C. § 12141 ... 13
42 U.S.C. § 12132 ... 12

42 U.S.C. § 12134(a) .................... 13
42 U.S.C. § 12148(a)(1).................... 12
42 U.S.C. § 12134.................... 13
42 U.S.C. § 12149.................... 13
N.Y.C. Admin. Code § 8-102 .................... 24
N.Y.C. Admin. Code § 8-107(4)(a)(1)(a) .................... 15, 24

Rules

Fed. R. Civ. P. 56.................... 1, 11

Regulations

28 C.F.R. Part 35.................... 13
28 C.F.R. § 35.102 .................... 13
28 C.F.R. § 35.133(a)-(b).................... 14
28 C.F.R. § 35.150(a).................... 14
29 C.F.R. § 1630.2(g)(1).................... 4
49 C.F.R. Part 37.................... 13
49 C.F.R. § 27.7(a).................... 15
49 C.F.R. § 37.161(a)-(b).................... 14, 16
49 C.F.R. § 37.161(c).................... 15
49 C.F.R. § 37.21(c).................... 13
49 C.F.R. § 37.61(a).................... 14

## PRELIMINARY STATEMENT

In this second round of dispositive motions before the Court, Defendants Metropolitan Transportation Authority ("MTA"), the New York City Transit Authority ("NYCT"), and the individual Defendants sued in their official capacities (collectively, "Defendants") again move for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. Defendants provide a comprehensive system of reasonable accommodations which are available to serve class members in the event of a temporary elevator outage, meaning that the access provided is, as the Second Circuit explained, reasonable as a matter of law. Plaintiffs have not proffered any evidence to create a material issue of fact on this point, let alone to meet their burden of proof.

As set forth below, Defendants have established a robust information and notification system to make customers aware of outages as soon as feasible and to help customers identify alternate routes or methods of travel. Those methods include: online real-time information about elevator status; the MTA website's Trip Planner, which incorporates elevator outage information as it provides for alternative routes; Customer Information Center ("CIC") screens within stations; permanent signage at every elevator along the ADA accessible path which provides alternative routing information; and Help Point communication devices at every station, which enable riders to connect to NYCT representatives for re-routing assistance in the event of an elevator outage.

Because the subway is not a destination, but rather a means of getting from one place to another, the alternative means of travel vary based on the circumstances and location of the individual customer, including whether there is a temporarily out-of-service elevator along the customer's preferred route, or whether the an elevator goes out-of-service while a customer is en route. Such alternatives include taking different subway lines or using different stations within NYCT's vast system, "back-riding" (going in a different direction to the next accessible stop and

then crossing over to get the train back in the intended direction), and using Defendants' extensive, fully accessible bus system. For certain riders, NYCT's Access-a-Ride ("AAR") paratransit service also serves as an reasonable accommodation when a station is rendered inaccessible due to an outage.

These alternate means of travel serve as a permanent backstop layered on top of the subway system designed to reduce the impact of an unanticpated elevator outage. Plaintiffs have not, and cannot, establish that the system Defendants have in place for providing reasonable accommodations to Plaintiff class members violates the ADA, its implementing regulations, or the City Human Rights Law.[1]

## BACKGROUND AND PROCEDURAL HISTORY

We respectfully assume the Court's familiarity with the pleadings and its prior decision, but briefly set forth the relevant background here for the Court's convenience. Plaintiffs are several disability rights organizations and a certified class of individuals with mobility disabilities who require elevators to use the subway system. They brought suit in 2017, alleging that subway elevators broke down with such frequency as to deny the class "meaningful access" to the subway system in violation of the Americans with Disabilities Act ("ADA") and the New York City Human Rights Law ("NYCHRL"). Plaintiffs argued primarily that (1) the availability metrics of ADA-accessible elevators in the subway system were too low, due to sub-par maintenance and

[1] Both parties expect to rely on expert opinions in support of their respective positions. As the Court may recall, Defendants moved to preclude the expert evidence previously proffered by Plaintiffs, *see* Dkts. 153 through 156, but the Court did not reach those motions in rendering its first decision on summary judgment. The Second Circuit's opinion remanding the matter to this Court suggested that some of the parties' expert evidence may be material, requiring that *Daubert* arguments be resolved. In the interest of judicial economy and to streamline any renewed *Daubert* motions, the parties agreed to postpone the renewal of their expert preclusion motions until each side's opening summary judgment brief was filed, in order to better tailor any ensuing *Daubert* motions to the evidence actually presented. The parties proposed a revised briefing schedule to accomplish this objective, which the Court so-ordered. Dkts. 252, 253. To the extent that Plaintiffs may continue to rely on any portion of the evidence previously introduced, or proffer new or additional expert evidence, Defendants anticipate moving to preclude such evidence as appropriate in accordance with the agreed-upon briefing sequence.

cleaning procedures; and (2) there were insufficient reasonable accommodations offered to assist customers in the event of an elevator outage. *See generally* Dkt. 143.

On March 30, 2020, this Court denied Plaintiffs' motion for partial summary judgment, and granted Defendants' motion for summary judgment in its entirety. Dkt. 202; *Center for Independence of the Disabled, New York, et al v. Metropolitan Transportation Authority et al.*, 17 Civ. 2990 (GBD), 2020 WL 1503454 (S.D.N.Y. Mar. 30, 2020). In connection with Plaintiffs' claim that NYCT's elevators were insufficiently available, this Court held that "the ADA does not require any specific or definitive procedures . . ." and agreed with Defendants that there was "no standard for a system-wide elevator availability in the . . . implementing regulations from the Department of Transportation" and further, that the regulations "expressly contemplate that the elevators will go out of service . . ." *Id.* at *5. The Court opined that Plaintiffs had "los[t] sight of this fact, focusing their claims on whether NYCTA's elevators are adequately maintained or replaced to the extent that *they would like*, instead of whether Plaintiffs are receiving 'meaningful access' to the NYC Subway." *Id* (emphasis in original). Noting Plaintiffs' reliance on anecdotal evidence, a survey of elevators conducted by plaintiffs and an assertion that "80 percent of planned preventive maintenance doesn't happen," the Court commented that "Plaintiffs, however [did] not, and cannot, describe what more is required of defendants in order to comply with the ADA other than to say things should be better." *Id.*

The Court further observed that Plaintiffs had "wholly reject[ed] the notion that this Court should rely on *any* statistics" in support of its claims relating to elevator availability and instead "ask[ed] this Court to rely upon only their statements that the elevators could be better and the experiences of individual class members' personal experiences." *Id.* (emphasis in original). This Court rejected Plaintiffs' evidence, concluding that Plaintiffs had not met their burden to

demonstrate a "systemic failure to provide meaningful access to individuals with disabilities." *Id.* Based on that ruling, the Court did not reach the question of whether Defendants provided adequate reasonable accommodations to subway riders who use elevators in the event of an elevator outage. *Id.* at *6.

On appeal, the U.S. Court of Appeals for the Second Circuit vacated this Court's order and remanded it for further proceedings. *Brooklyn Ctr. for Indep. of the Disabled v. Metropolitan Transp. Auth.*, 11 F.4th 55 (2d Cir. 2021). The Circuit left intact this Court's rulings and reasoning summarized above, but vacated the decision for two specific reasons. First, while agreeing with this Court that "the subway system considered as a whole . . . provides meaningful access as a matter of law," *id* at 63, the Circuit held that there remained a question of fact as to whether, for certain riders, meaningful access has been denied. More specifically, citing to Plaintiffs' experts, the Circuit noted that Plaintiffs had asserted that for riders on "high-trafficked routes" and needing to use "multiple elevators per trip," an inference could be drawn that "for some, access is not meaningful (assuming no accommodation) . . ." and for some, MTA is in violation of the DOT regulations because "elevator outages go beyond isolated or temporary." *Id.* at 64. In this regard, the Circuit concluded, contrary to this Court's conclusion, that the expert evidence was not immaterial. *Id.*[2]

The Circuit made clear that summary judgment remains available to Defendants: "The district court did not decide whether the MTA provides reasonable accommodation during elevator outages. If it can be determined that reasonable accommodation is provided, then access is

[2] As mentioned in note 1, above, Defendants previously moved to preclude the evidence referenced by the Circuit, which was not ruled upon by this Court. Pursuant to the agreed upon briefing sequence, Defendants will address any expert evidence proffered by Plaintiffs after it has been presented as part of their opening motion, and/or in opposition to Defendants' instant motion.

meaningful as a matter of law." *Id.* The Circuit noted that both the bus system and paratransit system could constitute reasonable accommodations. In this regard, the Circuit emphasized that the context within which these accommodations should be assessed was not whether they are "proffered as a substitute for the subway," but rather, whether these services may serve as a "backstop" when an individual encounters an out-of-service elevator impeding their route of travel. *Id*. at 65. The Circuit also directed that, on remand, this Court consider Plaintiffs' claim that Defendants' outage notices are delayed or otherwise inaccurate, such that class members may not know that they need to plan to use those alternative transportation methods. *Id.* at 65-67.

At a conference following the Circuit's remand, this Court instructed that supplemental discovery and briefing "primarily should focus . . . on the issue of reasonable accommodation" and not, by contrast, the broader issues that the Court had already addressed in its 2020 decision. Dkt. 218 (11/3/21 Conf. Tr.) at 3:17-20; *see also id.* at 4:11-5:2, 6:1-20.

As set forth below, the undisputed facts establish that MTA's information and notification system, together with the alternative routing available, its bus system, and its paratransit system, collectively provide an adequate backstop for those who encounter an elevator outage during their trip. Accordingly, MTA indeed provides meaningful access to class members in satisfaction of its obligations both under the ADA and the New York City Human Rights Law.

## STATEMENT OF FACTS

### A. New York City's Transportation System and Elevator Inventory

NYCT operates the largest public transportation agency in North America, and one of the largest of the world. 56.1[3] ¶ 1. It operates 24/7, and consists of a subway system, a bus fleet, and paratransit service. *Id.* ¶¶ 1-5.

[3] All citations in the form of "56.1 ¶ __" are to Defendants' Statement of Material Undisputed Facts Pursuant to Local Rule 56.1, filed herewith.

The NYCT Subway system currently has 114 stations that are ADA accessible, and another 45 provide accessible transfer points. *Id.* ¶ 3. There are more than 270 elevators which provide access to disabled customers which are owned and operated by NYCT, and another 49 elevators providing access which are owned and maintained by third parties pursuant to agreements with the MTA. *Id.* ¶¶ 6-7. Since the last round of summary judgment briefings in 2019, the MTA has added 37 ADA accessible elevators to the subway system. Compare *id*. ¶ 6 with Dkt. 159 ¶ 24.

B. NYCT's Elevators & Escalators Division

The Elevators & Escalators Division ("E&E") is responsible for maintaining the NYCT-owned elevators in the subway system. E&E uses an Enterprise Asset Management system ("EAM"), a successor to the prior "EERMS" system, to track elevator performance metrics, status reports, work orders, maintenance checklists, and material management. *Id.* ¶ 8. Among its many functions, the EAM system is able to provide more accurate estimates for when elevators under repair will be returned to service, based on component availability. *Id.* ¶¶ 8-9. Elevators are equipped with LiftNet devices which can detect outages, and NYCT is currently completing an upgrade to the LiftNet system. *Id.* ¶¶ 11-13. Outages are also reported by Stations personnel who regularly monitor elevator status, and also by the public. *Id.* ¶ 13. E&E maintains a Control Desk at NYCT headquarters which is staffed around the clock in order to receive, investigate, and confirm reports of suspected or confirmed elevator outages. *Id.* ¶¶ 10, 14-15.

C. Outage Information Available to Riders

Confirmed outages of both NYCT and non-NYCT elevators, along with estimated time of return to service, are immediately reported to the public on the MTA website, the MYmta app, and CIC screens within stations, and are pushed out as text and/or email alerts to customers who have subscribed to those alerts. *Id.* ¶¶ 22-24; 32-34. The website also identifies potential alternative

routes to bypass any given elevator outage, and also links to the Trip Planner function, which takes real-time outages into account when a customer plans an accessible trip. *Id.* ¶¶ 22, 25. In addition to the real-time status information online or on the CIC screens in the station, Alternate Accessible Travel Information ("AATI") signs are posted at each elevator with customized re-routing instructions based on the customer's location. Help Points and station agents are also available within the station to assist. *Id.* ¶¶ 26-31, 35-36.

D. Alternatives in the Event of an Elevator Outage

Depending on their location, a customer who encounters an elevator outage may re-route using one or more of several potential methods. Approximately ten stations have redundant elevators providing multiple accessible paths of travel through the station, so that an elevator outage may not preclude access at all. *Id.* at ¶¶ 44-46. Many NYCT subway stations have multiple platforms served by different elevators, so that an outage of an elevator at any given station may not impact a customer with a disability who needs to use that station, depending on the platform or line they need to access. *Id.* ¶ 37. Some stations are referred to as "complexes," because they contain several interconnecting stations. At these complexes, if an elevator outage prevents access to one line, another elevator at that station may be taken to a different platform serving a different line, which in many cases may enable the customer to proceed to their destination via an alternative route, either entirely within the subway system, or with a connecting bus. *Id.* ¶¶ 38-39.

Outside of complexes, many ADA accessible stations are configured with three elevators. These stations are often configured with a platform on each side of the tracks going in opposite directions. These ADA accessible stations are typically serviced by one elevator from the street to the mezzanine and two elevators at the mezzanine level – one for each platform. *Id.* ¶ 40. At stations with these configurations, if the customer cannot access their desired platform due to an

elevator outage, they may take the other mezzanine-to-platform elevator for the train going in the opposite direction, board a train heading in the opposite direction to the next available ADA accessible station, and then transfer to a train providing service in the direction they wish to travel. This is often referred to as "back-riding." *Id.* ¶ 41. Similarly, if the customer is already en route in the subway system but an out-of-service elevator at the destination station makes that stop unavailable, the customer may proceed to the next accessible station and back-ride to the desired destination. *Id.* ¶ 42. Often, such an alternate route will add a relatively short amount of travel time to the customer's journey. As an example, if a customer is trying to exit the system from the Manhattan bound platform at the Eastern Parkway – Brooklyn Museum station but the platform elevator is out of service, the customer can continue riding 3 stops to the Atlantic Avenue station, use the elevators at that station to transfer to a Brooklyn-bound 2 or 3 train, then ride back (approximately 5 minutes in each direction) and exit via the Brooklyn-bound platform at Eastern Parkway. *Id.* ¶ 43.

If a customer cannot enter a station to begin a trip due to an elevator outage, they may be able to walk, wheel, or take an accessible bus to another nearby accessible station instead. *Id.* ¶¶ 47-48. NYCT and MTA Bus together operate approximately 5,800 buses (the largest fleet in the country), each of which is accessible either by ramp or lift, and contains at least two wheelchair securement areas. *Id.* ¶¶ 49-52. The bus system runs parallel to the subway system, and all of the subway system's accessible stations offer connecting bus service which would allow a customer to ride all the way to their destination, or just to the next accessible subway station. *Id.* ¶ 53.

Customers with mobility disabilities may also be eligible for AAR, and can be enrolled after filling out an application and undergoing a functional assessment. *Id.* ¶¶ 54-56. Once accepted, a customer can book a trip one or two days in advance by telephone or online, or can set

up a "subscription" service if they have a consistent commute. *Id.* ¶¶ 57-58. Depending on their capabilities, customers may alternate their use of the subway and bus with AAR trips. *Id.* ¶¶ 59-60.

E. Class Members' Use of NYCT's Transit System and Rerouting Tools

Over the course of the original discovery period and the recent supplemental discovery period, Plaintiffs have proffered the testimony of approximately eight class member witnesses, as well as four additional individuals serving as witnesses on behalf of the organizational plaintiffs. These twelve witnesses have provided testimony regarding their own use of the subway, buses, paratransit, and the sources of information provided by NYCT regarding subway elevator status.

Some class members do not use the subway at all. Karin Willison, a frequent visitor to the city, has only ridden the subway once, in May of 2010. 56.1 ¶ 69. Jean Ryan has not used the subway since 1994, despite an accessible station recently opening near her home. *Id.* ¶ 64. Instead, she relies on AAR for trips that she can plan in advance, and buses for trips that are more spontaneous. *Id*. Jennifer Bartlett does take the subway, but also relies on a bus when it is more convenient for her to do so. When she travels to Williamsburg, she takes the bus from a stop one block away from her home, rather than the subway station five blocks from her home. *Id.* ¶ 74.

Although Plaintiffs complain that the information provided by NYCT regarding subway elevators is inadequate, many of them testified that they were either not aware of the avenues of information available, or did not use them, despite the existence of community outreach efforts by the Office of Systemwide Accessibility, including newsletters, community events, and invitations to join advisory committees. *Id.* ¶ 61. Arielle Rausin testified that she was not aware of NYCT's subway outage alert system. *Id.* ¶ 62. Susan Dooha, the designated CIDNY representative, testified that she was personally aware that it was possible to sign up for elevator status email alerts, but

she never did so, and never advised anyone else that they could. She testified that she had no knowledge of the MTA's mobile application, or that Help Points within subway stations could be used to obtain elevator status information, *Id.* ¶ 67, and that she was unaware of any elevator outage that was not communicated to the public. *Id.* ¶ 68. Class member Monica Bartley, who serves as CIDNY's community outreach organizer, testified that she was not familiar with the MTA's notification system for elevator outages. She also testified that she had never heard of the MYmta app and did not know what a Help Point was, or how it could be used. Ms. Bartley testified that she sometimes checks the MTA website for elevator outages before leaving her home, but does not check her phone before entering the station because "that time could be spent doing something else." *Id.* ¶ 69. Class member Grace Agalo-Os testified that she is aware that the MTA website provides elevator status information but she does not check it. Ms. Agalo-Os also testified that she was not aware that the MTA also provides elevator status information via email and text message alerts. *Id.* ¶ 71. Plaintiff Dustin Jones testified that he was not aware that he could sign up for the MTA's elevator status notification emails. He testified that he used to check the MTA's website for elevator outages, but has not done so since January 2018 because he found the process to be time consuming. *Id.* ¶ 72. Class member Jennifer Bartlett testified that she does not check the elevator status along her planned route before leaving her house, nor does she use the MTA's website, Trip Planner, station Help Points, or consult with station agents in order to reroute herself in the event of an elevator outage. *Id.* ¶ 73, 76.

Class members have also testified that they have been able to successfully reroute themselves entirely within the subway system after encountering an outage. Class member Arielle Rausin has successfully rerouted herself where she has encountered an elevator outage by riding the subway to the next station with a functioning elevator. *Id.* ¶ 62. Class member Bryanna

Copeland has successfully rerouted herself by using Google Maps to research alternate accessible routes. *Id.* ¶ 64. Plaintiff Sasha Blair-Goldensohn has successfully rerouted himself by riding the subway to the next station with a functioning elevator and doubling back, resulting in a delay of approximately half an hour. *Id.* ¶ 66.

## ARGUMENT

### I. LEGAL STANDARDS

#### A. Summary Judgment Standards and Burden of Proof

Summary judgment is appropriate where there is no genuine issue of material fact and the undisputed facts warrant judgment for the moving party as a matter of law. Fed. R. Civ. P. 56(c). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986). "To withstand a summary judgment motion, sufficient evidence must exist upon which a reasonable jury could return a verdict for the nonmovant." *Gonzalez v. Wright*, 665 F. Supp. 2d 334, 346 (S.D.N.Y. 2009) (quoting *Anderson*, 477 U.S. at 248). Moreover, the burden is on the Plaintiffs to prove that Defendants have violated their rights under the ADA. *See Martinelli v. Bridgeport Roman Catholic Diocesan Corp.*, 196 F.3d 409, 428 (2d Cir. 1999) ("In general, the law places the burden of proof on the party that asserts a contention and seeks to benefit from it.").

#### B. "Meaningful Access" Under the ADA

Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. A plaintiff must show that a public entity has failed to provide "meaningful

access" to its benefits, programs, or services. *Disabled in Action v. Bd. of Elections*, 752 F.3d 189, 198-99 (2d Cir. 2014). In order to recover, a plaintiff must show that he "was denied the opportunity to participate in or benefit from the defendant's services, programs, or activities, or was otherwise discriminated against by the defendant because of [the plaintiff's] disability." *Brooklyn Ctr. for Indep. of the Disabled* , 11 F.4th at 61 (quoting *Disabled in Action*, 752 F.3d at 196-97).

To ensure meaningful access, a public entity must make "reasonable accommodations in its program or benefit." *Id.* at 61-62 (quoting *Alexander v. Choate*, 469 U.S. 287, 301 (1985)). "An accommodation must overcome structural impediments and "non-trivial temporal delays that limit access to programs, services and activities." *Id.* at 62 (citation omitted). "If it can be determined that reasonable accommodation is provided, then access is meaningful as a matter of law." *Id.* at 64.

*1. The ADA's Implementing Regulations*

Part A of Title II applies to public entities generally, while Part B applies to entities providing public transportation specifically. With respect to existing transportation facilities, Part B provides that "it shall be considered discrimination . . . for a public entity to fail to operate a designated public transportation program or activity conducted in such facilities so that, when viewed in the entirety, the program or activity is readily accessible to and usable by individuals with disabilities." 42 U.S.C. § 12148(a)(1).

Plaintiffs have also brought claims under § 504 of the Rehabilitation Act ("RA"), which provides in relevant part: "No otherwise qualified individual with a disability. . . shall, solely by reason of his or her disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial

assistance." 29 U.S.C. § 794(a). RA claims are treated as coextensive with ADA claims and may be analyzed together. *See Brooklyn Ctr. for Indep. of the Disabled*, 11 F.4th at 61.

*2. The ADA Regulations: DOT vs. DOJ*

Both the Department of Justice ("DOJ") and the Department of Transportation ("DOT") have promulgated regulations pursuant to the ADA: the DOJ has authority to regulate Part A of Title II, pertaining to public entities generally, and the DOT has authority to regulate Part B, pertaining to public transportation. *See* 42 U.S.C. §§ 12134 (Part A, regulated by the Attorney General); 12149 (Part B, regulated by the Secretary of Transportation).

The DOT implementing regulations, set forth at 49 C.F.R. Part 37, apply specifically to transportation services for individuals with disabilities. The DOJ's implementing regulations, at 28 C.F.R. Part 35, apply more generally to public entities, and have an explicit carve-out for public transportation: "To the extent that public transportation services, programs, and activities of public entities are covered by subtitle B of title II of the ADA (42 U.S.C. 12141), they are not subject to the requirements of this part." 28 C.F.R. § 35.102; *see also* 42 U.S.C. § 12134(a) (specifically prohibiting the DOJ from regulating "any matter within the scope of the authority of the Secretary of Transportation"). The DOT regulations recognize that there may be some overlap between the two sets of regulations, and instruct that the DOT regulations take priority. *See* 49 C.F.R. § 37.21(c) ("Entities to which this part applies also may be subject to ADA regulations of the Department of Justice . . . The provisions of this part shall be interpreted in a manner that will make them consistent with applicable Department of Justice regulations. In any case of apparent inconsistency, the provisions of this part shall prevail.")

*3. The ADA Regulations: General Obligation of Accessibility*

Both sets of regulations impose a general obligation on public entities to ensure accessibility for persons with disabilities. The DOJ regulation provides: "A public entity shall operate each service, program. or activity so that the service, program, or activity, when viewed in its entirety, is readily accessible to and usable by individuals with disabilities." 28 C.F.R. § 35.150(a). The analogous DOT regulation similarly provides: "A public entity shall operate a designated public transportation program or activity conducted in an existing facility so that, when viewed in its entirety, the program or activity is readily accessible to and usable by individuals with disabilities." 49 C.F.R. § 37.61(a).

*4. The ADA Regulations: Obligation to Maintain and Repair*

Both sets of regulations address the obligation to maintain and repair "accessible features," such as elevators and bus lifts, while contemplating that a certain number of outages are to be expected as a matter of course. The DOJ regulations provide: "A public entity shall maintain in operable working condition those features of facilities and equipment that are required to be readily accessible to and usable by persons with disabilities by the Act or this part," and further, that "[t]his section does not prohibit isolated or temporary interruptions in service or access due to maintenance or repairs." 28 C.F.R. § 35.133(a)-(b).

Particularly germane to the issue on remand, the DOT regulations go further: in addition to requiring that accessibility features be maintained in "operative condition," there is a requirement that they be "repaired promptly if they are damaged or out of order," and that in the event of an outage, "the entity shall take reasonable steps to accommodate individuals with disabilities who would otherwise use the feature." 49 C.F.R. § 37.161(a)-(b); *Brooklyn Ctr. for Indep. of the Disabled*, 11 F.4th at 62. "[I]solated or temporary interruptions in service or access

due to maintenance or repairs" are expressly permitted by the regulations and cannot be a basis for the denial of meaningful access. 49 C.F.R. § 37.161(c); *Brooklyn Ctr. for Independ. of the Disabled*, 11 F.4th at 62.

*5. The Rehabilitation Act and its Enacting Regulations*

DOT regulations implementing RA similarly prohibit discrimination based on disability "under any program or activity that receives Federal financial assistance administered by the Department of Transportation." 49 C.F.R. § 27.7(a).

**C. The New York City Human Rights Law**

The New York City Human Rights Law ("NYCHRL") prohibits an owner of a public accommodation to "refuse, withhold from or deny to such person the full and equal enjoyment, on equal terms and conditions, of any of the accommodations, advantages, services, facilities or privileges of the place or provider of public accommodation." N.Y.C. Admin. Code § 8-107(4)(a)(1)(a).

Courts must analyze NYCHRL claims separately and independently from any federal and state law claims, construing the NYCHRL's provisions broadly. *Brooklyn Ctr. for Indep. of the Disabled*, 11 F.4th at 68 (cleaned up). Where, however, there is no difference between the analysis required by the NYCHRL and the analysis required by the federal anti-discrimination laws, the result under the federal and city laws may be the same. *See, e.g.*, *Brooklyn Ctr. for Indep. of the Disabled v. Bloomberg*, 980 F. Supp. 2d 588, 642 (S.D.N.Y. 2013); *DiCarlo v. Walgreens Boot All., Inc.*, No. 15-CV-2919 (JPO), 2016 WL 482982, at *2 (S.D.N.Y. Feb. 5, 2016).

**II. REASONABLE ACCOMMODATIONS ARE AVAILABLE IN THE EVENT OF AN ELEVATOR OUTAGE**

The DOT regulations contemplate that accessibility features, such as elevators, will inevitably malfunction, and provide that "the entity shall take reasonable steps to accommodate

individuals with disabilities who would otherwise use the feature." 49 C.F.R. § 37.161(a)-(b). Even in the face of an elevator outage, the Circuit instructs that "reasonable accommodations can render access meaningful." *Brooklyn Ctr. for Indep. of the Disabled*, 11 F.4th at 64. Meaningful access is not the same as "total" access. *Id.* at 63. There is no dispute that NYCT offers several alternative transit options in the event of an elevator outage, and that there is a robust communications program in place to ensure that customers can effectively plan their routes. The availability of these options renders NYCT compliant with the law. *See Lonberg v. City of Riverside*, No. Ed CV 97-00-237 RGK (AJWx), 2011 WL 13289607, at *6 (C.D. Cal. Mar. 28, 2011) (rejecting ADA suit involving alleged lack of accessible curb cuts for sidewalks, noting that the City provided "alternative measures" "including a 311 call number, a paratransit service, and a program allowing requests to fix or build additional curb cuts").

### A. NYCT's Communications Systems Enable Customers to Use Existing Alternative Routes

The Circuit explained that an informative notification and communication system would allow for NYCT's alternative transportation systems to serve as reasonable accommodations in the event of an elevator outage. *Id.* at 65 ("Although the MTA must provide meaningful access to the subway system itself, it may perform that duty by timely directing passengers to nearby bus stops when an elevator needed for access is out of service."); *id.* at 66 ("the adequacy of buses as a reasonable accommodation depends, at least in part, on whether a passenger gets prompt notice to go to a bus stop instead of a subway station, or to find a bus if an outage arises in the course of travel.); *id.* ("a permanent sign posted near an elevator can give notice of alternative routing information for passengers who encounter an inoperative elevator en route."); *id.* at 67 ("Adequate notice may enable the use of paratransit as a reasonable accommodation in some circumstances.").

There is no genuine dispute that NYCT operates a system by which it informs the public of elevator outages as soon as practicable, including on its website, app, in-station screens, text and email alerts, and TripPlanner routing. *Id.* at 60; 56.1 ¶¶ 21-25, 32-36. These same tools provide information about alternate accessible routes, as do permanent AATI signs posted at each elevator with individualized re-routing instructions. *Brooklyn Ctr. for Indep. of the Disabled*, 11 F.4th at 66-67 (questioning whether signs have been placed at every elevator); 56.1 ¶¶ 26-31 (explaining progress on signage program to include every elevator).

The real-time notification systems are all connected directly to the Control Desk in the Division of Elevators and Escalators, which monitors the equipment around the clock. 56.1 ¶ 10. All elevators are equipped with LiftNet, which monitors and reports on elevator status. NYCT has been steadily upgrading the LiftNet technology to ensure faster and more reliable reporting. *Id.* ¶¶ 11-13. Outages are also reported by stations personnel, who regularly patrol the stations, as well as customers. *Id.* ¶ 13. A delay occasioned by the need to verify that an elevator is, in fact, experiencing an outage, is "plainly reasonable," as it would not serve Plaintiffs well to be notified of an outage that does not actually exist. *Brooklyn Ctr. for Indep. of the Disabled*, 11 F.4th at 66 ("posting a notice of delay before the outage is confirmed (and confirmed to require repair) can disrupt a trip unnecessarily, or needlessly send a passenger to pursue alternatives."). There is no dispute as to how long it takes an outage to be posted on the website, and sent out as alerts to customers. *Id.* ("there is no arithmetical contradiction between an average delay of 14 minutes and a maximum delay of 45 minutes.").

However, as the Circuit noted, the analysis does not stop at how long it takes to report an outage; the question is what, if any, effect an allegedly late outage report has on the trips of the two categories of disabled subway riders identified by the Circuit: "(i) commuters on high-

trafficked routes during peak hours, and (ii) riders who need multiple elevators per trip." *Id.* at 64. The ADA does not demand perfection in the delivery of services. *Brooklyn Ctr. for Indep. of Disabled*, 980 F. Supp. 2d at 641. Instead, Plaintiffs have the burden to demonstrate that any alleged inadequacy creates a "non-trivial temporal delay" for these riders. *Brooklyn Ctr. for Indep. of the Disabled*, 11 F.4th at 62. Plaintiffs have not produced any evidence which specifically links any delay in reporting outages to quantifiable travel delays on a class-wide basis. As described *infra*, anecdotal evidence does not suffice.

### B. Alternative Paths Within the Subway System Constitute a Reasonable Accommodation

NYCT has presented extensive, unrebutted evidence of the ways in which the subway system itself contains multiple options and redundancies which allow for flexibility in re-routing should a customer encounter an unexpected elevator outage. Certain stations have multiple redundant elevators which serve the same platform, meaning that an outage will not preclude access at all. 56.1 ¶¶ 44-46. Other stations are part of larger station "complexes," where multiple subway lines converge, and a customer may be able to re-route using a functioning elevator serving a different subway line. *Id.* ¶¶ 38-39. Other stations' configurations allow for "back-riding," where the customer will take a train going in the opposite direction and cross over to the train heading in the correct direction at the next accessible station, posing only a modest delay. *Id.* ¶¶ 40-43.

All available re-routing options are listed on the AATI signs posted at every elevator landing, as well as on the website and app. *Id.* ¶¶ 22, 26-31. These re-routings generally do not add much time to a given trip. *See, e.g.*, *id.* ¶ 43 (citing example of an additional 10 minutes). An additional 10 minutes of riding the subway does not violate the ADA. *See Williams v. Chicago Transit Auth.*, No. 16 C 9072, 2017 WL 4467456, at *3 (N.D. Ill. Sept. 30, 2017) (riding to the next station and looping back is "a reasonable response to an isolated elevator outage."); *Ellison*

*v. United States Postal Serv.*, 603 F. Supp. 3d 658, 664–65 (S.D. Ind. 2022) (inaccessible post office did not violate the ADA where plaintiff was able to drive an extra four to eight minutes each way to reach nearby accessible branches).

### C. NYCT's Extensive Bus Network is a Reasonable Accommodation

As the Circuit recognized, "buses should be considered as an accommodation," because NYCT may provide meaningful access "by timely directing passengers to nearby bus stops when an elevator needed for access is out of service." *Brooklyn Ctr. for Indep. of the Disabled*, 11 F.4th at 65. The Circuit rejected Plaintiffs' argument that buses were being "proffered as a substitute for the subway," explaining that it was proper to consider buses as "an accommodation and backstop" in the event of an outage. *Id.* The bus network is, of course, "extensive and ramified," *id.*, entirely accessible, and has a bus stop adjacent to virtually every ADA-accessible subway station. 56.1 ¶ 53. In the event that an elevator outage prevents a customer from entering a station, the AATI sign at the elevator will direct the customer to the closest bus stop, and bus directions are also available on the website and app. *Id.* ¶ 26-31, 47. There is no dispute that bus service runs parallel to subway lines, and that if a customer does not want to complete her trip entirely by bus, she may ride the bus to the next accessible station and continue onto the subway. *Id.* ¶ 47.

### D. Paratransit is a Reasonable Accommodation

The Circuit recognized that, with advance notice of planned elevator outages, a customer may plan ahead to use AAR for their trips. *Brooklyn Ctr. for Indep. of the Disabled*, 11 F.4th at 67. Although the need for advance reservations may in some situations be "impractical," the Circuit noted that "the plaintiffs complain primarily of difficulty commuting," and that AAR offers a subscription service for customers who commute to the same place at the same time on a recurring basis. *Id.*; 56.1 ¶ 58. Moreover, the need to make a reservation for a paratransit trip does not, in and of itself, preclude meaningful access. *Woods v. Centro of Oneida, Inc.*, No.

620CV539FJSATB, 2022 WL 14374734 (N.D.N.Y. Sept. 19, 2022) (transportation authority provided meaningful access by providing FTA-compliant paratransit program which delivered "comparable" service; meaningful access did not require provision of same-day paratransit reservations); *see also Neal v. Metro Reg'l Transit Auth.*, No. 5:18-CV-2402, 2019 WL 3753605, at *6 (N.D. Ohio Aug. 8, 2019) (paratransit service provides meaningful access).

## III. PLAINTIFFS CANNOT PROVE ABSENCE OF REASONABLE ACCOMMODATION WITH ANECDOTAL EVIDENCE

Because Defendants offer reasonable accommodations in the limited instances when elevators do go out of service, Point II, *supra*, Plaintiffs have meaningful access to the subway system as a matter of law. Plaintiffs attempt to prove the contrary with anecdotal evidence from a very small number of witnesses, whose testimony is often, in any case, ambiguous at best. The Second Circuit referenced the individual experiences of class members as "illustrative," *id*. at 64, but did not conclude that such testimony was sufficient to establish a claim of a systemic violation of their rights to meaningful access.

Such a claim must be supported by statistical evidence. *See, e.g,. Mandala v. NTT Data, Inc.*, 975 F.3d 202, 209 (2d Cir. 2020) (discussing quality of statistical evidence needed to prove disparate impact in class action discrimination suit); *B.C. v. Mount Vernon School District*, 837 F.3d 152, 158 (2d Cir. 2016) (requiring statistical proof in disparate impact claims). Courts have consistently held in the context of discrimination cases that anecdotal evidence is insufficient to prove that a problem is pervasive, particularly in the absence of statistical evidence. *See, e.g. Coral Const. Co. v. King Cnty.*, 941 F.2d 910, 919 (9th Cir. 1991) (noting that "[w]hile anecdotal evidence may suffice to prove individual claims of discrimination, rarely, if ever, can such evidence show a systemic pattern of discrimination necessary for the adoption of an affirmative action plan"). As the Eleventh Circuit noted in a case involving the allegedly unconstitutional use

of an affirmative action program, "anecdotal evidence can play an important role in bolstering statistical evidence, but [] only in the rare case will anecdotal evidence suffice standing alone." This is because "[w]hile such evidence can doubtless show the perception and, on occasion, the existence of discrimination, it needs statistical underpinnings or comparable proof to show that substantial amounts of business were actually lost to minority or female contractors as the result of the discrimination." *Eng'g Contractors Ass'n of S. Fla. Inc. v. Metro. Dade Cnty.*, 122 F.3d 895, 925-26 (11th Cir. 1997).

Here, while Plaintiffs' anecdotal evidence from class members may show that they personally have, on occasion, had their trips disrupted by elevator outages, or that on occasion MTA's elevator information and notification system was not accurate, such evidence is insufficient to prove a systemic failure to provide meaningful access to public transportation services in the New York City area. *See Wessmann v. Gittens*, 160 F.3d 790, 805–06 (1st Cir. 1998) ("As a general matter, anecdotal evidence is problematic because it does not tend to show that a problem is pervasive."); *Gittens-Bridges v. City of New York*, No. 19 CIV. 272 (ER), 2022 WL 954462, at *17 (S.D.N.Y. Mar. 30, 2022) (discrimination claims "cannot survive" summary judgment where Plaintiff "has introduced only anecdotal evidence" from depositions and did not introduce statistical evidence of disparate impact); *Chen-Oster v. Goldman, Sachs & Co.*, No. 10CIV6950ATRWL, 2022 WL 814074, at *4, n.4 (S.D.N.Y. Mar. 17, 2022), *on reconsideration in part*, No. 10CIV6950ATRWL, 2022 WL 3586460 (S.D.N.Y. Aug. 22, 2022) (noting that the court "did not certify [disparate treatment] claims based on anecdotal evidence."); *E.E.O.C. v. Bloomberg L.P.*, 778 F. Supp. 2d 458, 471 (S.D.N.Y. 2011) (analyzing Title VII pattern-and-practice claim, holding that "[t]he singular fact that the EEOC has no statistical evidence in support

of its case, while maybe not fatal in itself, is severely damaging in this case. In addition to that fact, the EEOC has presented nothing other than anecdotal evidence. The result is fatal.").

The anecdotal experiences of class members simply cannot undermine the conclusion that Defendants offer reasonable accommodations when elevators go out of service. Rather, almost all of the class members who testified explained that they do not even avail themselves of several accommodations available in the event of an elevator outage. Although Defendants provide real-time notifications in the event of elevator outages and can push alerts to customers via the MTA's website, text or email messages (when the customer subscribes to outage notifications), and the MYmta mobile app, class members Jennifer Bartlett and Grace Agalo-Os testified that they do not check for elevator outages before entering the subway system. 56.1 ¶¶ 71, 73. Class representative Dustin Jones testified that he used to check the website, but has not done so since January 2018. *Id.* ¶ 72. Jones, Rausin, Agalo-Os, and Monica Bartley (who is the CIDNY community outreach organizer), all testified that they were not aware of the extent to which Defendants provide elevator status information to customers. *Id.* ¶¶ 63, 69, 71, 72. Susan Dooha, the designated CIDNY representative, testified that she knew that she could sign up for elevator status notifications, but she never did, nor did she advise anyone else of this service. She also testified that she had no knowledge of the mobile phone application or Help Points within subway stations that could be used to access elevator status information in real time. *Id.* ¶ 67. Plaintiffs cannot establish that Defendants' alternate accommodations are inadequate when they choose not to avail themselves of the information or alternate modes of transport available as a "backstop" in the event of an outage.

If anything, class member testimony reveals that the alternate accommodations *do* allow customers to complete their intended journeys. Class members Arielle Rausin and Bryanna

Copeland and class representative Sasha Blair-Goldensohn all testified that they successfully rerouted themselves within the subway system by using alternative accessible stations. *Id.* ¶¶ 62, 64, 66. Jean Ryan explained that she uses Access-A-Ride or buses. *Id.* ¶ 65.

At most, Plaintiffs can offer evidence that they are inconvenienced when an elevator goes out of service. But this is not a problem specific to class members – all customers are inconvenienced when they cannot travel along their intended route because of an unanticipated delay. This is a frustration common to all passengers and does not constitute discrimination particularly where, as here, there are adequate alternative routing options and information and notification systems available to accommodate class members as a backstop for those occasions where they may encounter an elevator outage.

## IV. PLAINTIFFS' NYCHRL CLAIM SHOULD BE DISMISSED

As the Circuit noted, the NYCHRL requires a separate and independent analysis. *Brooklyn Ctr. for Indep. of the Disabled*, 11 F.4th at 68. Although the federal anti-discrimination statutes "serve only as a floor below which the [NYCHRL] cannot fall," and the NYCHRL is generally to be "construed liberally for the accomplishment of [its] uniquely broad and remedial purposes," *id* at 68 (cleaned up), the differences between the NYCHRL and the ADA when it comes to accessible public accommodations do not necessarily compel a different result, and do not in this case. *See, e.g., Brooklyn Ctr. for Independence of Disabled*, 980 F. Supp. 2d at 643 (same outcome possible where there is no "relevant difference between the analysis required by the NYCHRL and the analysis required by the federal laws of the question at issue here."); *see also West v. Five Guys Enterprises, LLC*, No. 15-CV-2845 (JPO), 2016 WL 482981, at *2 (S.D.N.Y. Feb. 5, 2016); *Kreisler v. Second Ave. Diner Corp.*, No. 10 CIV. 7592 RJS, 2012 WL 3961304, at *14 (S.D.N.Y. Sept. 11, 2012), *aff'd*, 731 F.3d 184 (2d Cir. 2013). To the extent that the ADA has "similar

wording" to federal law, it may be used to "aid in interpretation" of the NYCHRL. *Loeffler v. Staten Is. Univ. Hosp.*, 582 F.3d 268, 278 (2d Cir. 2009).

When it comes to the issues relevant to this case, the ways in which the NYCHRL has a broader scope than the ADA do not materially impact the analysis. First, the definition of what constitutes a qualifying disability under the ADA does not dictate a different result under the NYCHRL. *Compare* 29 C.F.R. § 1630.2(g)(1) (ADA requires, *inter alia*, an impairment than limits a major life activity) *with* N.Y.C. Admin. Code § 8-102 (NYCHRL requires only an impairment, without regard to functional impact). The distinction is of no moment where, as here, the parties have consented to certify the Plaintiff class as "all persons who use or seek to use the New York City subway system, and have a disability that requires them to use an elevator to access the subway system." Dkt. No. 63. Second, the NYCHRL shifts the burden to the defendant to demonstrate that a reasonable accommodation has been provided. N.Y.C. Admin. Code § 8-107(15)(b). But a defendant already has the burden on summary judgment to demonstrate that the accommodations offered are "plainly reasonable." *Brooklyn Ctr. For Indep. Of the Disabled*, 11 F.4th at 62.

Plaintiffs' NYCHRL claim should therefore be dismissed on the same basis of their ADA claim. The alternate accommodations provided by NYCT in the event of elevator outages are "plainly reasonable," and Plaintiffs have not—and cannot—create an issue of fact with solely anecdotal evidence or their flawed survey evidence regarding those accommodations. *See Lowell v. Lyft, Inc.*, 352 F. Supp 3d 248, 262-63 (S.D.N.Y. 2018) (allegations of longer wait times for available wheelchair-accessible vehicles do not state a NYCHRL violation).

## CONCLUSION

For the foregoing reasons, Defendants respectfully request that this Court grand their motion for summary judgment in its entirety, along with such other and further relief as it deems just and proper.

Dated: New York, New York
March 17, 2023

By:______________________________

Ira J. Lipton
Helene R. Hechtkopf
Miriam J. Manber
Steven M. Silverberg
Alison Ward

HOGUET NEWMAN
REGAL & KENNEY, LLP
60 East 42nd Street, 48th Floor
New York, NY 10165
Phone: 212-689-8808

*Attorneys for Defendants*