UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X

CENTER FOR INDEPENDENCE OF THE
DISABLED, NEW YORK et al.,

                                        Plaintiffs,

                                                                    17-CV-2990 (GBD) (VF)

                    -against-                                       OPINION & ORDER

METROPOLITAN TRANSPORTATION
AUTHORITY et al.,

                                        Defendants.
-----------------------------------------------------------------X

```
┌─────────────────────────────┐
│ USDC SDNY                    │
│ DOCUMENT                     │
│ ELECTRONICALLY FILED         │
│ DOC #: _____               │
│ DATE FILED:_  9/6/2023        │
└─────────────────────────────┘
```

**VALERIE FIGUEREDO, United States Magistrate Judge.**

On August 9, 2019, Defendants filed a <u>Daubert</u> motion, seeking to preclude the testimony of Plaintiffs' experts, David Rishel, Dr. Stephen Fielding, Dr. Richard Stern, and Andrew Schwarz, pursuant to Federal Rule of Evidence 702. <u>See</u> ECF No. 153. On March 30, 2020, the Honorable George B. Daniels granted summary judgment to Defendants. <u>See</u> ECF No. 202. As part of that decision, the Court summarily denied Defendants' motion in limine to exclude the testimony of Plaintiffs' experts, concluding that the evidence offered by Plaintiffs' experts had not affected the Court's analysis in granting Defendants' summary judgment. <u>Id.</u> at n.4. Plaintiffs appealed the grant of summary judgment, and on August 23, 2021, the United States Court of Appeals for the Second Circuit reversed. <u>See</u> ECF No. 205; <u>Brooklyn Ctr. for Indep. of the Disabled v. Metro. Transp. Auth.</u>, 11 F.4th 55 (2d Cir. 2021). Following the Second Circuit's remand, the parties engaged in limited fact and expert discovery and filed renewed motions for

1

summary judgment. See, e.g., ECF Nos. 233, 254-55. Pending before the Court is Defendants'
motion to preclude the testimony of Plaintiffs' experts. See ECF No. 269. In addition to
renewing their 2019 motion in limine, Defendants also seek to preclude the testimony of Sylvia
Morse, who was newly identified by Plaintiffs as an expert following the Second Circuit's
remand. See ECF No. 272 at 14. For the reasons discussed below, Defendants' motion to exclude
the testimony of Plaintiffs' five experts is **DENIED**.

## DISCUSSION

Under Federal Rule of Evidence 702, after a witness is qualified as an expert, the party
seeking to admit expert testimony must show that, "(1) 'the testimony is based on sufficient facts
or data,' (2) 'the testimony is the product of reliable principles and methods,' and (3) 'the expert
has reliably applied the principles and methods to the facts of the case.'" United States v. Pryor,
474 F. App'x 831, 834 (2d Cir. 2012) (summary order) (quoting Fed. R. Evid. 702). The
proponent of the expert's testimony must further show that "the testimony is relevant and will
assist the jury." In re Mirena IUS Levonorgestrel-Related Prod. Liab. Litig. (No. II), 341 F.
Supp. 3d 213, 240 (S.D.N.Y. 2018), aff'd, 982 F.3d 113 (2d Cir. 2020). The party seeking to
introduce expert testimony "has the burden of establishing by a preponderance of the evidence
that the admissibility requirements of Rule 702 are satisfied." United States v. Williams, 506
F.3d 151, 160 (2d Cir. 2007).

Trial courts serve as "gatekeep[ers]," responsible for "ensuring that an expert's testimony
both rests on a reliable foundation and is relevant to the task at hand." Daubert v. Merrell Dow
Pharm., 509 U.S. 579, 597 (1993); Wills v. Amerada Hess Corp., 379 F.3d 32, 48 (2d Cir. 2004).
This "gatekeeping" function applies whether the expert testimony is based on scientific,

2

technical, or "other specialized" knowledge. <u>Kumho Tire Co., Ltd. v. Carmichael</u>, 526 U.S. 137, 141 (1999). "It is well-established that the trial judge has broad discretion in the matter of the admission or exclusion of expert evidence[.]" <u>Boucher v. United Suzuki Motor Corp.</u>, 73 F.3d 18, 21 (2d Cir. 1996) (citation and internal quotation marks omitted).

Although a district court has "broad latitude" in deciding both "how to determine reliability" and in reaching "its ultimate reliability determination," it may not abandon its "gatekeeping function." <u>Williams</u>, 506 F.3d at 160-61 (citation omitted). "[N]othing in either <u>Daubert</u> or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the ipse dixit of the expert." <u>Kumho Tire Co. v. Carmichael</u>, 526 U.S. 137, 157 (1999) (citation omitted). Thus, "when an expert opinion is based on data, a methodology, or studies that are simply inadequate to support the conclusions reached, <u>Daubert</u> and Rule 702 mandate the exclusion of that unreliable opinion testimony." <u>Ruggiero v. Warner-Lambert Co.</u>, 424 F.3d 249, 255 (2d Cir. 2005) (citation omitted).

"In <u>Daubert</u>, the Supreme Court set out a list of non-exclusive factors that courts should consider in determining whether an expert's methodology is reliable. These are: (1) whether the expert's technique or theory can be or has been tested; (2) whether it has been subjected to peer review and publication; (3) whether there is a high error rate for the expert's technique, and whether there are 'standards controlling the technique's operation'; and (4) whether the expert's technique or theory is generally accepted by the relevant scientific community." <u>In re Mirena</u>, 341 F. Supp. 3d at 240 (citing <u>Daubert</u>, 509 U.S. at 592-94; <u>Nimely v. City of New York</u>, 414 F.3d 381, 396 (2d Cir. 2005)). However, "[a] proffered opinion may fail all four <u>Daubert</u> reliability factors and still be admitted." <u>Id.</u> "[T]he types of factors that are appropriate to

3

consider will 'depend[ ] upon the particular circumstances of the particular case at issue.'" In re Pfizer Inc. Sec. Litig., 819 F.3d 642, 658 (2d Cir. 2016) (quoting Kumho Tire Co., Ltd. v. Carmichael, 526 U.S. 137, 150 (1999)); see also E.E.O.C. v. Bloomberg L.P., No. 07-CV-8383 (LAP), 2010 WL 3466370, at *14 (S.D.N.Y. Aug. 31, 2010) ("The fact that a social scientist's approach might have inherent methodological limitations and does not produce a testable hypothesis or a known or potential rate of error, does not necessarily render the resulting testimony unreliable under Rule 702.") (citations and internal quotation marks omitted). Ultimately, the Court's task "is to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." Kumho Tire, 526 U.S. at 152.

Expert testimony is relevant if it "'fits' the facts of the case." LVL XIII Brands, Inc. v. Louis Vuitton Malletier S.A., 209 F. Supp. 3d 612, 641 (S.D.N.Y. 2016) (quoting Daubert, 509 U.S. at 591-92). Even where the expert's method is reliable, her testimony may fail Daubert's fit requirement where (1) her data "is materially different from the data relevant to the facts of the case," (2) the expert "has failed to consider the necessary factors" or based the analysis "upon a faulty assumption," or (3) the expert's "methodology [was] transposed from one area to a completely different context, and there is no independent research supporting the transposition." Astra Aktiebolag v. Andrx Pharms., Inc., 222 F. Supp. 2d 423, 488 (S.D.N.Y. 2002) (citations and internal quotation marks omitted), aff'd sub nom. In re Omeprazole Patent Litig., 84 F. App'x 76 (Fed. Cir. 2003) (summary order).

Additionally, the Court must determine whether the proposed expert testimony "will help the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702. This inquiry looks primarily to whether the testimony is relevant. See In re Zyprexa Prod. Liab. Litig., 489 F. Supp. 2d 230, 283 (E.D.N.Y. 2007). Under the Federal Rules of Evidence, evidence is relevant if it has a "tendency to make a fact more or less probable than it would be without the evidence." Fed. R. Evid. 401; see also Daubert, 509 U.S. at 591-92 ("Rule 702's 'helpfulness' standard requires a valid scientific connection to the pertinent inquiry as a precondition to admissibility.").

A court should not admit expert testimony that is "'directed solely to lay matters which a jury is capable of understanding and deciding without the expert's help.'" United States v. Mulder, 273 F.3d 91, 104 (2d Cir. 2001) (quoting United States v. Castillo, 924 F.2d 1227, 1232 (2d Cir. 1991)); see also Atl. Specialty Ins. v. AE Outfitters Retail Co., 970 F. Supp. 2d 278, 291-92 (S.D.N.Y. 2013) (excluding expert's "opinion on the extent of fire damage resulting from [fire department's] response time," where expert's opinion was essentially that "a fire causes increasing damage the longer it burns," because "a lay person is entirely capable of reaching this conclusion without the help of an expert"). Further, a court should exclude expert testimony if it is "speculative or conjectural or based on assumptions that are so unrealistic and contradictory as to suggest bad faith." Restivo v. Hessemann, 846 F.3d 547, 577 (2d Cir. 2017) (quoting Zerega Ave. Realty Corp. v. Hornbeck Offshore Transp., LLC, 571 F.3d 206, 214 (2d Cir. 2009)). "Finally, as with all evidence, under Rule 403, the Court may exclude testimony if its probative value is substantially outweighed by the danger of unfair prejudice, confusion, or delay." LVL XIII Brands, 209 F. Supp. 3d at 636 (citation omitted).

5

A. **The Rebuttal Report of Sylvia Morse**

Sylvia Morse, Policy Program Manager at Pratt Center for Community Development, prepared an expert rebuttal report, to respond to the September 12, 2022 report of Defendants' expert, Dr. Alan J. Salzberg.[1] See ECF No. 270-3 at 2.[2] For Defendants, Dr. Salzberg had assessed the availability and associated delays of alternative itineraries for riders with mobility disabilities who encounter an elevator outage in the subway system. Id. at 2. Morse, who has over a decade of experience in urban planning, policy, and community development research and programs in New York City, was asked by Plaintiffs' counsel to "review and opine on Dr. Salzberg's conclusions regarding the 'availability' and associated delays of alternative itineraries for riders with mobility disabilities who are forced to reroute after encountering an elevator outage in the subway system." Id. at 2-3. Morse focused on the "real-world performance of the bus system and factors affecting rider experience" to challenge two assumptions underlying Dr. Salzberg's opinion: (1) that transit users with mobility disabilities will always be able to access busses as part of alternative itineraries, and (2) that the MTA's Trip Planner itineraries accurately reflect a transit users' trip completion and travel time. Id. at 2, 4-5.

Morse reviewed bus and subway performance data, customer feedback data, city agency reports, news reporting, and other data. Id. at 4-5, Appendix A. In particular, Morse examined

---

[1] In 2018, Dr. Salzberg prepared a report for Defendants titled "Subway Accessibility Analysis." See ECF No. 154-4. Dr .Salzberg was asked to review the public elevators in the subway system to determine the "elevator, station, and station stop availability" for subway riders with mobility disabilities. Id. at 2-3. In 2022, Dr. Salzberg updated the findings in his 2018 report. See ECF No. 270-1.

[2] The page numbers used herein refer to the original pagination of a document, and not to the pagination introduced in the header of a document by the ECF filing system.

"Feedback Data" about city busses between 2014 and 2019, collected by the Metropolitan

Transit Authority ("MTA") from transit users, because such feedback "provides valuable

information regarding a range of aspects of rider experience." Id. Appendix B at 26. Morse

began her analysis by identifying MTA records of "Complaints" related to "NYC Buses" and

"Buses," which yielded 293,093 records. Id. Out of those records, Morse identified complaints

related to trip accessibility or the experience of riders with disabilities and then distilled those

complaints into various subcategories depending on whether the complaints directly or indirectly

affected access for riders with mobility disabilities. Id. Appendix B at 26-30.

From 2014 to 2019, the most recent years for which MTA feedback data was available,

Morse found that the MTA received 24,589 complaints on 19 issues that related, directly or

indirectly, to mobility accessibility of the bus system. Id. at 6. Of those, 3,271 complaints were

on 11 issues that directly related to accessibility barriers and service denial for passengers with

mobility disabilities, such as complaints that a bus driver did not stop for a wheelchair user to

board the bus, the driver failed to secure the wheelchair once on the bus, or the driver refused to

deploy the lift for the wheelchair user. Id. at 6. For the remaining 21,318 complaints, Morse

determined that those complaints related to eight issues that could present obstacles to

accessibility, such as complaints about difficulty boarding or leaving the bus, snow or ice

obstructing access to a bus stop, or illegal parking preventing access to a bus. Id.

Ultimately, Morse concluded that accessibility barriers and the unreliability of buses

impede or delay the completion of alternative itineraries that rely on use of the bus system for

transit users with mobility disabilities. Id. at 16-20. In her report, Morse outlined factors that

could impede bus access for riders with mobility disabilities and prevent them from taking a trip

according to the steps and time outlined in MTA's Trip Planner itinerary. Id. at 6. For example, Morse identified "service denial" as an example of one issue that impedes access for transit users with mobility disabilities and she identified the two most commonly reported instances of service denial for wheelchair users (when a driver refused to deploy a lift or bypassed a wheelchair user). Id. at 7. To further support the MTA Feedback Data, Morse recounted examples of real-world instances of service denial, which MTA users had publicly disclosed on Twitter or which were reported in news articles. Id. at 7-10.

Defendants do not attack Morse's qualifications to serve as an expert witness. Instead, Defendants contend that Morse's conclusions are "unscientific" and are not grounded in a "statistically valid method," and they fault Morse for relaying anecdotal evidence in her report. See ECF No. 272 at 11-13. None of Defendants' arguments have merit, as explained below.

First, Defendants' argument that Morse's expert report should be excluded because she did not conduct a scientific or statistical analysis is meritless. As the Second Circuit has explained, "expert testimony need not be based on statistical analysis in order to be probative." United States v. Joseph, 542 F.3d 13, 21 (2d Cir. 2008) (quoting United States v. Long, 328 F.3d 655, 668 (D.C. Cir. 2003) (internal quotation marks omitted)). "Not every expert admissible under Daubert need rely on a method that conforms with the exactness of hard science methodologies." United States v. Ray, No. 20-CR-110 (LJL), 2022 WL 101911, at *2 (S.D.N.Y. Jan. 11, 2022) (internal quotation marks and citations omitted). Instead, the inquiry conducted under Rule 702 is "flexible." United States v. Jones, 965 F.3d 149, 161 (2d Cir. 2020). And, such flexibility is particularly necessary when assessing expert testimony in the "social sciences," where "research, theories and opinions cannot have the exactness of hard science

8

methodologies." United States v. Simmons, 470 F.3d 1115, 1123 (5th Cir. 2006); see also

O'Loughlin v. USTA Player Dev. Inc., No. 14-CV-2194 (VB), 2016 WL 5416513, at *3

(S.D.N.Y. Sept. 28, 2016) (explaining that court's discretion in analyzing admissibility of expert

evidence "is particularly broad where the area of expertise in question is not a so-called hard

science").

Here, there is no basis for precluding Morse from testifying as a rebuttal expert for

Plaintiffs. "The Second Circuit instructs district courts to exclude expert testimony if it is

'speculative or conjectural or based on assumptions that are so unrealistic and contradictory as to

suggest bad faith.'" LVL XIII Brands, Inc., 209 F. Supp. 3d at 636 (quoting Zerega Ave. Realty

Corp., 571 F.3d at 214 (further citation and quotations marks omitted)). Nothing in Morse's

report suggests speculation, conjecture, or bad faith. To the contrary, Morse's conclusions are

based on an array of diverse data sources, including data collected by the MTA itself pertaining

to customer complaints and feedback that relate specifically to issues of accessibility with the

bus system. See ECF No. 270-3, Appendix A. In addition to that data, Morse also reviewed

newspaper articles, reports of government agencies, reports from the MTA, and independent

studies focused on transit access. Id. at 4, Appendix A. Using that data, Morse identified and

described various reliability issues and barriers to access that might be encountered by transit

riders with mobility disabilities—some of which the MTA itself has acknowledged present a

problem. See, e.g., ECF No. 270-3 at 7.

Although Morse's opinion may not rest on statistical studies or traditional scientific

methods, her opinion is based on her own personal experience and expertise in this area, and on

customer complaints and data collected by the MTA. See ECF No. 270-3 at 26; ECF No. 259-6

9

at 10-12. And as Morse explained, such data "is of a type reasonably relied upon by experts in various disciplines of social science." Katt v. City of New York, 151 F. Supp. 2d 313, 357 (S.D.N.Y. 2001); accord Cerbelli v. City of New York., No. 99–CV–6846 (RML), 2006 WL 2792755, at *8 (E.D.N.Y. Sept. 27, 2006); see also Kumho Tire Co., 526 U.S. at 148-49 (acknowledging that in some fields the reliability inquiry may turn on personal knowledge and experience rather scientific method). Any weaknesses in Morse's analysis on these fronts is a basis for cross-examination and not wholesale preclusion of her rebuttal testimony. See, e.g., Vazquez v. City of New York, No. 10-CV-6277 (JMF), 2014 WL 4388497, at *12 (S.D.N.Y. Sept. 5, 2014); Cerbelli, 2006 WL 2792755, at *6; see also Daubert, 509 U.S. at 596 ("Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence.").

Next, Defendants also challenge Morse's reliance on certain hearsay materials, arguing that Morse improperly offers a recitation of customer complaints in order to construct a factual narrative for the jury. ECF No. 272 at 11-12. Of course, under Federal Rule of Evidence 703, a party cannot "call an expert simply as a conduit for introducing hearsay under the guise that the testifying expert used the hearsay as the basis of his testimony." Malletier v. Dooney & Bourke, Inc., 525 F. Supp. 2d 558, 666 (S.D.N.Y. 2007). But as Plaintiffs correctly counter (see ECF No. 279 at 10, 12), an expert witness may testify to opinions based on hearsay or other inadmissible evidence where experts in that field reasonably rely on such evidence in forming their opinions. See United States v. Daly, 842 F.2d 1380, 1387 (2d Cir. 1988) ("[I]f experts in the field reasonably rely on hearsay in forming their opinions and drawing their inferences, the expert witness may properly testify to his opinions and inferences based upon such hearsay."); see also

10

United States v. Torres, No. 20-CR-608 (DLC), 2021 WL 1947503, at *7 (S.D.N.Y. May 13, 2021) (same). Morse explained that feedback from transit users provides "valuable information regarding a range of aspects of rider experience." ECF No. 270-3 at 26. And, Defendants themselves sought and collected such comments, presumably to assist in making improvements to the transit system based on feedback from users of the system. See, e.g., ECF No. 259-11 at 80; see also ECF No. 270-6 at 71 (Morse testifying to rider "wait time[ ]" feedback cited "in various MTA rider feedback analyses and studies"). To the extent Defendants suggest that the customer complaints relied on by Morse are unverified, that is an argument they can pursue on cross-examination, but it does not present a basis for preclusion of her testimony. See, e.g., Ray, 2022 WL 101911, at *11-12 (permitting expert testimony that relied, in part, on "unverified stories" from the expert's clients). Likewise, Defendants' argument that Morse's report is "limited to theoretical obstacles that a bus rider might face" (see ECF No. 289 at 12), misreads the substance of Morse's report and, in any case, is an argument that goes to the weight the trier of fact should give her testimony, and not its admissibility.

Moreover, and contrary to Defendants' argument, Morse's report does not improperly create a factual narrative for the jury. ECF No. 272 at 11-12. Yes, Morse recounted various customer complaints about the bus system. See, e.g., ECF No. 270-3 at 8. But that was a necessary foundation for her opinion that Dr. Salzberg had erred in assuming that transit users with mobility disabilities could always access buses as an alternative to the subway when they encounter an elevator outage. And, significantly, Morse's analysis went further than merely recounting customer complaints. See Scott v. Chipotle Mexican Grill, Inc., 315 F.R.D. 33, 46 (S.D.N.Y. 2016) (admitting expert testimony where expert's factual narrative was a necessary

foundation for his opinion). Instead, Morse aggregated and analyzed the complaints collected by the MTA and cross-referenced those complaints against other sources, such as news articles and agency reports, to support her ultimate conclusion that accessibility barriers and the unreliability of buses may impede the successful completion of alternative itineraries that rely on the bus system. See, e.g., ECF No. 270-6 at 81-83 (explaining that she relied on customer complaints, "news reports," and "scholarly articles" to reach conclusion that accessibility barriers and unreliability of the MTA buses is "regularly experienced by riders with disabilities").

Finally, for the first time in their reply brief, Defendants contend that Morse's report is not a proper rebuttal report because it is outside the scope of Dr. Salzberg's report. See ECF No. 289 at 8. It is well settled, however, that an argument raised for the first time in a reply brief is waived. See Thomas v. Roach, 165 F.3d 137, 146 (2d Cir. 1999) (declining to consider argument raised for the first time in reply brief) (citation omitted); Unlimited Cellular, Inc. v. Red Points Sols. SL, No. 21-CV-10638 (NSR), 2023 WL 4029824, at *9 (S.D.N.Y. June 14, 2023) (same).

In sum, Defendants' motion to exclude the testimony of Sylvia Morse is denied.

## B.  **The Expert Report of David Rishel**

David R. Rishel, the Principal of Delta Services Group, Inc., consulted with Dr. Ross Koppel[3] and David Mirch "to conduct an objective evaluation" of the New York City subway's elevators during the spring of 2018, which was "intended to measure the rate of elevator outages and to assess their maintained condition." See ECF No. 154-3 at 6. Rishel and his team conducted two separate assessments: (1) an "unannounced survey of elevators," which took

---

[3] Dr. Koppel—a "scholar of research methods used for the study of transportation, cybersecurity, and healthcare [information technology]"—aided Rishel in the "design and execution of the survey of the elevators and the analysis of the findings." ECF No. 154-3 at 8.

account of their operability and general condition, and (2) an inspection of a "select group" of elevators to assess their condition and check the available maintenance records in order to determine the adequacy of their maintenance. See id. at 7.

Rishel hired and trained six "surveyors" who, during the course of three weeks, visited a variety of subway stations in order to "select and ride the elevators in such a way, and with a sample large enough, that [Rishel] could obtain results that would be representative of what any person was likely to encounter when using the Accessibility Elevators." Id. at 9, 16-17, 19. Using the MTA's website, Rishel began by determining that 88 subway stations were designated as accessible because they have one or more elevators. Id. at 9. To determine which elevators to survey, Rishel selected a subway station from the 88 accessible stations using a random number generator. Id. at 10. Once a station was selected, the surveyor selected the subway line using a random number generator. Id. The surveyor then selected at random the direction of travel on the subway line—north/east or south/west. Id. With a subway line and direction of travel determined, the surveyor rode the subway, "stopping at each accessible station and surveying all elevators at each accessible station." Id. After stopping at three stations on the same subway line and in the same direction of travel, the surveyor was instructed to select "a different line traveling on a different trunk from that station and a different direction of travel," using the same methodology used to select the first station. Id. The surveyor repeated the sequence until she "passed through enough stations for a 5-6 hour sequence." Id. When a surveyor encountered an out-of-service elevator, she used the stairs to bypass the elevator and continued her survey of the station. Id. Rishel explains that "these sequencing rules" resulted in "a list of stations and travel

directions" that were "determined entirely by a combination of chance and fixed rules," a type of sequence known in statistics as a "Random Walk." Id.

During the survey, 48 elevators were not working when the surveyors inspected them. Id. at 19. Rishel conducted a comparison analysis, whereby he compared the elevators that were observed by the surveyors as "Out of Service" with those elevators listed as "Out of Service" by the MTA. Id. at 19. Rishel concluded that 5.1% of the time, he and his surveyors encountered an out-of-service elevator, and 20.8% of those outages were not reported by the MTA. Id. at 45. Rishel further concluded that passengers were "likely to encounter elevators with deficiencies 51.2% of the time," a statistic which he described as "unusually high." Id. Additionally, Rishel conducted a "detailed inspection of four elevators in the system" and opined that none of the elevators were "well maintained," because they had "significant deficiencies with major operating components." Id. Ultimately, Rishel concluded that although the MTA had a "reasonably well-developed" elevator maintenance program, his survey results demonstrated that in practice the MTA was not properly maintaining its elevators. Id. Rishel's conclusions were based on an inspection of four elevators and observations of 935 surveyed elevators. Id. at 19, 31-43.

Defendants renew their challenge to Rishel's expert report, which they first raised in 2019. See ECF No. 272 at 10. Beginning with Defendants' attack on Rishel's experience, Defendants contend that Rishel has no experience in the field of elevator maintenance or operability and thus his opinion that the MTA is not properly maintaining its elevators is inadmissible. See ECF No. 156 at 9-10. A review of Rishel's qualifications demonstrate that Defendants' attack is unfounded.

14

Rishel is a nationally recognized transportation accessibility expert who has conducted studies for other transportation agencies, similar to the study he conducted for Plaintiffs here. See ECF No. 154-3 at 8 (detailing experience); ECF No. 180 ("Rishel Decl.") ¶¶ 1-2, 4-5. In 2004, for example, Rishel conducted a two-part study to examine the elevator maintenance practices of the Massachusetts Bay Transportation Authority ("MBTA"). Rishel Decl. ¶¶ 5-6. In addition to his elevator maintenance analysis for the MBTA, Rishel also conducted an observational study to assess whether the MBTA's buses complied with the American with Disabilities Act ("ADA"). Id. ¶¶ 7-8. Rishel was also asked by the United States Department of Justice and the Detroit Department of Transportation ("DDOT") to implement a systemwide reform of DDOT's management of its bus service to ensure compliance with the ADA. Id. ¶ 11. Subsequently, Rishel was appointed by the court as the auditor in charge of reviewing DDOT's compliance, and in that role, conducted an evaluation of the bus system to assess its accessibility problems for users with a mobility disability. Id. ¶¶ 12-15. In performing that evaluation, Rishel used a methodology akin to what was used here: Rishel employed teams of trained surveyors who attempted to ride a variety of DDOT's buses and recorded the obstacles to access that they encountered. Id. ¶¶ 13-14. In any case, "[d]isputes as to the strength of [Rishel's] credentials . . . go to the weight, not the admissibility," of his expert opinion. McCullock v. H.B. Fuller Co., 61 F.3d 1038, 1044 (2d Cir. 1995) (citation omitted).

Further, although Defendants attack Rishel's ability to opine about elevator maintenance and operability (see ECF No. 186 at 6), Defendants acknowledge (see ECF No. 156 at 10) that Rishel, in conducting his survey, was aided by an expert with a specialty in elevator maintenance, David Mirch. Mirch conducted the inspection of the elevators and delivered the

assessment pertaining to elevator operability and maintenance that underlies Rishel's opinion about elevator accessibility. See ECF No. 154-3 at 9, 30, 44. And, tellingly, the MTA's own expert, Alan J. Salzberg, testified that he has previously relied on the technical expertise of others to support his own expert opinion. See ECF No. 173-9 at 27-28 (Salzberg testifying in deposition that he relied on "expertise of people in the MTA for aspects of the work" he performed here, and in a different case, he relied on expertise of "Liberty Consulting" for their knowledge of telecommunication devices).

Defendants also contend that Rishel's survey methodology has numerous faults. First, Defendants argue that Rishel's survey did not provide for inspection of a random sample of elevators and thus is not representative of the total population of elevators. ECF No. 156 at 12-13. Second, Defendants aver that Rishel's study was performed during 19 successive days, between March 31 and April 18, 2018, and thus did not involve a representative time period. Id. at 14. Third, Defendants contend that Rishel's surveyors were told to deem an elevator inoperable if it did not respond within a minute of pressing the call button—a time period, Defendants' claim, that fails to account for the realities of heavy elevator usage. Id. at 15. Fourth, Defendants argue that Rishel failed to consider publicly available data regarding subway station usage and instead identified for himself "common trips" that a passenger might take. Id. at 15-16. Fifth, Defendants claim that the surveyors were unqualified and did not receive meaningful training. Id. at 16. Finally, Defendants contend that the surveyors did not follow the methodology outlined by Rishel in his report.[4] Id. at 17-20.

---

[4] Specifically, Defendants point to the fact that one surveyor did not begin the survey at a randomly selected subway station, and instead began his work at the JFK Airport-Howard Beach station, after arriving at JFK airport. See ECF No. 156 at 19.

All of Defendants' criticisms, focused on potential errors in the methodology used by Rishel to conduct his observational survey, go to the weight a trier of fact should afford Rishel's opinion, not its admissibility.[5] <u>Playtex Prod., Inc. v. Procter & Gamble Co.</u>, No. 02-CV-8046 (WHP), 2003 WL 21242769, at *2-3 (S.D.N.Y. May 28, 2004) (explaining that methodological deficiencies in a survey relate to weight afforded the survey's conclusions, not its admissibility); <u>see also</u> <u>McCullock</u>, 61 F.3d at 1044 (explaining that faults in methodology used by expert is a matter for cross-examination); <u>Deutsch v. Novartis Pharm. Corp.</u>, 768 F. Supp. 2d 420, 433-34 (E.D.N.Y. 2011) (explaining that "[t]he weight of a conclusion derived" from an observational study "involves the resolution of a factual dispute . . . for the jury") (citation omitted); <u>POM Wonderful LLC v. Organic Juice USA, Inc.</u>, 769 F. Supp. 2d 188, 197 (S.D.N.Y. 2011) ("When evaluating survey evidence, errors in a survey's methodology usually go to the weight accorded to its conclusions rather than its admissibility.") (citation omitted). Regardless, as Defendants' expert, Dr. Salzberg, explained, Rishel's findings about overall elevator outages show "the same outage rate" as Defendants' study, undermining Defendants' criticism as to the soundness of Rishel's methodology. <u>See</u> ECF No. 173-29 at 7.

Finally, Defendants contend that Rishel's survey is an improper attempt to "shoehorn" inadmissible hearsay—specifically, the survey responses—into the trial record. ECF No. 156 at

---

[5] To the extent Defendants claim that Rishel's surveyors needed additional training, it is worth noting that the surveyors were asked to evaluate common issues with elevator operation, such as cleanliness, odor, stop-and-go elevator operation, and whether the elevator doors closed. <u>See</u> ECF No. 154-3 at 11-16. Although the surveyors received four days of training, <u>id.</u> at 16-17, the simple tasks they were asked to perform could have been done by any person of reasonable intelligence, without the need for specialized training.

22-23. Defendants aver that Rishel's entire report relies on hearsay and is thus an improper attempt to create a factual narrative for the jury about the difficulties of using subway elevators. Id. An expert, however, can rely on hearsay in reaching his own opinion. Malletier, 525 F. Supp. 2d at 666 ("It is true that under Rule 703, experts can rely on hearsay in reaching their own opinions."). Moreover, the survey responses are information that necessarily underlie Rishel's opinion and it therefore was appropriate for him to recount that information in his report, even if the responses themselves are not independently admissible. Celebrity Cruises Inc. v. Essef Corp., 434 F. Supp. 2d 169, 192 (S.D.N.Y. 2006) (noting that expert's discussion of the "dynamics of the cruise industry" was permissible). And, Rishel does not "simply repeat this evidence 'without applying any expertise whatsoever.'" In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig., No. 05-MD-1720, 2022 WL 14814183, at *37 (E.D.N.Y. Oct. 26, 2022) (citation omitted). To the contrary, Rishel applied his own expertise in reviewing the survey responses, MTA data concerning elevator outages, and other work on the subject of elevator outages in the subway system, to conclude that elevator outages in the subway system were unusually high and that the MTA was not properly maintaining its elevators. See ECF No. 154-3 at 44-45. A discussion about the underlying survey data was thus necessary for the fact finder to understand the basis of Rishel's opinion.

In sum, Defendants' motion to preclude the testimony of David Rishel is denied.

## C.  Dr. Stephen Fielding and Dr. Richard Stern

Plaintiffs submitted a report from Dr. Richard Stern and a declaration from Dr. Stephen Fielding, both for the limited purpose of responding to criticisms of Rishel's survey raised by Defendants' expert, Dr. Salzberg. See ECF No. 154-9 at 3 (Stern's Report); ECF No. 154-8 at

¶ 3 (Fielding's Declaration). Defendants contend that the opinions of these experts must be precluded because Plaintiffs have proffered their opinions solely to bolster Rishel's conclusions. ECF No. 156 at 20-21. But, "expert opinion which assess or critique another expert's substantive testimony are relevant" and admissible so long as they do not attack an expert's credibility which necessarily usurps the jury's role. <u>Deutsch</u>, 768 F. Supp. 2d at 481 (citations and internal quotation marks omitted). Further, to the extent Defendants fault Stern and Field for not having conducted a proper assessment of Rishel's study, that argument goes to the weight the jury should afford Stern's report and Field's declaration, not their admissibility.

### D. <u>The Expert Report of Andrew Schwarz</u>

In support of their first motion for summary judgment, and prior to the Second Circuit's remand, Plaintiffs submitted an expert report from Andrew Schwarz, dated January 24, 2019. <u>See</u> ECF No. 154-10. Schwarz, an economist, was retained by Plaintiffs to "develop a methodology for demonstrating the practical implications of the analysis performed" by Defendants' expert, Dr. Salzberg. ECF No. 154-10 at ¶¶ 1-3. Schwarz was asked to assume that Dr. Salzberg's calculations were correct and "apply his results to possible commuter routes to assess the frequency of ride disruption on those routes." <u>Id.</u> ¶¶ 2, 5. Additionally, Schwarz was asked to "opine whether or not a median availability of 98.7% implies that commuters who use high-traffic ADA-accessible stations should expect to experience uninterrupted trips with more than 2% frequency."[6] <u>Id.</u> In his report, Schwarz expressly states that his assessment is not based on "a random sample." <u>Id.</u> ¶ 6. He explains that his assessment is instead "intended to highlight

---

[6] Dr. Salzberg examined elevator availability at accessible subway stations and opined that the median availability of elevators at those stations is 98.7% during weekdays, between the hours of 6:00 a.m. and 10:00 p.m. <u>See</u> ECF No. 154-4 at 2.

the impact of the frequency of inaccessibility calculated by Dr. Salzberg on the commutes of targeted types of individuals"—specifically, residents of the Bronx, Queen, and Brooklyn who require elevators to be available and who commute to Manhattan between 8 a.m. and 9 a.m. and commute home between 5 p.m. and 6 p.m. Id.

After the Second Circuit's remand, Schwarz submitted an updated expert report, dated November 23, 2022. See ECF No. 270-2. In this report, Schwarz was asked to revisit his prior work in light of updates made by Dr. Salzberg to his report. Schwarz was instructed to make any necessary revisions to his analysis to account for Dr. Salzberg's new data and to respond to Dr. Salzberg's critiques of Schwarz's work in Salzberg's most recent report. Id. ¶ 3.

Defendants moved to preclude the introduction of Schwarz's report in August 2019. See ECF Nos. 153, 156. Now, Defendants have renewed that motion, relying on the same memorandum they filed in support of the motion in August 2019. See ECF No. 156 at 24-25. Defendants have not revised or updated their arguments for preclusion in light of Schwarz's updated expert report from 2022.

In any case, Defendants have failed to proffer a basis for preclusion of Schwarz's testimony. Defendants fault Schwarz for having assessed commutes between only 20 different subway stations; for having disregarded commutes that began in Manhattan; and for failing to select any subway stations in downtown Manhattan. See ECF No. 156 at 24-25. At bottom, all of these arguments pertain to the assumptions underlying Schwarz's opinion. And arguments that the assumptions relied on by an expert are flawed or unfounded go to the weight rather than the admissibility of the evidence. See Silivanch v. Celebrity Cruises, Inc., 171 F. Supp. 2d 241, 270 (S.D.N.Y. 2001); AU New Haven, LLC v. YKK Corp., No. 15-CV-3411 (GHW) (SN), 2019 WL

1254763, at *3 (S.D.N.Y. Mar. 19, 2019) ("Any contentions that the expert's 'assumptions are unfounded go to the weight, not the admissibility, of the testimony.'") (citation omitted). Consequently, Defendants' motion to preclude the testimony of Schwarz is also denied.

## **CONCLUSION**

For the foregoing reasons, Defendants' motion to preclude the testimony of Plaintiffs' experts is **DENIED**. The Clerk of Court is instructed to terminate the motion at ECF No. 269.

**SO ORDERED.**

DATED:        New York, New York
              September 6, 2023

_____
VALERIE FIGUEREDO
United States Magistrate Judge