**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

CENTER FOR INDEPENDENCE OF THE DISABLED, :
NEW YORK, *a nonprofit organization*; BROOKLYN :
CENTER FOR INDEPENDENCE OF THE DISABLED, :
*a nonprofit organization*; BRONX INDEPENDENT :
LIVING SERVICES, *a nonprofit organization*; HARLEM :
INDEPENDENT LIVING CENTER, *a nonprofit* :
*organization*; DISABLED IN ACTION OF :
METROPOLITAN NEW YORK, *a nonprofit* :
*organization*; NEW YORK STATEWIDE SENIOR :
ACTION COUNCIL, *a nonprofit organization*; SASHA :
BLAIR-GOLDENSOHN, *an individual*; and DUSTIN :
JONES *an individual, on behalf of themselves and all* :
*others similarly situated*,                         :
                                                     :
                                    Plaintiffs,      :
                                                     :
                      -against-                      :
                                                     :
METROPOLITAN TRANSPORTATION AUTHORITY, :
*a public benefit corporation*; VERONIQUE HAKIM, *in* :
*her official capacity as interim executive director of the* :
*Metropolitan Transportation Authority*; NEW YORK :
CITY TRANSIT AUTHORITY, *a public benefit* :
*corporation*; and DARRYL C. IRICK, *in his official* :
*capacity as acting president of the New York City Transit* :
*Authority*,                                         :
                                                     :
                                    Defendants.      :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

<u>MEMORANDUM DECISION</u>
<u>AND ORDER</u>

17 Civ. 2990 (GBD) (VF)

GEORGE B. DANIELS, United States District Judge:

Plaintiffs, a group of individuals and non-profit organizations, bring this class action

against the Metropolitan Transportation Authority ("MTA"); Veronique Hakim, in her official

capacity as Interim Executive Director of the MTA; the New York City Transit Authority

("NYCT" or "NYCTA"); and Darryl C. Irick, in his official capacity as Acting President of the

NYCTA (collectively, "Defendants"), alleging violations of Title II of the Americans with

Disabilities Act ("ADA"), 42 U.S.C. § 12131, *et seq.*, Section 504 of the Rehabilitation Act

("RA"), 29 U.S.C. § 794, and the New York City Human Rights Law ("NYCHRL"), N.Y.C. Code § 8-107(4). (Compl., ECF No. 1, ¶¶ 22–59, 122–166.) Plaintiffs bring this action on behalf of a class of "all persons who use or seek to use the New York City subway system[] and have a disability that requires them to use an elevator to access the subway system . . . ." (Stip. & Order Certifying Class, ECF No. 63, at 1–2.) They seek injunctive and declaratory relief, along with attorneys' fees and costs. (Compl. ¶¶ 171–176.) On remand from the Second Circuit, at issue is whether Defendants provide Plaintiffs with reasonable accommodations in the event of elevator outages—with a particular focus on commuters traveling on high-trafficked routes at peak hours and those who require the use of multiple elevators per trip. *See Brooklyn Ctr. for Indep. of the Disabled v. Metro. Transp. Auth.*, 11 F.4th 55, 64 (2d Cir. 2021). Following a renewed round of discovery, Defendants move once again for summary judgment on all claims. (Defs.' Mot. for Summ. J. ("Mot."), ECF No. 255, *renewed by* ECF No. 312.[1]) For the reasons stated below, there is no genuine dispute of material fact as to the reasonableness of Defendants' alternate transportation options, but there is a genuine dispute of material fact as to the adequacy and accuracy of Defendants' notification system. As a result, Defendants' motion for summary judgment is DENIED, as genuine disputes of material fact regarding the reasonableness of Defendants' accommodations preclude the dismissal of any of Plaintiffs' claims.

---

[1] Magistrate Judge Valerie Figueredo administratively terminated Defendant's motion in conjunction with a limited reopening of fact discovery, with leave to renew upon the close of discovery. (Order, ECF No. 307.) Magistrate Judge Figueredo's order allowed Plaintiffs to file a sur-reply and noted that the remainder of the parties' summary judgment briefing still stood notwithstanding the termination of the motion. (*Id.*; Order, ECF No. 309.)

# I.    BACKGROUND

## A.    Factual Background

The MTA designates approximately 123 of its 472 subway stations as "ADA-accessible"[2] (*see MTA Accessible Stations*, Metro. Transp. Auth., https://new.mta.info/accessibility/stations (last updated Aug. 21, 2024)); *Riding the Subway*, Metro. Transp. Auth., https://new.mta.info/guides/riding-the-subway (last updated Aug. 7, 2024)), though Plaintiffs note that at some such stations, only certain platforms or train lines are accessible. (*See* Pls.' Local Rule 56.1 Counterstatement ("Pls.' 56.1"), ECF No. 260, ¶ 3).  At ADA-accessible stations, Plaintiffs allege that "[r]iders with mobility disabilities routinely face elevator outages" (Compl. ¶ 2), with outages having a disproportionate impact at stations that serve as "critical juncture points for the system," *i.e.*, those with the highest levels of ridership. (*Id.* ¶ 79.)

Compounding the elevator outages is Defendants' alleged failure to "maintain and implement system-wide policies" that promptly alert riders to elevator outages, publicize alternate accessible routes, and ensure the availability of properly trained staff to assist during outages. (*Id.* ¶ 81.)  In Plaintiffs' view, "none of the City's alternate modes of transportation, including buses and paratransit services, offer meaningful, reliable substitutes for riders with mobility disabilities." (*Id.* ¶ 89; *see also id.* ¶ 4.)  As a result, Plaintiffs describe the subway as practically "unusable" (*id.* ¶ 88) due to Defendants' alleged "systematic, discriminatory exclusion of hundreds of thousands of New Yorkers with mobility disabilities." (*Id.* ¶ 1.)

---

[2] The parties disagree on the total number of subway stations and the precise number of ADA-accessible stations. (*Compare* Defs.' Local Rule 56.1 Statement, ECF No. 258, ¶¶ 2–3, *with* Pls.' Local Rule 56.1 Counterstatement, ECF No. 260, ¶¶ 2–3.)  The totals cited above, of which this Court takes judicial notice, are taken from the MTA's website, to which Defendants cite in their Local Rule 56.1 statement. (*See* Defs.' 56.1 ¶¶ 2–3.)

**B.      The Second Circuit's Decision**

This Court originally granted Defendants summary judgment in all respects, finding that Plaintiffs had not proffered evidence to show "a 'systemic failure' by Defendants to provide individuals with mobility disabilities . . . 'meaningful access' to the NYC Subway." *Ctr. for Indep. of the Disabled, N.Y. v. Metro. Transp. Auth.*, No. 17 Civ. 2990 (GBD), 2020 WL 1503454, at *5 (S.D.N.Y. Mar. 30, 2020) (quoting *Disabled in Action v. Bd. of Elections*, 752 F.3d 189, 198 (2d Cir. 2014)), *vacated, Brooklyn Ctr. for Indep. of the Disabled v. Metro. Transp. Auth.*, 11 F.4th 55.

On appeal, the Second Circuit noted that while the subway system as a whole offered meaningful access to riders with mobility disabilities as a matter of law, *see Brooklyn Ctr. for Indep. of the Disabled*, 11 F.4th at 63, this Court did not assess "[P]laintiffs' evidence that individuals with disabilities who rely on certain subway stations experience appreciable hardship during elevator outages." *Id.* at 59. Reasoning that "elevator outages are disproportionately frequent at especially inconvenient stations (usually, the busiest), at especially inconvenient times (usually, rush hour)," the Second Circuit held that "there are genuine disputes of material fact as to whether the subway system presents barriers to meaningful access." *Id.* at 63. Nonetheless, "[i]f it can be determined that reasonable accommodation is provided, then access is meaningful as a matter of law." *Id.* at 64. The Second Circuit remanded this action for further discovery regarding—and further consideration of—the accommodations issue. *See id.* at 67.

**C.      Defendants' Accommodations**

**1.      Outage Reporting and Notification**

Elevators in the subway system are equipped with LiftNet electronic monitoring, which can remotely detect elevator malfunctioning and outages. (Defs.' Local Rule 56.1 Statement ("Defs.' 56.1"), ECF No. 258, ¶¶ 12–13.) Station personnel and members of the public also submit

outage reports. (*Id.* ¶ 13.) Outage reports are sent to NYCT's central, 24/7/365 Control Desk, which "investigates and verifies the outage reports[] and coordinates the dispatch of maintenance crews as appropriate to make repairs." (*Id.* ¶ 10.) Control Desk confirms an elevator outage following a preliminary investigation. (*Id.* ¶¶ 10, 14–15.) Once Control Desk confirms an outage, it opens a work order for the repair, and after repair workers inspect the elevator, they provide a return to service estimate. (*Id.* ¶¶ 16–18.)

Control Desk's confirmation of an outage triggers simultaneous notification of the outage to the public. (*Id.* ¶ 10.) The MTA's website displays elevator outage information, including an estimate of when a broken elevator will return to service and "possible alternate accessible routes from the affected station . . . ." (*Id.* ¶¶ 22, 24.) Outage reports are funneled to the website's "Plan a Trip" function, which, after riders enter their origin and destination, incorporates elevator status information to provide customers with accessible route options. (*Id.* ¶ 25.) Customers can also sign up for text message or email updates alerting them to changes in a particular elevator's operability status. (*Id.* ¶ 23.)

Within stations, electronic Customer Information Center ("CIC") screens display elevator status information.[3] (*Id.* ¶ 32.) There are also physical signs affixed to each elevator, known as Alternate Accessible Travel Information ("AATI") signs, that list alternate accessible routes that customers can utilize if the associated elevator is out of service. (*See id.* ¶¶ 26–27, 29–31.) Riders can also speak to station agents, use Help Point intercoms, or call 511 to obtain alternate routing information. (*Id.* ¶¶ 35–36.)

---

[3] As of April 2022, approximately 370 subway stations had CIC screens. (*See* Defs.' 56.1 ¶ 32.)

### 2.    Intra-System Transportation Alternatives

In Defendants' telling, they offer a suite of alternate transportation options in the event of an elevator outage.   Within the subway system, Defendants identify three main alternate transportation options:  using redundant elevators, transferring to a different subway line at station complexes, and "back-riding."

Approximately ten stations, such as Atlantic Avenue–Barclays Center, have redundant elevators—*i.e.*, "more than one elevator that either provide[] access to and from the street or that serve[] the same platform"—so a single elevator outage might have only a "minor" impact on a journey.  (Defs.' 56.1 ¶¶ 44–46.)   Next, at station complexes, where multiple subway lines intersect, "if an elevator outage prevents access to one line, another elevator at that station may be taken to a different platform serving a different line, which in many cases may enable the customer to proceed to their destination via an alternat[e] route . . . ." (*Id.* ¶ 38.)

Accessible stations served by only one subway line typically have three elevators:  one from the street to the mezzanine fare control area and two from the fare control area to the platforms—one for each direction of travel. (*Id.* ¶ 40.)  At such stations, when an elevator outage prevents riders from accessing their desired platform, they can "back-ride" in the opposite direction to the next ADA-accessible station and transfer at that station to a train traveling in the intended direction. (*Id.* ¶ 41.)  Similarly, if an elevator is out at a customer's destination station, the customer can travel to the next accessible station and back-ride to her destination. (*Id.* ¶ 42.)

### 3.    Extra-System Transportation Alternatives

Defendants also contend that they offer reasonable accommodations outside of the subway system if an elevator outage prevents a passenger from entering a station.  In such cases, riders can

utilize Defendants' bus system.[4] (*See* Defs.' 56.1 ¶ 48.) Each of Defendants' buses are accessible via ramp or lift and have at least two wheelchair securement areas. (*Id.* ¶¶ 49, 51–52.) The bus system runs parallel to the subway system, with a bus station offering connecting service at every ADA-accessible subway station—so in the event of an elevator outage, riders can take the bus to the next ADA-accessible subway station or to their destinations. (*Id.* ¶ 53.)

During longer-term elevator outages, Defendants note that riders with disabilities can utilize the Access-A-Ride ("AAR") paratransit program. (*See id.* ¶ 54.) Riders must apply and complete a functional assessment to be eligible for AAR, and riders must reserve AAR rides in advance, so the program does not serve as an alternative to the subway in the event of a spontaneous elevator outage. (*See id.* ¶¶ 56–58.)

### D. Plaintiffs' Proposed Accommodations

Plaintiffs charge that Defendants' existing accommodations are inadequate to assist them during elevator outages and fault Defendants for failing to implement "effective, common-sense" accommodations. (Pls.' Mem. of Law in Opp'n to Mot. ("Opp'n"), ECF No. 261, at 2.) Plaintiffs propose four accommodations. First, they contend that Defendants should make elevator status announcements on board trains to alert riders to outages, noting that Defendants make on-board announcements for other service disruptions and that other subway systems make such announcements. (*See* Opp'n at 11; Pls.' 56.1 ¶¶ 106, 115.) Next, Plaintiffs argue that Defendants should dispatch shuttles to stations with elevator outages to ferry riders with disabilities to the nearest accessible station, similarly citing Defendants' practice of providing shuttle buses for other station disruptions and other subway systems' use of shuttles during elevator outages. (*See* Opp'n

---

[4] Defendants also note that certain ADA-accessible subway stations are "a relatively short distance" from one another, so if an elevator outage prevents access to one station, customers can navigate to the nearby station to continue their journeys. (*See* Defs.' 56.1 ¶ 47.)

at 11; Pls.' 56.1 ¶¶ 104–105, 109, 116–118.)  Third, Plaintiffs urge Defendants to adopt a policy promoting the installation of redundant elevators, noting that other subway systems have such policies.  (*See* Opp'n at 11–12; Pls.' 56.1 ¶¶ 108, 120–121.)  Finally, citing instances in which station personnel did not help class members in need of assistance, Plaintiffs seek improved training for Defendants' employees, so that employees can better assist class members in the event of an elevator outage.  (*See* Opp'n at 12; Pls.' 56.1, ¶ 36.)

## II.    LEGAL STANDARDS

### A.    Motions for Summary Judgment

To prevail on a motion for summary judgment, the movant must "show[] that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  A fact is material "if it 'might affect the outcome of the suit under the governing law.'" *Roe v. City of Waterbury*, 542 F.3d 31, 35 (2d Cir. 2008) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  A dispute of fact is genuine "if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Nick's Garage, Inc. v. Progressive Cas. Ins. Co.*, 875 F.3d 107, 113–14 (2d Cir. 2017) (quoting *Anderson*, 477 U.S. at 248).  The movant bears the initial burden of demonstrating the absence of a dispute of material fact.  *Holcomb v. Iona Coll.*, 521 F.3d 130, 137 (2d Cir. 2008).

If the movant meets its initial burden, "the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment." *Jaramillo v. Weyerhaeuser Co.*, 536 F.3d 140, 145 (2d Cir. 2008).  "[A] party may not rely on mere speculation or conjecture as to the true nature of the facts . . . ," and "conclusory allegations or denials . . . cannot by themselves create a genuine issue of material fact where none would otherwise exist." *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010) (citation omitted). In assessing whether there is a genuine issue of material fact, the court must "resolve all

ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." *Johnson v. Killian*, 680 F.3d 234, 236 (2d Cir. 2012) (citing *Terry v. Ashcroft*, 336 F.3d 128, 137 (2d Cir. 2003)).

### B.    ADA Claims

The ADA states that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." *Brooklyn Ctr. for Indep. of the Disabled*, 11 F.4th at 61 (quoting 42 U.S.C. § 12132). To establish an ADA violation as applied to a public entity, a plaintiff must show that she was denied "meaningful access" to the public entity's "benefits, programs, or services." *Id.* (quoting *Disabled in Action*, 752 F.3d at 197). "Meaningful access" requires that public entities make reasonable accommodations, which must "overcome structural impediments and non-trivial temporal delays that limit access to programs, services, and activities. *Id.* at 61–62 (quoting *Wright v. N.Y. State Dep't of Corr.*, 831 F.3d 64, 72 (2d Cir. 2016)).

In evaluating whether an accommodation "overcome[s] . . . non-trivial temporal delays" and grants meaningful access, *Wright*, 831 F.3d at 73, the Second Circuit does not engage in a rote arithmetic exercise, but rather considers a delay in the context of the particular case. *See Celeste v. E. Meadow Union Free Sch. Dist.*, 373 F. App'x 85, 88 (2d Cir. 2010) (finding that a ten-minute detour each way to school athletic fields nearly halved a student plaintiff's time to participate in his physical education class and "detract[ed]" from his ability to serve as a manager of the school football team). Of course, this presupposes that a delay could be overcome in the first place. *See id.* (describing an "*unnecessary* usurpation" of plaintiff's time (emphasis added)). By extension, if a delay is *not* avoidable, then it cannot be non-trivial so as to deny meaningful access.

"[T]he reasonableness of an accommodation is a fact-specific question that often must be resolved by a factfinder. A defendant is entitled to summary judgment only if the undisputed record reveals that the plaintiff was accorded a plainly reasonable accommodation." *Brooklyn Ctr. for Indep. of the Disabled*, 11 F.4th at 62 (quoting *Wright*, 831 F.3d at 72–73) (alteration in *Brooklyn Ctr. for Indep. of the Disabled*) (internal quotations omitted). In evaluating the reasonableness of a proposed accommodation, courts employ a burden-shifting framework. "[T]he plaintiff bears the initial burdens of both production and persuasion as to the existence of an accommodation that is facially reasonable. The burden of persuasion then shifts to the defendant to rebut the reasonableness of the proposed accommodation. This burden of non-persuasion is in essence equivalent to the burden of showing, as an affirmative defense, that the proposed accommodation would cause the defendant to suffer an undue hardship." *Wright*, 831 F.3d at 76 (cleaned up) (citations omitted). "It is enough for the plaintiff to suggest the existence of a plausible accommodation, the costs of which, facially, do not clearly exceed its benefits[.] . . . [O]nce the plaintiff has done this, she has made out a *prima facie* showing that a reasonable accommodation is available, and the risk of nonpersuasion falls on the defendant." *Henrietta D. v. Bloomberg*, 331 F.3d 261, 280 (2d Cir. 2003) (quoting *Borkowski v. Valley Cent. Sch. Dist.*, 63 F.3d 131, 138 (2d Cir. 1995)). Proposed accommodations are unreasonable if they "would 'fundamentally alter the nature of the service[s] provided, or impose an undue financial or administrative burden . . . .'" *Scalercio-Isenberg v. Port Auth. of N.Y. & N.J.*, 487 F. Supp. 3d 190, 194 (S.D.N.Y. 2020) (alteration in original) (quoting *Disabled in Action*, 752 F.3d at 197).

## C.    RA Claims

Section 504 of the RA "prohibits programs and activities receiving federal financial assistance," such as mass transit systems, "from excluding, denying benefits to, or discriminating against otherwise qualified individuals with a disability." *Brooklyn Ctr. for Indep. of the Disabled*,

11 F.4th at 61 (quoting *Disabled in Action*, 752 F.3d at 196) (internal quotations omitted). The RA and ADA are coextensive, and courts consider RA and ADA claims in tandem. *See id.* (citing *Disabled in Action*, 752 F.3d at 197).

### D.    NYCHRL Claims

The NYCHRL prohibits providers of public accommodations from "refus[ing], withhold[ing] . . . or deny[ing] . . . the full and equal enjoyment, on equal terms and conditions, of any of the accommodations, advantages, services, facilities or privileges of the place or provider of public accommodation" on the basis of disability. *Brooklyn Ctr. for Indep. of the Disabled*, 11 F.4th at 68 (quoting N.Y.C. Admin. Code § 8-107(4)(1)(a)). Courts construe the NYCHRL "liberally for the accomplishment of [its] uniquely broad and remedial purposes . . . ." *Id.* (quoting *Ya-Chen Chen v. City Univ. of N.Y.*, 805 F.3d 59, 75 (2d Cir. 2015)) (alteration in original). In this framework, federal civil rights statutes, such as the ADA and RA, serve "as a floor below which the [NYCHRL] cannot fall," and thus "courts must analyze NYCHRL claims separately and independently from any federal . . . law claims, construing [the NYCHRL's] provisions broadly in favor of discrimination plaintiffs to the extent that such a construction is reasonably possible." *Id.* (quoting *Ya-Chen Chen*, 805 F.3d at 75) (alteration in original).

## III.    THERE IS NO GENUINE DISPUTE OF MATERIAL FACT REGARDING THE ALTERNATE MEANS OF TRANSPORTATION PROVIDED BY DEFENDANTS

Defendants point to the "constellation" (Defs.' Reply in Supp. of Mot. ("Reply"), ECF No. 264, at 8) of alternate transportation options they provide to Plaintiffs in the event of an elevator outage—using redundant elevators, transferring to another subway line within station complexes, back-riding, utilizing the MTA's wheelchair-accessible bus network, and, in certain instances, arranging for AAR paratransit service (*see* Defs.' Mem. of Law in Supp. of Mot. ("Mem."), ECF No. 257, at 18–20)—to support their argument that they provide reasonable accommodations

such that Plaintiffs have meaningful access to the subway system as a matter of law. (*Id.* at 5.) Plaintiffs, on the other hand, claim that "[t]he extra time and other burdens that Plaintiffs bear due to elevator outages in the subway system demonstrate that Defendants' accommodations are ineffective" (Opp'n at 22) and fault Defendants for failing to implement "effective, common-sense steps" such as providing "station-to-station shuttles during outages to specifically accommodate riders who need stair-free access" and "establishing policies to promote installation of redundant elevators." (*Id.* at 2.)

On appeal, the Second Circuit noted that "[i]f it can be determined that reasonable accommodation is provided, then access is meaningful as a matter of law." *Brooklyn Ctr. for Indep. of the Disabled*, 11 F.4th at 64. As described above, Plaintiffs bear the initial burdens of production and persuasion as to the existence of a facially reasonable accommodation. (*See* Section II.B, *supra*.) Once they do so, it is Defendants' burden to rebut the reasonableness of the proposed accommodation. (*See* Section II.B, *supra*.) Accommodations must be "reasonable under the circumstances" of the particular case, *Scalercio-Isenberg*, 487 F. Supp. 3d at 194, cannot "fundamentally alter the nature of the service[s] provided, or impose an undue financial or administrative burden," *id.* (alteration in original) (quoting *Disabled in Action*, 752 F.3d at 197), nor can they pose an "undue hardship." *Wright*, 831 F.3d at 76.

Defendants have successfully shown the absence of a genuine dispute of material fact regarding the reasonableness of their existing alternate transportation offerings and the undue hardship and infeasibility of Plaintiffs' proposed accommodations.

## A.    Defendants' Current Accommodations

Plaintiffs, noting that "[t]he hallmark of a reasonable accommodation is effectiveness" (Opp'n at 1 (quoting *Dean v. Univ. at Buffalo Sch. of Med. & Biomed. Scis.*, 804 F.3d 178, 189

(2d Cir. 2015))), chiefly object to the ineffectiveness of, and delay added by, back-riding, bus transfers, and the AAR paratransit service.[5] (*See id.* at 13–19.)

### 1.    Back-Riding

Defendants claim that back-riding adds a "modest" delay to a passenger's journey (Mem. at 18; *see also* Decl. of Rachel Cohen ("Cohen Decl."), ECF No. 256-1, ¶ 9 (providing hypothetical back-riding example adding ten minutes to a subway trip); Reply. Decl. of Rachel Cohen ("Cohen Reply Decl."), ECF No. 265, ¶ 7 (citing other "similar" back-riding examples)), pointing to a Chicago case dismissing a single transit passenger's ADA suit in which the court held that "travel[ing] to the next station and loop[ing] back . . . was a reasonable response to an isolated elevator outage." *Williams v. Chi. Transit Auth.*, No. 16 Civ. 9072, 2017 WL 4467456, at *3 (N.D. Ill. Sept. 30, 2017). Plaintiffs argue that the "modest" back-riding delay suggested by Defendants is an undercount, excluding the time it takes for a passenger to "discover the outage, figure out a new route, wait for the next train, travel in the wrong direction, wait for elevators when transferring, and wait for the train back." (Opp'n at 14; *see also* Dep. of Rachel Cohen ("Cohen Dep."), ECF No. 259-1, at 106:6–14, 107:21–108:7, 109:8–12, 111:17–115:19 (noting such exclusions).) They further deride Defendants' "modest" back-riding examples as "cherry-picked" (Pls.' Sur-Reply in Opp'n to Mot., ECF No. 311, at 4), noting that the additional travel time caused by back-riding is "easily magnified," as certain subway lines have between five and eighteen inaccessible stations between accessible stations. (*See* Opp'n at 13–14; *see also* Cohen Dep. at 29:13–30:13.)

---

[5] Apart from noting the paucity of stations with redundant elevators (*see* Opp'n at 12), Plaintiffs do not object to the reasonableness of redirecting passengers to redundant elevators as an accommodation (in the few stations that have redundant elevators). Nor do Plaintiffs object to the reasonableness of transferring to a different line at station complexes (or nearby stations).

Defendants have successfully carried their burden of showing the absence of a genuine dispute as to any material fact over whether back-riding is a reasonable accommodation during elevator outages. As noted at oral argument, neither party has identified a mean, median, or modal delay caused by back-riding—or how the delay caused by back-riding could reasonably be avoided. Instead, each point to examples on the extreme ends of the back-riding spectrum in support of their position. (*See* Tr. of Oral Arg. ("OA Tr."), ECF No. 321, at 13:20–22 ("THE COURT: It's difficult for me to understand how I can assess the reasonableness of the delays if you don't tell me what the delay is."); *see also* Cohen Reply Decl. ¶ 8 ("[T]he number of back-riding possibilities and number of possible customer behaviors is so numerous that there is no 'average' back-ride time in the system.").) Nor have the parties set forth a metric of what constitutes an acceptable delay and what constitutes an unacceptable delay. (*See* OA Tr. at 56:2-5 ("THE COURT: How can I tell you whether or not it's reasonable or not reasonable unless you tell me what is the range of reasonable and you tell me what's the range of unreasonable, and that they are in the unreasonable range?").)

This Court must evaluate the delay presented by back-riding in the context of the New York City subway system. (*See* Section II.B, *supra*.) As Defendants noted at oral argument, "[t]o make the back-riding shorter, the solution would be to add more accessible stations, to build elevators." (OA Tr. at 8:9–11.) Defendants' obligation to increase the number of accessible stations is governed by class action settlements in other cases (*see* Reply at 8), and it would offend judicial comity for this Court to trample on these preexisting agreements that, in any event, are beyond the scope of this action. Plaintiffs have failed to identify a viable means by which Defendants could reduce the delay caused by back-riding, and their critique boils down to the vague notion that back-riding should not take as long as it does, without identifying what a

reasonable delay would be or a means by which Defendants could shorten the delay caused by back-riding. As stated above, if a delay cannot be overcome, it cannot be non-trivial and deny Plaintiffs meaningful access. (*See* Section II.B, *supra*.) Therefore, back-riding, in conjunction with the alternate transportation options discussed below, is a reasonable accommodation in the event of an elevator outage. *See Brooklyn Ctr. for Indep. of the Disabled*, 11 F.4th at 64 ("[R]easonable accommodations can render access meaningful.").

### 2.    Buses

In the event that an elevator outage prevents a passenger from entering a subway station, Defendants posit that the passenger can utilize the bus to complete her journey (or to travel to the nearest accessible station), as all of Defendants' buses are wheelchair-accessible and bus service runs parallel to subway lines. (*See* Mem. at 8, 19.) The Second Circuit noted, on appeal, that Defendants could perform their duty of providing Plaintiffs with meaningful access to the subway system by "timely directing passengers to nearby bus stops when an elevator needed for access is out of service," reasoning that "the New York City subway is not a destination; it is a means of getting from here to there. When a broken elevator prevents subway access, the bus allows passengers to get to the[ir] destination[s]." *Brooklyn Ctr. for Indep. of the Disabled*, 11 F.4th at 65. The Circuit could not, however, "determine as a matter of law that the bus system is a *reasonable accommodation*" and remanded for further consideration. *Id.* at 65–66.

Plaintiffs dispute the reasonableness of the bus system as an accommodation, arguing that "bus service burdens class members because it is often slow, unreliable, and limited in scope, making travel much more arduous and delayed than travel by subway, and making it an ineffective and unreasonable accommodation." (Opp'n at 15.) Plaintiffs' expert Sylvia Morse submits that "riders with mobility disabilities face myriad accessibility and reliability challenges in the bus

system," citing instances of service denial (where drivers bypass wheelchair users waiting for the bus); traffic, parking, and snow conditions that impede passengers' ability to board buses; delay caused by deploying lift and ramp equipment and securing and releasing wheelchairs; and crowding. (*See* Expert Report of Sylvia Morse ("Morse Report"), ECF No. 270-3, at 5–12.)

As with back-riding, this Court finds as a matter of law that Defendants' bus system, combined with the other transportation alternatives Defendants provide, is a reasonable accommodation in the event of an elevator outage. Plaintiffs do not dispute that Defendants' bus fleet is wheelchair accessible and that bus routes run parallel to subway lines (albeit with certain deviations)—instead, they point to barriers that prevent access to buses. (*See* Pls.' 56.1 ¶ 4 ("*[I]n practice*, riding the NYCT buses is not 'entirely accessible' for people with mobility disabilities." (emphasis added)).) Yet many such barriers, including illegally parked vehicles and snow and ice conditions, are largely beyond Defendants' control. The delay caused by traffic on the roads is likewise outside of Defendants' control, and to the extent that traffic poses an undesirable delay to Plaintiffs, they can use buses to travel to the next accessible subway station, rather than use them to travel to their final destinations.

Of the barriers that are within Defendants' control, Plaintiffs have failed to identify the frequency with which they experience service denials. Their expert, Sylvia Morse, simply provides raw numbers of complaints of service denial (*see* Morse Report at 7), but, as Defendants' expert Alan J. Salzberg notes in response, these complaints represent a small fraction of the total number of bus trips across New York City.[6] (*See* Expert Report of Alan J. Salzberg, ECF No. 270-4, at 3–6.) In the absence of any indication of the prevalence of service denial, this

---

[6] On November 9, 2023, Magistrate Judge Figueredo denied Plaintiffs' motion to exclude Defendants' expert reports in its entirety. (Op. & Order, ECF No. 300.) Plaintiffs did not object.

Court cannot find that select instances of service denial work to deprive Plaintiffs, as a class, from meaningful access to the bus system (and by extension, the subway system). *See Hicks*, 593 F.3d at 166 ("[A] party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment." (internal citation omitted)).

Plaintiffs' complaint about the delay caused by the deployment of lift and rail equipment and securing and releasing wheelchairs is a poor fit for their claims, as such a delay is meant to ensure that buses are accessible—and Plaintiffs have not identified how such a delay could be shortened, which is their burden. *See Jaramillo*, 536 F.3d at 145. Likewise, arguments about crowding on buses (*see* Morse Report at 12) miss the mark. Plaintiffs have not proffered enough evidence to establish the frequency with which crowding prevents them from accessing buses (as opposed to merely making buses a less desirable travel option than subways). *See Hicks*, 593 F.3d at 166. As buses are not "proffered as a substitute for the subway," but rather serve as "an accommodation and backstop," *Brooklyn Ctr. for Indep. of the Disabled*, 11 F.4th at 65, there is no genuine dispute of material fact regarding the reasonableness of the bus as an accommodation.[7]

## B.    Plaintiffs' Proposed Accommodations

Plaintiffs propose two accommodations for instances in which riders cannot access stations due to an elevator outage. First, Plaintiffs suggest that Defendants provide "station-to-station shuttles during elevator outages to accommodate people who need stair-free access," noting that other subway systems do so during elevator outages and citing the MTA's practice of offering

---

[7] The parties trade barbs about the reasonableness of the AAR paratransit service as an accommodation. (*See, e.g.*, Mem. at 19–20; Opp'n at 18–19.) While the delay caused by AAR's long pickup windows and circuitous routes (*see* Opp'n at 19) would raise serious questions about the reasonableness of AAR—standing alone—as an accommodation, this Court need not reach this issue given that it has already found that back-riding and the bus are reasonable accommodations as a matter of law.

shuttles for other service disruptions. (Opp'n at 11.) Next, Plaintiffs argue that Defendants should follow the lead of other subway systems and adopt a policy promoting the installation of redundant elevators, noting Defendants' "acknowledg[ment] that stations with redundant elevators cause the least impact to riders during outages." (*Id.* at 11–12 (quotation omitted).)

In response, Defendants contend that Plaintiffs' complaints about the bus system apply equally to shuttles and "Plaintiffs provide no explanation as to why shuttle buses would be acceptable when regular NYCT buses are not," particularly in light of the delay inherent in dispatching shuttles to a subway station and the "enormous" logistical challenges posed by establishing a standby shuttle service. (*See* Reply at 6–7.) Defendants further argue that they are not legally required to install redundant elevators and that their legal obligations regarding station accessibility are governed by settlements that are beyond the scope of this case.[8] (*See id.* at 7–8.)

Plaintiffs have failed to establish that their proposed accommodations are "facially reasonable," and, in any event, they "would cause [D]efendant[s] to suffer an undue hardship." *See Wright*, 831 F.3d at 76 (cleaned up). Plaintiffs give only vague descriptions of what a shuttle service would look like, but John Pillartz, NYCT's Vice President of Transportation (Decl. of John Pillartz ("Pillartz Decl."), ECF No. 310-9, ¶ 1), could not remember an instance where NYCT provided vehicles other than buses for shuttle service. (Dep. of John Pillartz ("Pillartz Dep."), ECF No. 310-10, at 113:17–22.) Shuttle buses, then, would not present much of an efficiency gain over Defendants' current bus system, particularly because shuttles would be "the same buses" and would use "the same . . . bus stops that already exist outside of the subway stations." (Pillartz Decl. ¶ 8.) It is conceivable, if not probable, that waiting for shuttle buses would *lengthen*

---

[8] Defendants argue that Plaintiffs did not identify the lack of redundant elevators as an ADA, RA, or NYCHRL violation in their complaint and did not seek a policy promoting the installation of redundant elevators as relief therein. (Reply at 8.) As this form of relief is not appropriate in this action, this Court need not address this dimension of Defendants' argument.

a passenger's journey, as shuttles would have to be dispatched from bus depots and traverse rush hour traffic to locations where passengers await alternate transportation. (*See* Pillartz Decl. ¶¶ 6–7 ("It would generally be faster for a customer to use the existing bus system to take a bus to the nearest accessible station, rather than waiting for a shuttle to arrive."); Pillartz Dep. at 36:6–20 (describing instance where it took "a couple of hours, a few hours" to get shuttle service up and running).) Given the limited upside of shuttle service, and because shuttle service would be "unrealistic and inefficient" in its resource allocation (*see* Pillartz Decl. ¶ 11), shuttle service would pose an undue hardship for Defendants.

Likewise, despite its superficial appeal, a policy promoting the installation of redundant elevators is not a facially reasonable accommodation for passengers *during elevator outages*. Such a policy merely tells a passenger that someday (without any indication when that day will come), there may be a redundant elevator at the station in question (or maybe not, as Plaintiffs have not indicated what the contours of such a policy would be or what percentage of stations should have redundant elevators). Until redundant elevators are installed, they do nothing to help a passenger continue her journey if she encounters a spontaneous elevator outage in the meantime. Moreover, a requirement to institute such a policy would also place an undue hardship on Defendants, as it would upset the balance created by class-action settlements in other cases which set forth Defendants' legal obligations regarding systemwide accessibility.

## IV.    GENUINE DISPUTES OF MATERIAL FACT REGARDING THE ADEQUACY OF DEFENDANTS' ELEVATOR OUTAGE REPORTING AND NOTIFICATION SYSTEM PRECLUDE SUMMARY JUDGMENT

In support of their motion, Defendants argue that there is no genuine dispute that their "robust" notification system alerts Plaintiffs to elevator outages "as soon as practicable" and enables them to plan an alternate accessible transportation route. (*See* Mem. at 16–18.) As the

Second Circuit noted, the adequacy of alternate modes of transportation "depends, at least in part, on whether a passenger gets prompt notice" of an outage. *See Brooklyn Ctr. for Indep. of the Disabled*, 11 F.4th at 66; *see also id.* at 67 ("Adequate notice may enable the use of paratransit as a reasonable accommodation in some circumstances."). Whether Defendants' notification system is "robust" enough to provide Plaintiffs meaningful access to the subway system is a multilayered analysis and must focus on (1) the promptness and accuracy of the notifications provided to the public, and (2) the comprehensiveness of outage notifications throughout the subway system. Plaintiffs, meanwhile, contend that Defendants' notification system is "effectively useless, either because [notifications] are delayed or because they are inaccurate," citing class members' complaints. (*See* Opp'n at 19–22.) After reviewing the parties' submissions and the record in its entirety, this Court cannot conclude that Defendants have carried their burden of showing an absence of a genuine dispute as to any material fact on this issue, precluding a grant of summary judgment on the reasonableness of Defendants' accommodations.[9]

### A.    Promptness and Accuracy

The Second Circuit noted that it was unable to decide whether Defendants provide Plaintiffs with meaningful access to the subway "in the absence of evidence as to how long the whole [notice] process takes from outage to notification." *Brooklyn Ctr. for Indep. of the Disabled*, 11 F.4th at 66.

As described above, elevators in the subway system are equipped with electronic LiftNet monitoring systems that can remotely notify NYCT's Control Desk of irregularities or outages.

---

[9] As the ADA and RA serve "as a floor below which the [NYCHRL] cannot fall," *Brooklyn Ctr. for the Indep. of the Disabled*, 11 F.4th at 68 (quoting *Ya-Chen Chen*, 805 F.3d at 75), this Court declines to separately consider Defendants' accommodations under the NYCHRL, as the existence of a genuine dispute of material fact regarding Plaintiffs' ADA and RA claims means that, by definition, there is a genuine dispute as to material fact regarding Plaintiffs' NYCHRL claim as well.

(Decl. of Robert Thompson ("Thompson Decl."), ECF No. 256-3, ¶¶ 12–13.)  Control Desk also receives reports of outages from station personnel and members of the public.  (Defs.' 56.1 ¶ 13.)

When Control Desk receives notice of an elevator outage—regardless of whether such notice is automatic, from station personnel, or from riders—it conducts a preliminary investigation remotely to assess the status of the elevator.  (*See id.* ¶¶ 10–14.)  After Control Desk completes its preliminary investigation and confirms an elevator outage, the public is simultaneously notified of the outage via the MTA's "Elevator & Escalator Status" webpage[10] and related text message and email alerts.  (*See id.* ¶ 10; *see also* Cohen Decl. ¶ 13 ("The website also provides the status of each of the subway system's elevators at any given time, the lines impacted in case of an elevator outage (if the station has multiple lines), the reason for the outage, and the expected duration of the outage.  Customers may also sign up for an alert service which will advise them by email or text message of changes in the status of the customer's selected elevators." (footnote omitted).)  The MTA's website lists the elevator's status as "under investigation" until repair workers physically inspect the elevator and provide a return to service estimate.  (*See* Defs.' 56.1 ¶¶ 16, 18.)

Accordingly, the "whole [notification] process . . . from outage to notification," *Brooklyn Ctr. for Indep. of the Disabled*, 11 F.4th at 66, encompasses two steps:  the time it takes for Defendants to receive notice of an outage and the time it takes for Defendants to notify the public of an outage.  In the context of the New York City subway system (*see* Section II.B, *supra*), inaccurate notifications, whether they identify a functioning elevator as out of service or vice versa, and needlessly delayed notifications may conceivably present non-trivial delays in travel time that result in an "unnecessary usurpation" of Plaintiffs' time and deny Plaintiffs meaningful access to

---

[10] *Elevator & Escalator Status*, Metro. Transp. Auth., https://new.mta.info/elevator-escalator-status.

the subway system. *Celeste*, 373 F. App'x at 88; *cf. Brooklyn Ctr. for Indep. of the Disabled*, 11 F.4th at 65–66 ("[A]bsent adequate notice of an elevator outage, a traveler who requires two or more elevators per trip may use one elevator only to find that a second is broken. It can be seriously burdensome to then ride the first elevator back to street level and proceed to a bus stop."). Indeed, the delay may be non-trivial because the passenger's additional travel time, either unnecessarily navigating around a working elevator or unknowingly navigating to an inoperative elevator, could be avoided by prompt and accurate outage notifications.

Plaintiffs allege that both (1) the time between the occurrence of an elevator outage and notification to Control Desk and (2) the time between notification to Control Desk and notification to the public are unreasonably long and cause non-trivial delays. Rachel Cohen, the MTA's Deputy Chief Accessibility Officer (Cohen Decl. ¶ 1), concedes that "[i]t is possible that there is some lag time" between the time an elevator goes out of service and the time the outage is reported on the MTA website. (Cohen Dep. at 174:18–23.)

It is eminently conceivable that the time between the occurrence of an elevator outage and the reporting of that outage to Control Desk is not insignificant. Such an unnecessary delay may be avoidable to some extent, as evidenced by the fact that Defendants actively seek to avoid it through the implementation of the LiftNet system. To the extent that the delay is avoidable, it is not trivial, thereby denying Plaintiffs meaningful access to the subway system. *See Brooklyn Ctr. for Indep. of the Disabled*, 11 F.4th at 62. Named Plaintiff Sasha Blair-Goldensohn testifies that despite checking the MTA's elevator status webpage before all planned subway trips, approximately twenty-five percent of the elevator outages he encounters "are never listed on the MTA website or mobile application either at the time I encounter them or retroactively." (Suppl. Decl. of Sasha Blair-Goldensohn ("Blair-Goldensohn Suppl. Decl."), ECF No. 259-12, ¶¶ 11–12.)

Similarly, Plaintiffs' expert David Rishel conducted a survey of elevator functionality throughout the subway system and found that approximately twenty-one percent of the elevator outages his surveyors encountered were not listed on the MTA's website.[11] (Expert Report of David R. Rishel, ECF No. 154-3, at 45.) Plaintiffs attribute these inaccuracies at least in part to alleged issues with LiftNet, noting that LiftNet may report inaccurate data due to component failures. (*See* Thompson Dep. at 109:3–14, 113:23–114:22); *see also Brooklyn Ctr. for Indep. of the Disabled*, 11 F.4th at 66 ("[P]laintiffs cite evidence of LiftNet deficiencies that could add delay.").) In the alternative, it may well be that some, or even many, of the unreported elevator outages Plaintiffs complain of are the reasonable result of the lag time that results from Control Desk's preliminary investigation of elevator outages. Yet this Court cannot, on this record, conclude that lag time resulting from Defendants' preliminary investigation is the sole reason for unreported outages. On the current record, it is also possible that there may be an *unnecessarily* long delay before Defendants receive report of an outage.

As to the time between notification to Control Desk and notification to the public, the parties disagree on the length of Control Desk's preliminary investigation of a malfunctioning elevator after it receives notification of the issue. The parties each cite testimony from Robert Thompson, who serves as Manager of Control Desk Operations in NYCT's Elevator and Escalator Division. (Thompson Decl. ¶ 1.) Defendants argue that this step takes "one or two minutes, if not fewer" (*id.* ¶ 14), while Plaintiffs point to deposition testimony from Thompson that, in the past, it has taken Control Desk over ten minutes to perform the preliminary investigation, but not more

---

[11] On September 6, 2023, Magistrate Judge Figueredo denied Defendants' motion to exclude Plaintiffs' experts in its entirety. (Op. & Order, ECF No. 293.) Defendants did not object.

than thirty minutes. (Dep. of Robert Thompson ("Thompson Dep."), ECF No. 259-22, at 176:2–23.)

It is unclear whether a delay of up to a half hour between when Defendants receive a report of an elevator outage and when the public is notified of a confirmed elevator outage is enough to deny Plaintiffs "meaningful access" to the subway system. A relatively brief notification delay caused by Control Desk's preliminary investigation of an elevator outage can be "reasonable," since "posting a notice of delay before the outage is confirmed (and confirmed to require repair) can disrupt a trip unnecessarily, or needlessly send a passenger to pursue alternatives." *Brooklyn Ctr. for Indep. of the Disabled*, 11 F.4th at 66; *see also* Thompson Decl. ¶ 15 ("After a preliminary investigation, the Control Desk may determine that the elevator is in fact operable. In those circumstances, no additional steps are necessary and no outage will be reported."). The ADA requires Defendants to provide prompt and accurate information. It does not require Defendants to sacrifice accuracy on the altar of speed, especially when any efficiency gains would be marginal at best. Moreover, it is unclear how Defendants could reduce (or avoid) the lag time between their receipt of an outage report and the public's notification of the outage.

Accordingly, Defendants have failed to carry their burden of showing an absence of a genuine dispute of material fact regarding the promptness and accuracy of their elevator outage notifications.[12]

---

[12] Plaintiffs argue that Defendants' automatically generated return-to-service time estimates for malfunctioning elevators are another dimension of the inadequacy and inaccuracy of Defendants' notification system. (*See* Pls.' 56.1 ¶ 22 ("In the event of an elevator outage, the elevator's estimated return-to-service time is posted to the MTA's website at the same time that the outage is posted, indicating that the return-to-service time is automatically generated and thus not meaningful.").) This is a red herring. Even if elevator outages last longer than anticipated and the return-to-service estimate is not well correlated with an elevator's actual return to service, the elevator outage itself remains posted on the MTA's website (and other MTA notification avenues). Accordingly, a rider who checks the elevator status website (or another MTA notification source) prior to a subway journey will be notified of the elevator outage and be able to redirect her journey in advance. Of course, a rider's awareness of a return-to-service estimate in

**B.    Comprehensiveness of Defendants' Notification System**

Defendants also point to the comprehensiveness of their notification system to argue that they provide Plaintiffs with meaningful access to the subway system, noting the multiple avenues the public can use to obtain elevator outage and rerouting information—including the MTA website, the MTA mobile application, in-station CIC screens, text message and email alerts, Plan a Trip navigation assistance, and AATI signs posted at each elevator.  (*See* Mem. at 17; Section I.C.1, *supra*.)  In effect, they contend that their multilayered notification system gives Plaintiffs meaningful access to the subway system by serving as a resource to passengers at various stages of their subway journeys, including by:  alerting them to an outage prior to heading to a station (via the elevator status webpage, mobile application, or text message and email alerts) or at a station (via CIC screens) so they can plan an alternate route if necessary (via Plan a Trip); providing alternate routing information on AATI signs at every elevator[13] so passengers receive alternate routing information to continue their journey if they encounter a malfunctioning elevator; and offering live assistance through the 511 customer assistance call line, Help Point intercoms, and in-station personnel.  (*See* Cohen Decl. ¶¶ 13–21 (describing the various sources of outage and alternate routing information available to passengers).)

Plaintiffs chafe at the notion that Defendants' notification system is comprehensive, noting that many, though not all, of Defendants' information sources require a cellular signal and internet

---

the first place means that she has *already* been notified of an elevator outage and therefore has even more reason to confirm the elevator's operating status before beginning her journey.  Awareness of the outage in advance allows the rider to avoid the delay that the outage would otherwise cause.  As a result, this Court cannot find that there is a non-trivial delay caused by allegedly inaccurate return-to-service estimates.

[13] Plaintiffs contend that AATI signs are "often confusing and unhelpful, and can direct customers to walk longer distances than they are able due to their disabilities . . . ."  (Opp'n at 5.)  This argument is off-base. AATI signs are not meant to provide individualized routing information, and to the extent that a passenger desires such individualized information, she can receive it within a subway station from Plan a Trip, in-station personnel, Help Point intercoms, and the 511 customer assistance call line.

connection, but "cellular and internet connectivity [are] available in only some parts of the subway system." (Opp'n at 20; *see also* Cohen Dep. at 107:2–20 (admitting that status notifications require internet and cellular connectivity).) Class member testimony corroborates this. (*See* Decl. of Arielle Rausin ("Rausin Decl."), ECF No. 259-3, ¶ 11 ("If I encounter an out-of-service elevator while I'm stuck underground, that is the worst situation, since I often don't have cell service and there may not be any MTA workers around to ask for rerouting directions.").) To fill in the gap, Plaintiffs argue that Defendants should take the "common-sense" step of announcing station elevator outages on board trains (Opp'n at 25), noting that Defendants "announce other service disruptions—both planned and unplanned—on board." (*Id.* at 6.) There is no on-board notification that an upcoming station is inaccessible because of a spontaneous elevator outage.[14]

Defendants have not met their burden of showing the absence of a genuine dispute of material fact regarding the reasonableness of on-board elevator outage announcements. Defendants claim that "it would be an enormous logistical challenge to advise train crews of unplanned or short-term outages in a way that would allow them to make announcements to customers onboard that are relevant, accurate, and timely and do so with their many other duties." (Reply at 9.) Rachel Cohen, the MTA's Deputy Chief Accessibility Officer, testifies that train crews "would need to be verbally provided with the exact script for each announcement, given the number of possible situations and alternative travel paths, and commit the script instantly to

---

[14] Plaintiffs claim that "[o]ther mass transit systems, such as the Washington D.C. Metro and the Boston T, make public address announcements of outages" (Opp'n at 6), but on the record before this Court, those systems do not make the kind of on-board announcements that Plaintiffs seek regarding *spontaneous* elevator outages. Carol P. Lopez, the Director of the Washington Metropolitan Area Transit Authority's Office of ADA Policy and Planning, describes outage announcements made *within stations*. (*See* Aff. of Carol P. Lopez, ECF No. 259-40, ¶ 9.) And Laura Brelsford, the Assistant General Manager overseeing the Massachusetts Bay Transportation Authority's Department of System-Wide Accessibility, testifies that "[f]or *planned/upcoming* outages, Motorpersons are required to make manual announcements regarding the outage at several key locations along the subway line in such a way that the customer has time to exit at an alternate location if needed." (Aff. of Laura Brelsford, ECF No. 259-41, ¶ 6.f (emphasis added).)

memory to recite it back to the customer." (Cohen Reply Decl. ¶ 18.) She also argues that the benefit of any on-board announcement to customers would be limited due to rider-specific circumstances and could create undue confusion. (*See id.* ¶ 17.)

Plaintiffs point to evidence that Defendants already make on-board announcements that contain "time-bound information," that is, information that train operators announce for only a portion of their shifts (*see* 2d Dep. of Rachel Cohen, ECF No. 310-3, at 76:18–77:25), and that there are on-board announcements that are conditional on operators' receipt of certain information during their shifts. (*See id.* 79:4–80:21.) Defendants do not articulate why on-board elevator announcements would be more difficult than other, current on-board announcements. At summary judgment, this Court cannot conclusively determine that time-limited elevator outage announcements would cause Defendants "undue hardship," *Wright*, 831 F.3d at 76, when Defendants already make other time-limited announcements that require operators to receive information during their shifts, as a spontaneous elevator outage announcement would.

Nor can this Court determine that the benefits of on-board outage announcements would be as marginal as Defendants claim. Although announcements would not, by definition, always provide customers with individually relevant information, an announcement that a particular elevator is out of service is not necessarily of "highly limited utility" (Reply at 9)—it could save a customer from a needless and avoidable delay in her trip by informing her to stay on the train, rather than exiting only to find a broken elevator and then needing to wait for the next train. (*See* Blair-Goldensohn Suppl. Decl. ¶ 13 ("It would be very helpful to have [elevator outage] information while on the train in particular because, in some instances, I could avoid disembarking and continue riding the train to the next accessible station without being forced to travel all the way to the mezzanine before discovering an outage.").) Moreover, there is no evidence that on-

board outage announcements would be "more confusing than useful" to riders (Cohen Reply Decl. ¶ 17), especially considering that Plaintiffs, who depend on elevators for subway access, would conceivably have more knowledge of elevator locations and nomenclature than the average rider.

Plaintiffs point to class member testimony to identify another alleged gap in Defendants' notification system: the lack of knowledgeable assistance provided by MTA personnel in stations, via Help Point intercoms, and on the 511 call line.[15] (*See* Dep. of Sasha Blair-Goldensohn, ECF No. 256-9, at 25:16–26:23 (describing "difficulty getting accurate, up-to-date [elevator status] information" from MTA employees); Rausin Decl. ¶ 10 ("No one ever answers the help button, but I always try."); Blair-Goldensohn Suppl. Decl. ¶ 10 (recalling instances where MTA station agents were unaware of elevator outages at their stations); Decl. of Bryanna Copeland ("Copeland Decl."), ECF No. 259-18, ¶¶ 10, 13 ("I attempted to call the MTA help line, but they were extremely rude and unwilling to help, and then hung up on me."); Decl. of April Coughlin, ECF No. 259-28, at 25:20–26:16 ("[O]ftentimes the station agents will not know what to do."). *But see* Copeland Decl. ¶ 11 (recounting an instance in which the station agent informed her of an elevator outage at the next station).) As an accommodation, Plaintiffs seek additional training for Defendants' employees so that they can provide "better assistance" to passengers during elevator outages. (Opp'n at 10.)

Defendants argue that Plaintiffs "give absolutely no detail as to what type of training is necessary, who would receive that training, or why the 'additional' training they propose is better

---

[15] Defendants take issue with Plaintiffs' reliance on "anecdotal evidence" to support their claims (*see* Mem. at 20–23), but their argument that Plaintiffs' claims "must be supported by statistical evidence" (*id.* at 20) misses the mark. The cases they cite (*see id.* at 20–21) speak of the necessity of statistical evidence to prove *disparate impact* claims, not failure-to-accommodate claims. Although Plaintiffs rely heavily on anecdotal evidence, this Court cannot exclude such testimony from its consideration entirely, particularly in light of the Second Circuit's reference to such evidence on appeal. *See Brooklyn Ctr. for Indep. of the Disabled*, 11 F.4th at 64.

28

or different than the training already provided." (Reply at 8 (internal citation omitted).)  While the additional training that Plaintiffs desire is lacking in specificity, Defendants likewise do not proffer evidence as to the current training and why additional training would cause them "undue hardship." *Wright*, 831 F.3d at 76.

As Plaintiffs' burden of suggesting a reasonable accommodation "is not a heavy one," *Borkowski*, 63 F.3d at 138 (citing *Gilbert v. Frank*, 949 F.2d 637, 642 (2d. Cir. 1991)), this Court cannot find that Defendants have carried their burden at summary judgment of showing the absence of a genuine dispute of material fact regarding the reasonableness of their provided accommodations.

## V.    CONCLUSION

Defendants' motion for summary judgment is DENIED, as genuine disputes of material fact regarding the reasonableness of Defendants' accommodations preclude the dismissal of any of Plaintiffs' claims.

The Clerk of Court is directed to close the motion at ECF No. 312.

Dated:  New York, New York
       August 29, 2024

SO ORDERED.

GEORGE B. DANIELS
United States District Judge